# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION AT MEMPHIS

| | |
|---|---|
| THEODORE J. ZALLER, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>FRED'S INC., MICHAEL K. BLOOM, WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA and GEORGE R. FAIRWEATHER,<br><br>　　　　　　　Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Theodore J. Zaller ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fred's Inc. ("Fred's" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Fred's securities between December 20, 2016 and June 28, 2017, both dates inclusive (the "Class Period"), against Fred's, Walgreens Boots Alliance, Inc. ("Walgreens" or "WBA"), and certain Fred's and Walgreens executive officers named herein (collectively, "Defendants"), seeking to recover damages caused by Defendants' dissemination of materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      On October 27, 2015, Rite Aid Corp. ("Rite Aid") and Walgreens jointly announced an Agreement and Plan of Merger (the "Original Merger Agreement") pursuant to which Walgreens would acquire Rite Aid for $9.00 per share in cash (the "Original Merger" and the "Original Merger Consideration"). To convince the investing public that it would receive Federal Trade Commission ("FTC") approval to complete the Original Merger, Walgreens and Rite Aid had entered into an agreement with Fred's to sell 865 Rite Aid stores for $950 million in an all-cash transaction in order to complete the Original Merger (the "Fred's Asset Purchase Agreement"). On January 30, 2017, Rite Aid and Walgreens announced that they had entered into a new merger agreement (the "Revised Merger Agreement"), which cut the proposed consideration for Rite Aid stockholders from $9.00 per share to between $6.50 to $7.00 per share (the "Revised Merger" and the "Reduced Merger Consideration").[1] On June 29, 2017, Rite Aid and Walgreens announced that they had terminated the Revised Merger Agreement.  Following

---

[1] The preliminary proxy statement related to the Revised Merger Agreement that Rite Aid filed with the SEC on Schedule 14A on March 3, 2017 (the "2017 Proxy").

the termination of the Revised Merger Agreement, Walgreens terminated the Fred's Pharmacy asset purchase agreement.

3.      Throughout the Class Period, Defendants made numerous materially false and misleading statements concerning the level of regulatory risk faced by the Original Merger and the Revised Merger which would ultimately cause the termination of the Fred's Asset Purchase Agreement. Specifically, Defendants made false and/or misleading statements: (i) downplaying or disputing contrary reports from journalists signaling regulatory turbulence in closing the merger; (ii) representing that inside knowledge of the FTC gave confidence that the deal would close.

4.      As discussed further below, Plaintiff hereby adopts and incorporates the allegations the Court found actionable from the Amended Complaint in *Hering v. Rite Aid Corp., et al.*, Case No. 1:15-cv-02440-JEJ (M.D. Pa.) (the "*Hering* Action"), attached hereto as Exhibit A as well as in *Douglas S. Chabot, et al. v. Walgreens Boots Alliance, Inc., et al.* Case No. 1:18-cv-2118-JEJ (M.D. Pa) (the "*Chabot* Action") attached hereto as Exhibit B.

5.      On July 11, 2018, the Court issued a ruling on Defendants' Motion to Dismiss in the *Hering* Action (the "Hering Opinion"), attached hereto as Exhibit C. In the Hering Opinion, the Court ruled:

> Starting October 20, 2016, the Walgreens Defendants began to express confidence that the deal would close and questioned newspaper reports of regulatory turbulence. With these statements, Plaintiff's allegations have more merit. At the time the statements were made, the end date for the original merger agreement already had been pushed back by three months. ***In one instance, in April 5, 2017, the statement of confidence was made even after the merger agreement had been revised. Furthermore, Walgreens alluded to their "inside knowledge" of the FTC's review and their close collaboration with the FTC as a basis for dismissing contradictory reports from journalists. The Walgreens Defendants also noted that their confidence in the deal closing had not changed since the beginning, despite the obvious effects of the FTC's concerns. Because the statements directly questioned contradictory reports and purportedly were based***

3

> *on non-public information from the FTC, we find that a reasonable investor could have been misled into thinking that the review process was progressing better than it was. At a time when approval of the transaction may have been legitimately in doubt, the Walgreens Defendants' statements alluded to secret knowledge that created a false sense of security. Therefore, with respect to these particular statements,4 we find that Plaintiff has satisfied the first element of a § 10(b) claim. Footnote 4: These include statements downplaying or disputing contrary reports from journalists that the review was not going well, made on October 20, 2016, and November 17, 2016, as well as statements expressing confidence based on "inside" knowledge of the review, made on October 20, 2016, November 17, 2016, January 5, 2017, and April 5, 2017.*

(Emphasis added.)

6.      Moreover, the Court also held that:

> These statements were made in close proximity to both the revision of the merger agreement and the ultimate decision to terminate the merger. Moreover, *the statements were made specifically to counteract reports that the merger may not be approved, making them more than mere statements of corporate optimism*.
>
> (Emphasis added.)

7.      On April 15, 2019, the Court issued a ruling on Defendants' Motion to Dismiss in the *Chabot* Action (the "Chabot Opinion"), attached hereto as Exhibit D. In the Chabot Opinion, the Court ruled:

> Thus, at this initial stage in the proceedings, we find that Plaintiffs' allegations support an inference of fraudulent intent that is at least as compelling as any competing inference. Defendants repeatedly insisted that the merger would pass regulatory review, while actively contradicting reports to the contrary. Moreover, Defendants continued to hold the line despite having to revise the Original Merger Agreement's terms and adjust the merger's timeline. Defendants refused to acknowledge that the merger was rapidly becoming less probable. And in the end, the merger was terminated, which was the logical consequence of its downward trajectory.
>
> Plaintiffs also have made factual allegations suggesting Defendants knew or should have known of the merger's looming failure. Significantly, Plaintiffs allege that the FTC itself notified Defendants that approval was unlikely. Given what Defendants knew or should have known, we must again conclude that Defendants were at least reckless with respect to their

actionable statements. Thus, Plaintiffs have plead a strong inference of scienter for purposes of the PSLRA and dismissal is inappropriate.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district.

11.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.      Plaintiff Theodore J. Zaller purchased Fred's common stock during the Class Period, as described in the Certification attached hereto and incorporated herein by reference, and thereby suffered damages caused by Defendants' actions alleged herein.

### *The Fred's Defendants*

13.     Defendant Fred's Inc. operates approximately 550 discount value stores and its mission is to make it easy and exciting to save money. Its unique format offers customers a full range of value-priced everyday items, along with terrific deals on closeout merchandise throughout the store.

14.     Defendant Michael K. Bloom ("Bloom") was at all relevant times the Company's Chief Executive Officer ("CEO") and on March 7, 2017, Bloom was appointed as a Director and resigned from his post effective on April 24, 2018.  By virtue of his position as the Company's most senior executive officer, Defendant Bloom had the authority and ability to correct any false or misleading statements made about the Company's business, operations or prospects, and ultimate control over the contents of the information provided to investors and the market on the Company's behalf.

### *The Walgreens Defendants*

15.     Defendant Walgreens is a Delaware corporation with its corporate headquarters located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreens is a global pharmacy-led health and well-being enterprise that was created through the combination of Walgreens and Alliance Boots in December 2014. Walgreen's stock is publicly traded on the NASDAQ Exchange under the ticker symbol "WBA."

16.     Defendant Stefano Pessina ("Pessina") is, and at all relevant times was, the CEO and Executive Vice Chairman of Walgreens. Pessina participated on Walgreens' earnings calls and, by virtue of his position as the company's most senior executive officer, had the authority and ability to correct any false or misleading statements made about the company's business,

6

operations or prospects, and ultimate control over the contents of the information provided to investors and the market on the company's behalf.

17.     Defendant George R. Fairweather ("Fairweather") is, and at all relevant times was, the Executive Vice President and Global CFO of Walgreens.

18.     The Defendants named in ¶¶16-17, above, are at times collectively referred to herein as the "Walgreens Individual Defendants," and collectively with Defendant Bloom, the "Individual Defendants".

19.     The Individual Defendants are liable for the false and misleading statements pleaded herein because, through their positions as senior executives of Fred's or Walgreens, possessed the power and ultimate authority to control the contents of these companies' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions within Fred's or Walgreens, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

### Background and Chronology of the Failed Walgreens and Rite Aid Mergers

20.     Rite Aid is a Delaware corporation with its corporate headquarters located at 30 Hunter Lane, Camp Hill, Pennsylvania 17011. Rite Aid is a retail drugstore chain that sells prescription drugs and a range of other merchandise referred to as "front-end products." Rite

Aid's stock is publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "RAD." Walgreens is a global pharmacy-led health and well-being enterprise created through a combination of Walgreens and Alliance Boots in December 2014.

21.     The full extent of the antitrust risk inherent in the Original Merger was known only to Defendants who, as detailed below, continuously misled investors regarding those facts and the likelihood that the Original Merger would receive regulatory approval as then-constituted under the Original Merger Agreement, as well as the detriment that would result in the event the Original Merger was not approved.

22.     As in all mergers that require a remedy, the Federal Trade Commission ("FTC") Staff typically analyzes whether the proposed transaction will have anticompetitive effects in violation of Section 7 of the Clayton Act.[2] Once the FTC Staff determines that anticompetitive effects are likely, it will discuss with the parties its findings. Typically, the parties then propose an acceptable remedy that will maintain or restore competition in the markets affected by the proposed transaction.

23.     In this case, Walgreens proposed the divestiture of certain Rite Aid stores as a cure to maintain or restore competition in certain areas. In connection with a proposed divestiture, the FTC Staff typically assesses whether the proposed buyer is able to maintain or restore competition in the relevant market after acquiring the divested assets. The FTC Staff evaluates a proposed buyer to determine whether it has (1) the financial capability and incentives to acquire and operate the assets, and (2) the competitive ability to maintain or restore competition in the market.

---

[2] Section 7 of the Clayton Act prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly."

24.     Walgreens allowed access to a virtual data site containing extensive due diligence information about a package of divestiture assets being offered to potential purchasers. Access to the data room was given to eighteen (18) potential purchasers along with a bid process letter requiring bids to be submitted by September 26, 2016.  Following the receipt of bids from various potential purchasers, based upon a variety of factors, including, among other things, the willingness and ability of each potential purchaser to purchase all of the divestiture assets being offered and the perceived likelihood that each potential purchaser would be deemed an acceptable purchaser of the divestiture assets by the FTC, Walgreens determined to pursue more intensive discussions and negotiations with three potential purchasers, Party J, Party K and Fred's.

25.     According to the 2017 Proxy, in early November 2016, Fred's met with, and made presentations to, the FTC Staff regarding its suitability as a potential purchaser of the divestiture assets and its plans to transition full operation of the divestiture assets from Rite Aid. Based on a variety of factors, including, among other things, the willingness and ability of Fred's to purchase all of the divestiture assets being offered and the perceived likelihood it would be deemed an acceptable purchaser of the divestiture assets by the FTC, Walgreens determined to focus its efforts in connection with the divestiture on negotiations with Fred's.

26.     Throughout the remainder of November and early December 2016, additional meetings and negotiations occurred between Walgreens and Fred's and their respective advisors.

27.     On December 19, 2016, Rite Aid, Walgreens, and Fred's entered into the Fred's Asset Purchase Agreement. Pursuant to the terms and subject to the conditions set forth in the Fred's Asset Purchase Agreement, AFAE, LLC, a subsidiary of Fred's, would purchase from Rite Aid 865 stores and certain specified related assets for a purchase price of $950 million plus

the assumption of certain liabilities of Rite Aid and its affiliates. If the FTC requires divestiture of more than the 865 Rite Aid stores contemplated by the original asset purchase agreement and Walgreens agrees to sell such stores, the Fred's Asset Purchase Agreement required Fred's to purchase such additional stores. The Fred's Asset Purchase Agreement was conditioned on FTC approval, the approval and completion of Rite Aid's pending merger with Walgreens and other customary closing conditions.

28.     During January 2017, on several occasions members of the Rite Aid and Walgreens management teams discussed the FTC review process and ways in which the parties might propose to revise certain aspects of Fred's business plan and propose potential changes to the Fred's Asset Purchase Agreement to address the questions raised by the FTC Staff in their review of Fred's and to increase the likelihood of obtaining FTC approval of the transaction.

29.     On January 29, 2017, Walgreens and Rite Aid entered the Revised Merger Agreement, the merger consideration to be paid to Rite Aid shareholders would drop from $9.00 per share to $7.00 if Walgreens were required to divest up to 1,000 stores.

30.     Then, on June 29, 2017, Defendants stunned the market once again with the announcement that both the Revised Merger Agreement and the Fred's Asset Purchase Agreement had been terminated.

**Background of Statements Regarding the Mergers
Ruled Non-Actionable in the Heron Opinion's July 11, 2018 Order**

31.     On September 8, 2016, Walgreens issued a press release providing an update on the Original Merger. The release stated that Walgreens was actively engaged with the FTC and that as a result of "progress of these discussions with the FTC staff" it was "exploring potential divestiture remedies." The release continued that "[i]n order to expedite that process, . . . the most likely outcome will be that the parties will be required to divest more than the 500 stores

previously communicated, but still continues to expect that fewer than 1,000 stores will be required to be divested." Lastly, the release noted that, "the company continues to believe that the acquisition will close in the second half of calendar 2016." Thus, Walgreens led investors and the market to believe that the Original Merger was close to closing within the parameters set forth in the Original Merger Agreement.

32.    On November 8, 2016, Walgreens presented at the Credit Suisse Healthcare Conference. In his prepared remarks, Defendant Pessina rejected any notion that the Original Merger had encountered regulatory turbulence based on his insider knowledge purportedly obtained during the review process:

> And if we can add something, everybody we have seen today and in the last days is asking about Rite Aid and about – we have a different opinion than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of.
>
> So, just to reassure you, if we say that we are confident, it is because what we know makes us very confident. I don't believe that there is any technical reason why this deal should not go through. Of course, everything is possible politically.
>
> But, until now, we have seen a careful, diligent, but absolutely not hostile attitude of the FTC. And we are collaborating. We are presenting our barriers. And I believe that so far, so good. And we continue to be very positive in spite of the opinion of certain people who apparently are not particularly well informed.

33.    On November 15, 2016, Walgreens participated in the Morgan Stanley Consumer Conference where Alex Gourlay (Walgreens' Co-Chief Operating Officer) was asked if he had any further updates regarding Rite Aid. Once again, Mr. Gourlay rebutted any notion that the Original Merger had generated any regulatory concern and reiterated that his confidence was as strong as it was on "day one" when the transaction was announced:

> No, the process continues, the process has never stopped. It's a process that clearly has taken longer than we had anticipated. We happened to sell potentially to a few more pharmacies than we anticipated. We have buyers. When I say we have buyers, not a buyer, we have buyers. We believe these buyers – we believe

strongly these buyers meet the criteria the SEC have laid down. And the process continues and we've given an update saying that we expect to give more information on the deal in the early part of next year and we stick by that. So we don't recognize what's written in the press, to be honest. We don't recognize the names or the people talking about it. So we don't know what that's being said. We remain, as we did from day one, confident about [doing] strategic deal for us. The Rite Aid board clearly believes it's a good deal for them and we believe we will get it done.

34.   On November 17, 2016, Walgreens presented at the Jefferies Healthcare Conference. During the conference, Defendant Fairweather reiterated that "nothing really has changed" regarding the Original Merger and that he was "very clear" that the deal would pass regulatory review within the divestiture cap:

> We are very clear – from what we said in September, we expect the deal to complete. We have been absolutely consistent on that from day one when we announced it. As we said back in September and reinforced in our results, we do expect the store divestitures to now be in the range of 500 to 1000.
>
> We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction in the first quarter, so it is – sorry, early in the new year, in the calendar year.
>
> So other than really from where we are a year ago, it is a few more divestitures than we had originally anticipated but within what we had in the contract, and it has just taken us a little bit longer than – ideally we would have hoped to work through with the FTC when we work in a very collaborative manner (inaudible).
>
> But, fundamentally, the economics of the deal are the same. We still expect to be able to deliver the $1 billion of tangible, measurable cost synergies in a 3- to 4-year period. The benefits are from the front end; all these other things, ***nothing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place. There's lots of stuff in the papers but it is amazing where it comes from.***

35.   Gerald Gradwell ("Gradwell"), Walgreens' Senior Vice President, bolstered Fairweather's remarks by stating that they had "clarity" on the issue derived from the companies' extensive due diligence, merger-related expertise and discussions with FTC personnel:

> But I think – ***just to be clear on where we are in the process and we have spoken about this – I mean we have enough clarity on what we have to do in terms of***

12

*remedies with the FTC to be – to have opened the data room for sale of pharmacies to potential buyers.*

Everyone I know – there was large speculation in the marketplace that we would never find buyers. We are not entirely that green when it comes to doing transactions. We went into this in the knowledge that the Walgreens management team had looked at Rite Aid in many different ways and had not been able to justify the deal for a variety of reasons.

And so we went into it having assessed initially that we would be able to find buyers and that those interested in the marketplace to buy stores we may have to divest. That remains the case. We have been in ongoing discussion with the FTC.

(Emphasis added.)

36.     Defendant Pessina, as Walgreens' highest ranking officer, had the authority and ability to correct any false or misleading statements made about the company's business, operations or prospects, and ultimate control over the contents of the information provided to investors and the market on the company's behalf, but he failed to issue corrections to Mr. Gradwell's materially false and misleading statements.

**Materially False and Misleading
<u>Statements Issued During the Class Period</u>**

37.     Throughout the Class Period, Defendants issued a series of materially false and misleading statements regarding the likelihood that the Original Merger and, later, the Revised Merger would receive regulatory approval as then constituted, as well as the detriment that would result in the event either deal was not approved. The actionable, materially misleading statements (which are identical to the statements found actionable and materially misleading in the Hering Opinion), are identified in bold, italic type ¶¶ 41, 44-45 below.

38.     The Class Period begins on December 20, 2016. On that day, Rite Aid and Walgreens issued a joint press release announcing that they had entered into an agreement with Fred's to sell 865 Rite Aid stores for $950 million in an all-cash transaction in order to complete

the Original Merger. The release stated that the "agreement is being entered into to respond to concerns identified by the FTC in its review of the proposed acquisition of Rite Aid by Walgreens . . . , which was announced in October 2015." The release further stated that Walgreens was "actively engaged in discussions with the FTC regarding the transaction and is working toward a close of the Rite Aid acquisition in early calendar 2017," which, if accomplished, would have completed the deal within the extended timeframe and divestiture cap under the Original Merger Agreement. The release quoted Defendant Pessina as stating: "With this agreement, we are moving ahead with important work necessary to obtain approval of our acquisition of Rite Aid." The market understood Defendant Pessina's comments to indicate that the extended timeframe and announced divestitures meant the Original Merger was close to receiving the necessary regulatory approvals.  As a result, Fred's would purchase approximately 865 stores and certain assets related to store operations located across the eastern and western United States for $950 million in cash.

39.     On or about the same day, Fred's announced over the *Business Wire* the following:

Fred's Pharmacy Agrees to Acquire 865 Rite Aid Stores

Purchase Would Create Third-Largest U.S. Drug Store Chain and Support Healthcare Growth Strategy

MEMPHIS, Tenn.--(BUSINESS WIRE)--December 20, 2016--Fred's Inc. ("Fred's Pharmacy" or "the Company") (NASDAQ: FRED) today announced that the Company has signed an agreement with Walgreens Boots Alliance, Inc. (NASDAQ: WBA) and Rite Aid Corporation (NYSE: RAD) to purchase 865 stores and certain assets related to store operations located across the eastern and western United States for $950 million in cash. Closing of the transaction is expected to take several months after Walgreens Boots Alliance's proposed acquisition of Rite Aid is completed and is subject to approval by the Federal Trade Commission as well as customary regulatory approvals and closing conditions. Shareholder approval is not required. The transaction, if approved, is targeted to close during the first half of 2017 and will position Fred's Pharmacy as

the third-largest drugstore chain in the United States and create a new national competitor. In connection with this transaction, the Company has received financing commitments to fund the purchase price, transaction-related costs, ongoing business operations and anticipated capital investments.

Fred's Pharmacy Chief Executive Officer Michael K. Bloom, commented, ***"This will be a transformative event for Fred's Pharmacy that will accelerate our healthcare growth strategy through our acquisition of 865 new stores located in highly attractive markets. We believe that this transaction will also create tremendous opportunities for both our new and existing front of store and pharmacy team members. We look forward to realizing the considerable benefits this transaction will bring to our customers, patients, payors, supplier partners, team members and shareholders."***

Bloom continued, "We have been working for several months on integration plans to ensure a seamless transition for Rite Aid customers, patients, team members and supplier partners by leveraging our world-class senior leadership team's significant expertise in managing major healthcare acquisitions and integrations. We assembled this highly experienced team in 2015, implemented upgrades to our infrastructure in 2016, and now, in 2017, we look forward to the continued optimization of our business, fueled by today's milestone announcement. We believe the purchase of these stores will not only complement recent investments in our team members, processes, and technological infrastructure, but also positively impact our business and maximize shareholder value."

In aggregate, the 865 stores are generally representative of Rite Aid's pre-divesture store performance with respect to both sales and EBITDA. Fred's Pharmacy expects that the acquired stores would be accretive to earnings and generate substantial cash flow.

Fred's Pharmacy will continue to employ, contingent on consummation of the transaction, store and certain field and regional team members related to the operations of the acquired stores. Upon completion of the acquisition, the Company will operate the acquired stores and will retain the Rite Aid banner through a 24-month transition.

A.T. Kearney served as a strategic advisor to the CEO and Board of Directors and provided financial and operational diligence related to the transaction. BofA Merrill Lynch and Regions Bank have committed to provide financing to Fred's Pharmacy. Peter J. Solomon Company, LLC provided a fairness opinion to the Board of Directors of the Company in connection with the transaction.

40.     On January 5, 2017, Walgreens held an earnings call for its first fiscal quarter of

2017. Defendant Fairweather began his prepared remarks by stating: "We continue to make good

progress towards completing our Rite Aid transaction, and today we have raised the lower end of our adjusted earnings per share guidance for FY17." He later added: "So turning now to our pending acquisition of Rite Aid. As you'll see from today's earnings press release, we are actively engaged in discussions with the FTC, and are still working towards a close of the acquisition in the early part of this calendar year, having announced the Fred's agreement on December 20, 2016." He also reaffirmed 2017 fiscal guidance that included Rite Aid accretion of $0.05 to $0.12 adjusted diluted net earnings per share for the year.

41.     Defendant Pessina followed up by highlighting "the progress we have announced at the end of December, regarding the proposed transaction with Rite Aid, in having reached a conditional agreement with Fred's." He continued that the FTC review process, while slow, allowed him to "remain as convinced as ever of the strategic benefits of the proposed Rite Aid transaction." He then added: "We are clearly making progress, and while I would always like to move faster and do more, we must be measured and ensure we work at a pace with which *we are confident we can deliver for our customers and our shareholders, on all the plans and strategies we have discussed with you*." When asked if Walgreens had a "Plan B" in the event the Original Merger was not approved, Defendant Pessina said the company did not, and that:

> [W]e don't want even to think of the fact that this could not be approved after so many months, when we have given a lot of information, and *we have had a very good relationship with the people of the FTC . . . . So we are not thinking of a Plan B today*.

42.     Shortly after these statements, on January 30, 2017, Rite Aid and Walgreens announced that they had terminated the Original Merger Agreements and entered into the Revised Merger Agreement, slashing the Original Merger Consideration to be paid to Rite Aid shareholders from $9.00 per share to between $7.00 and $6.50 per share, depending on the

16

number of Rite Aid stores that Walgreens would need to divest to satisfy antitrust regulators, and that they extended the merger deadline, yet again, to July 31, 2017.

43.     On or about the same day, Fred's commented on the extension of the Merger by stating the following:

Fred's Pharmacy Comments on Extension to Merger Agreement

MEMPHIS, Tenn.--(BUSINESS WIRE)--January 30, 2017--Fred's Inc. ("Fred's Pharmacy" or the "Company") (NASDAQ:FRED) today issued the following statement regarding the agreement between Walgreens Boots Alliance, Inc. (NASDAQ:WBA) and Rite Aid Corporation (NYSE:RAD) under which Walgreens and Rite Aid have entered into an amendment and extension of their previously announced definitive merger agreement:

> Fred's Pharmacy affirms that the asset purchase agreement it entered into on December 19, 2016 with Walgreens and Rite Aid remains in effect. As previously disclosed, to the extent the Federal Trade Commission ("FTC") requests that additional stores be sold, and Walgreens agrees to sell such stores, Fred's Pharmacy has agreed to buy those stores. ***The amendment and extension of the Walgreens-Rite Aid merger agreement reinforces the Company's confidence that the transaction is in the mutual best interest of Fred's Pharmacy and all of its shareholders. Fred's Pharmacy continues to work with the FTC, Rite Aid and Walgreens to complete the transaction, and looks forward to realizing the considerable benefits the transaction will bring to customers, patients, payors, supplier partners, team members and shareholders.***

> ***(Emphasis Added)***

44.     On April 5, 2017, Walgreens held an earnings call for its second fiscal quarter of 2017. In his prepared remarks, Defendant Pessina touted Walgreens' announcement of a $1 billion share repurchase program that became available as a result of the Revised Merger, which would return value to Walgreens shareholders "without undermining our intention to [profitably] deleverage the company ***following the closing of the proposed Rite Aid acquisition***." Defendant Pessina added: "I am still optimistic that we will bring this deal to a successful conclusion" and that "[w]e believe that we can [certify compliance] in the coming weeks[.]" He concluded by

reassuring investors that the Revised Merger Agreement would be more likely to satisfy regulators:

> *The changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval.*

45.     When asked by an analyst, "[W]here exactly aren't you and the FTC seeing eye to eye?," Defendant Pessina responded:

> *"I am still positive on this deal. I believe that we have a strong argument for – to defend this deal"* and added that *"We are collaborating very well with the FTC. And as I said, we are preparing our facts to be ready to certify compliance, if we will decide to do so."*

46.     On April 6, 2017, Fred's held a conference call.  In the conference call, Defendant Bloom stated the following:

> The fourth quarter was highlighted by a transformational event for our Company. The announcement of the pending acquisition of 865 Rite Aid stores, which would make Fred's the third largest drugstore chain in the nation and transform the largest regional pharmacy player into a true national competitor. *Fred's Pharmacy is working collaboratively with Walgreens Boots Alliance, Rite Aid, and the Federal Trade Commission to help obtain the FTC's approval of Walgreens Boots Alliance's pending acquisition of Rite Aid and the divestiture of certain Rite Aid assets to Fred's Pharmacy.*
>
> Fred's Pharmacy remains committed to purchasing additional assets, including up to 1,200 Rite Aid stores to the extent necessary to obtain the FTC's approval of the transaction. Completion of the transaction is subject to approval by the FTC as well as other customary regulatory approvals and closing conditions. We expect that acquiring the Rite Aid stores in these highly attractive markets will further accelerate our healthcare growth strategy and result in a company with enhanced scale and size that combined will be more competitive and create tremendous opportunities for our customers and team members.
>
> We know we have work ahead of us. *Fred's has lacked investment and process improvement for a very long time. That said, we are pleased with the progress we are making against our strategic plan and are focused on doing what needs to be done to have our financial results match our operational successes.*

47.     On June 6, 2017, Fred's held a conference call.  In the conference call, Defendant

Bloom stated the following:

> We saw substantial momentum in our retail and specialty pharmacy businesses
> during May, including total comparable store sales increasing 80 basis points
> compared with the prior year. While, we are laser focused on the core Fred's, **we
> continue to work collaboratively with Walgreens, Rite Aid and the Federal
> Trade Commission to obtain the FTC's approval of the divestiture of certain
> Rite Aid assets to Fred's Pharmacy in connection with Walgreens pending
> acquisition of Rite Aid.**
>
> As we have previously disclosed, Fred's Pharmacy remains committed to
> purchasing additional assets including up to 1,200 Rite Aid stores to the extent
> necessary to obtain the FTC's approval of the transaction. Completion of the
> transaction is subject to approval by the FTC, as well as other customary
> regulatory approvals and closing conditions. **We remain optimistic in our ability
> to receive FTC approval and we expect that acquiring the Rite Aid stores in
> these highly attractive markets will further accelerate our healthcare growth
> strategy.**
>
> We also made great progress with our Board reconstitution during the quarter
> with five new highly qualified directors joining the Board. The five new directors
> are Tim Barton, Pete Bocian, Chris Bodine, Linda Longo-Kazanova and Steve
> Rossi. We have already begun to leverage many of the directors' unique
> experiences and skill sets to help guide the Fred's Pharmacy transformation.
> We're also excited by the opportunity for these directors to contribute to our
> planning process with the integration of the Rite Aid assets, as well as the core
> Fred's business. Each brings a unique background in specific areas such as
> finance, human resources, technology, integration, supply chain, Retail Pharmacy,
> specialty pharmacy and healthcare services that will contribute to this important
> process as we transform Fred's Pharmacy. I cannot stress enough the role the
> refreshed Board is playing in our ongoing transformation and will play in the
> forthcoming integration of the divested stores from the Rite Aid transaction. We
> look forward to executing sour growth plan and delivering value for all of Fred's
> Pharmacy shareholders.

48.     The statements in bold, italicized type ¶¶38-41, 43-47 above were materially false

and misleading because Defendants did not subjectively believe them to be true, and Defendants

failed to disclose the following adverse facts that were known to Defendants or recklessly

disregarded by them:

(a)     Far from presenting no "regulatory concern," the FTC had informed Defendants that the Original Merger was unlikely to garner regulatory approval as then-constituted because of the significant market overlap between Rite Aid and Walgreens stores. In fact, as a result of prior discussions with the FTC, Rite Aid's legal advisors had already concluded by January 6, 2017 that "the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date" in light of the "increasing likelihood that the merger would not be consummated by the January 27, 2017 end date." And by that point (January 6, 2017), the FTC had already subpoenaed members of Fred's management and sent document requests regarding the potential divestiture. Yet, one day prior (January 5, 2017), with access to the same underlying facts and information, Walgreens executives stated the opposite;

(b)     Defendants did not possess "clarity" from their non-public discussions with FTC regulators that the deal would be approved, but, rather, FTC officials had expressed concern that the planned divestitures did not go far enough to preserve competition in the pharmaceutical marketplace;

(c)     The delay in the regulatory review process and FTC requests for additional information were not simply routine and inconsequential as Defendants had represented, but, instead, indicated to Defendants that the FTC had significant concerns about the deal and was unlikely to approve it;

(d)     The FTC Staff indicated to Defendants that Fred's did not have (1) the financial capability and incentives to acquire and operate the assets, and (2) the competitive ability to maintain or restore competition in the market; and

(e)     Fred's wouldn't (1) purchase the Rite Aid stores and certain assets related to store operations located across the eastern and western United States pursuant to the Fred's Asset Purchase Agreement, and (2) realize the considerable benefits this transaction would bring to its customers, patients, payors, supplier partners, team members and shareholders.

## Fred's Artificially Inflated Stock Price
## <u>Tumbles as the Truth is Finally Revealed to the Market</u>

49.     On January 20, 2017 – ***barely two weeks*** after Defendants had stressed their "confidence," based on purported insider knowledge and conversations with regulators, that the deal would be approved by the FTC as structured – *Bloomberg* reported in an article entitled, "Walgreens Faces U.S. Antitrust Concerns Over Rite Aid Fix," that the FTC was, in fact, unlikely to approve the deal. The article relayed the concerns of FTC officials that "Walgreens's proposal to sell 865 drugstores . . . doesn't go far enough to preserve competition that would be lost in the tie-up." The article noted that the revelation ran sharply counter to investor expectations. On this news, the price Fred's stock fell $0.55 per share, and continued to decline on unusually high volume.

50.     Ten days later, on January 30, 2017, Rite Aid and Walgreens announced that the Rite Aid Board had agreed to slash the Original Merger Consideration to be paid to Rite Aid shareholders from $9.00 per share to between $7.00 and $6.50 per share, depending on the number of Rite Aid stores that Walgreens would need to divest to satisfy antitrust regulators and that they extended the merger deadline, yet again, to July 31, 2017.

51.     Then, on June 29, 2017, once again the market was stunned by the announcement of the termination of the merger between Walgreens and Rite Aid, and the Fred's Pharmacy asset

purchase agreement with Walgreens and Rite Aid. Fred's received $25 million as reimbursement for expenses associated with the terminated transaction.

52.     On this news, Fred's stock price dropped $2.78 per share or over 22.8% from $12.20 per share to close at $9.41 per share on June 29, 2017. The Company's stock price would continue to fall over the following months, closing at $6.60 per share on September 27, 2017.

### Fred's Stock Price Was Artificially Inflated During the Class Period

53.     As a result of Defendants' materially false and misleading statements alleged herein, Fred's stock traded at artificially inflated prices during the Class Period. On December 19, 2016, the last trading day prior to the joint press release announcing that they had entered into an agreement with Fred's to sell 865 Rite Aid stores for $950 million in an all-cash transaction in order to complete the Original Merger, Fred's stock closed at $11.15 per share. Defendants' false and misleading statements downplaying the antitrust risks inherent in the Original Merger and the announcement of the agreement with Fred's, sent Fred's stock price skyrocketing on December 20, 2016 to close at $20.19 per share on trading volume in excess of 29 million shares, compared to a trading volume of 264,000 shares, a day earlier.  After the truth underlying Defendants' false and misleading statements was revealed to the market, the price of Fred's stock declined by over 50% from its Class Period high.

54.     Fred's stock traded at artificially inflated levels based on the market's expectation that the Original Merger would close on schedule and under the terms of the Original Merger Agreement. The market's misperception was fueled by Defendants' repeated materially false and misleading statements that the both the Mergers and asset purchase agreements bore little antitrust risk and would close on schedule. As further described herein, these inflated trading

levels existed far above the price at which Fred's stock would have traded if the market knew the truth that the deal was in serious antitrust jeopardy.

### Post-Class Period Statements Further Demonstrate
### That Defendants' Class Period Statements Were False and Misleading

55.     On June 29, 2017, Walgreens held an earnings call for analysts and investors concerning its third fiscal quarter of 2017. When asked about the regulatory review process for the Asset Purchase Agreement under which Walgreens would acquire 2,186 Rite Aid stores, Defendants' response was noticeably different. For example, after pointing out that "the stores you're trying to buy do still seem to have a decent amount of overlap with existing Walgreens stores, at least on a state-by-state basis," a securities analyst from BofA Merrill Lynch asked: "Should we assume that the new plan takes into account feedback from the FTC such that you're highly confident in a shorter FTC review for the new asset purchase? Or could this still be a battle with the FTC even for the new plan?" Unlike in previous calls where Defendants were eager to share their "clarity" based on insider knowledge, Gradwell diverted the question to Walgreens' General Counsel, Marco Patrick Anthony Pagni ("Pagni"): "We actually have (inaudible) our Counsel, internal General Counsel here, who might answer that. Marco?" Pagni provided the answer Defendants should have offered throughout the Class Period: "I wouldn't care to express any level of confidence one way or another as to how the transaction will proceed." Another analyst later asked:

> I understand what you're saying in terms that this is more of a simple asset deal.
> But if I must – you're giving them an option to buy generic drugs through
> WBAD, and it looks like from the Rite Aid slides for a period of 10 years. Can
> you talk about how the FTC might view that kind of more strategic alliance on the
> purchasing side? And do you think that perhaps presents a different kind of
> hindrance?

56.     This time, it was Defendant Pessina who diverted the question to Pagni: "Marco?"

Pagni, again, refused to comment on the FTC's views:

> We're not able to comment on how the FTC may or may not see any particular
> facet of this transaction. But I would say is that it's important that the Rite Aid,
> going forward, be competitive in the market. And clearly, it's an option to join our
> procurement vehicle, WBAD, will help it with its cost of goods going forward,
> which we believe is important for its competitive position in the market. And I
> express no view as to how the FTC will see that, but one could imagine that, that
> might be important for them.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

purchased or otherwise acquired Fred's securities between December 20, 2016 and June 28,

2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are

Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in

which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Fred's common shares actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class. Millions of Fred's common stock were

traded publicly during the Class Period on the NASDAQ. Record owners and other members of

the Class may be identified from records maintained by Fred's or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Fred's; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members I impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

63.     The market for Fred's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Fred's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Fred's securities relying upon the integrity of the market price of the Company's securities and market information relating to Fred's, and have been damaged thereby.

64.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Fred's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Fred's business, operations, and prospects as alleged herein.

65.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fred's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted

26

in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

66.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted material information concerning Fred's business and prospects and engaged in a scheme to deceive the market. By artificially inflating and manipulating the price of Fred's stock, Defendants deceived Plaintiff and the Class (as defined herein) and caused them losses when the truth was revealed. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, this caused Fred's stock price to fall precipitously as the prior artificial inflation came out of the stock price, including following the January 20, 2017, and June 29, 2017 disclosures. As a result of their purchases of Fred's stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

67.     As alleged herein, Defendants acted with scienter in making false and misleading statements during the Class Period in that Defendants had a motive and opportunity to commit fraud, and Defendants also had actual knowledge that their Class Period statements were false and misleading and/or were reckless in making statements that were likely to mislead investors.

68.     The Walgreens Defendants misled investors to gain shareholder approval of the Original and Revised Merger Agreements and continued to mislead investors in order to rebut criticism of the deal's viability, which threatened to tarnish Pessina's strong deal-making reputation.

69.     The Fred's Defendants misled investors to gain approval of the credit agreements etc. and to receive additional financing.  Moreover, it sought to mislead investors since it sought to fight Alden Global Capital LLC, ("Alden"), a holder of nearly 25% of the outstanding Fred's common stock.   Specifically, on March 8, 2017, Alden responded to Fred's announced appointment of new directors, Christopher W. Bodine and Peter J. Bocian, and CEO Michael K. Bloom, to the Company's Board of Directors (the "Board"). Alden also expressed its concerns with the Company's unacceptable operating performance, unwarranted dilutive equity issuance to A.T. Kearney and the Board's failure to provide proper oversight of management.

70.     On March 8, 2017, during the Class Period, Alden issued a press release that stated in pertinent part the following:

Heath Freeman, President of Alden, issued the following statement:

"For more than two months, we have attempted to work cooperatively and privately with Fred's to reconstitute the Board in a manner that we believe is in the best interests of shareholders. We have remained patient and respectful of the Company's heightened sensitivity around any public communications during the pendency of the deal with Rite Aid Corporation ("Rite Aid"). We are deeply frustrated by the Board's decision to reconstitute the Board with new candidates, including CEO Michael Bloom, rather than work in good faith with its largest shareholder to reach an agreement around Board composition.  It is quite clear that these changes were only made in reaction to our involvement and were crafted in such a manner to give the appearance that the Board is acting reasonably, while really seeking to protect the destructive status quo.

We think it is telling that the Board did not proactively seek to refresh the Board on its own, but rather only as a way to diffuse our efforts to work cooperatively to enhance the Board with directors committed to serving shareholders' best interests.  Importantly, these reactionary changes do not go far enough to address the significant issues facing the Company and, in our view, are transparent attempts by the Company to create the illusion of change to appease shareholders. Fred's latest maneuver only reinforces our belief that this Board cannot be trusted and that shareholder representation on the Board is immediately required to ensure that the Company's cost structure resets in advance of any transaction and that the transaction with Rite Aid is properly managed. Fred's abysmal business decision-making and country club environment in the executive suite and boardroom are serving as significant obstacles to maximizing shareholder value.

The Board's delay tactics during our discussions and adoption of a poison pill and defensive Bylaws just four days after public disclosure of our ownership stake in Fred's demonstrate their intention to further retreat inward from the alarming reality at Fred's core business.

Unfortunately, these entrenchment-minded actions are just the tip of the iceberg of the corporate governance problems plaguing Fred's. We were appalled to learn the Company had issued 490,074 Class A Voting shares to A.T. Kearney, putting a significant amount of voting stock in the hands of the Company's own advisors. This action was irresponsible and unnecessary when the Company has the capacity to pay in cash. This harmful action taken at the expense of shareholders deceitfully provided A.T. Kearney double the disclosed value of its services in the form of valuable Fred's shares, based on the share price on the grant date. To us, these are signs of a Board that is looking to go to war with its own shareholders.

The Company stands at a critical juncture. Fred's business has persistently underperformed as evidenced by poor comparable store traffic, declining comparable store sales, suboptimal gross margins and bloated SG&A. Given the Company's lackluster operating performance, it is not surprising that Fred's total shareholder return significantly lags behind its dollar store and pharmacy peers. This poor performance should have been addressed long before the occurrence of any transaction.

The Board and management should be held accountable for its shortcomings. The Company's reactive approach to adopting changes as a result of shareholder pressure further underscores the need for independent, shareholder representation in the boardroom. When the pressure is off, what will keep the Board from returning to its past practices of complacent oversight and weak governance?

It is time for the Board to prove it is committed to protecting and enhancing shareholder value. We have made every effort to engage with the Board constructively and in good faith to resolve this matter through a private process. The entrenchment and dilution needs to immediately cease. Shareholders deserve directors who will be proactive and work tirelessly to enhance value, not ones who appear only committed to doing the bare minimum in the face of shareholder pressure.

We therefore urge the Board to reconsider its uncooperative approach and to immediately engage with us to discuss a real reconstitution of the Board. Despite our clear frustration with the Company, we remain ready, willing and able to continue our negotiations with the Board in good faith to reach an amicable resolution. A true Board refresh is required, and all factors point to that. We nonetheless are prepared to take any and all actions necessary to ensure that the interests of shareholders remain paramount in the boardroom, including seeking

the election of director candidates at Fred's 2017 annual meeting of shareholders."

71.     Defendants knew that their public statements were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

72.     In addition to their orchestration of the fraudulent scheme, Defendants' scienter is evidenced by the following: (i) the Individual Defendants' senior positions within Walgreens and their extensive personal participation in the merger review process; (ii) the Individual Defendants held themselves out as the persons most knowledgeable on the topics about which they spoke, including the statements alleged herein to be false and misleading; and (iii) the close temporal proximity between statements made by Defendants and the revelation that those statements were false and misleading.

**The Individual Defendants' Access to, and
Extensive Personal Involvement in, the Mergers**

73.     As the most senior executives and/or board members at their respective companies, each of the Individual Defendants participated in extensive due diligence regarding the deal and stayed regularly apprised of its progress, including developments in connection with the FTC's review.

74.     Defendants were required to, and, in fact, did, "make all strategic decisions and lead all discussions, negotiations and other proceedings, and coordinate all activities with respect to any requests that may be made by, or any actions, consents, undertakings, approvals, or waivers that may be sought by or from, the FTC or other governmental entities."

75.     During 2016-2017, Defendants' counsel had "extensive discussions" with the FTC, regarding Walgreens, Rite Aid and/or Fred's, the substance of which counsel then relayed to Defendants.

76.     As a result of these activities and the Individual Defendants' positions and personal involvement in the regulatory review process, each Defendant was fully informed of the developments in the FTC approval process, including the FTC's expressed concerns regarding the deal and the FTC's determination that it was unlikely to approve the Original Merger or the Revised Merger as then-constituted which Fred's Asset Purchase Agreement was contingent upon.

**Defendants Repeatedly Stated that They Were
Informed About the Regulatory Review Process**

77.     Defendants repeatedly held themselves out to the market as knowledgeable on the topics on which they spoke that are alleged herein to be false and misleading, including on conference calls with investors and security analysts. Throughout the Class Period, Defendants stated that they had knowledge and information regarding the mergers and Fred's Asset Purchase Agreement as a result of extensive collaboration, due diligence efforts, expertise in such matters, familiarity with the business of Fred's and/or Walgreens, and discussions with FTC staff and/or persons knowledgeable about the FTC's ongoing review. Defendants further insisted that any criticism of the deal's viability was flat wrong and not "well informed."

**The Close Temporal Proximity Between
Defendants' Statements and the Revelation of Their Falsity**

78.     Defendants' representations that they had "confidence" that the deal would satisfy antitrust regulators and be approved, as outlined in the Original Merger Agreement, soon before

the falsity of those statements was revealed, further bolsters an already compelling inference of scienter.

79.     On January 5, 2017, Defendant Pessina told investors and the market with regards to the deal: "we are confident we can deliver for our customers and our shareholders, on all the plans and strategies we have discussed with you." On that same call, Defendant Pessina represented that Walgreens was "clearly making progress" in its discussions with the FTC, and that he "remain[ed] as convinced as ever of the strategic benefits of the proposed Rite Aid transaction." Similarly, Fairweather stated that Walgreens was "actively engaged in discussions with the FTC" and, based in part on these discussions, reaffirmed Walgreens' 2017 fiscal guidance that included Rite Aid accretion of $0.05 to $0.12 adjusted diluted net earnings per share for the year. But by the very next day, based on prior discussions, and with access to the same facts available on January 5, Rite Aid's attorneys had privately concluded that "*the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date*." And on January 20, 2017 – *barely two weeks* after Defendants had stressed their "confidence" that the deal would be approved by the FTC as structured based on purported insider knowledge and conversations with regulators – *Bloomberg* reported in an article entitled, "Walgreens Faces U.S. Antitrust Concerns Over Rite Aid Fix," that the FTC was, in fact, unlikely to approve the deal which would lead to the demise of the Fred's Asset Purchase Agreement. The article relayed the concerns of FTC officials that "Walgreens's proposal to sell 865 drugstores . . . doesn't go far enough to preserve competition that would be lost in the tie-up." Just ten days after this revelation, on January 30, 2017, Fred's shareholders were again shocked to learn of the terms of the Revised Merger Agreement and that the purported reason for the proposed revisions was that antitrust regulators would not approve the deal as structured.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

80.     The market for Fred's securities was open, well-developed and efficient at all

relevant times. As a result of the materially false and/or misleading statements and/or failures to

disclose, Fred's securities traded at artificially inflated prices during the Class Period. Plaintiff

and other members of the Class purchased or otherwise acquired the Company's securities

relying upon the integrity of the market price of Fred's securities and market information relating

to Fred's, and have been damaged thereby.

81.     During the Class Period, the artificial inflation of Fred's shares was caused by the

material misrepresentations and/or omissions particularized in this Complaint causing the

damages sustained by Plaintiff and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about Fred's business, prospects, and operations. These material

misstatements and/or omissions created an unrealistically positive assessment of Fred's and its

business, operations, and prospects, thus causing the price of the Company's securities to be

artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

Company shares. Defendants' materially false and/or misleading statements during the Class

Period resulted in Plaintiff and other members of the Class purchasing the Company's securities

at such artificially inflated prices, and each of them has been damaged as a result.

82.     At all relevant times, the market for Fred's securities was an efficient market for

the following reasons, among others:

(a)     Fred's shares met the requirements for listing, and was listed and actively traded

on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated insurer, Fred's filed periodic public reports with the SEC and/or NASDAQ;

(c)     Fred's regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Fred's was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the marketplace.

83.     As a result of the foregoing, the market for Fred's securities promptly digested current information regarding Fred's from all publicly available sources and reflected such information in Fred's share price. Under these circumstances, all purchasers of Fred's securities during the Class Period suffered similar injury through their purchase of Fred's securities at artificially inflated prices and a presumption of reliance applies.

84.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment

decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR PROTECTION

85.     Defendants' false and misleading statements during the Class Period are not immunized by the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act. First, most of Defendants' materially false and misleading statements were not "forward-looking statements," but rather, were statements of existing fact and/or conditions, which do not qualify for the safe harbor protection. Second, at the time each false and misleading statement was made, the speaker had actual knowledge that the statement was false or misleading and/or the statement was authorized or approved by an executive officer and/or director who had actual knowledge that the statement was false or misleading. Third, Defendants' cautionary statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the statement would not be misleading. Fourth, Defendants provided no meaningful cautionary language regarding their false and misleading statements, only vague and boilerplate disclaimers about general regulatory risk that failed to apprise shareholders of the true risks inherent in the mergers, which were contradicted by Defendants' false and misleading statements. Moreover, many of Defendants' boilerplate disclaimers themselves were misleading because they warned of risks that had already materialized.

## CAUSES OF ACTION

### COUNT I

### Claim for Violations of §10(b) of the 1934 Act and SEC Rule 10b-5 (Against All Defendants)

86.     Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

87.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or deliberately disregarded, to be misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with his purchases of Fred's common stock during the Class Period.

89.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fred's stock. Plaintiff and the Class would not have purchased Fred's common stock during the Class Period at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Claim for Violations of §20(a) of the 1934 Act (Against the Individual Defendants)

90.     Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

91.     The Individual Defendants acted as control persons of Walgreens and/or Fred's within the meaning of §20(a) of the 1934 Act as alleged herein. By virtue of their intimate knowledge of the false and misleading statements made during the Class Period, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Walgreens and/or Fred's, including the content and dissemination of the false and misleading statements alleged herein.

92.     The Individual Defendants were provided with or had unlimited access to copies of the statements alleged to be misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of those statements or cause those statements to be corrected.

93.     As set forth above, the Individual Defendants had the ability to exercise control over, and did control, Walgreens and/or Fred's who violated §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder, in connection with the false and materially misleading Class Period statements as alleged herein.

94.     By virtue of these facts, the Individual Defendants have violated §20(a) of the 1934 Act and are liable to Plaintiff and the other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff and the Class, and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.     Awarding Plaintiff and the Class compensatory damages;

C.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E.      Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.

Dated: June 27, 2019                                  Respectfully submitted,

**BRAMLETT LAW OFFICES**

s/***Paul Kent Bramlett***
Paul Kent Bramlett TN #7387/MS#4291
Robert Preston Bramlett TN#25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone: 615.248.2828
Facsimile: 866.816.4116
PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

**OF COUNSEL**

**LIFSHITZ & MILLER LLP**
Joshua M. Lifshitz
821 Franklin Ave, Suite 209
Garden City, NY 11530
Tel: (516) 493-9780
Fax: (516) 280-7376
Email: jml@jlclasslaw.com