**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS**

THEODORE K. ZALLER, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

FRED'S INC., MICHAEL K. BLOOM, WALGREENS BOOTS ALLIANCE, INC., and STEFANO PESSINA,

Defendants.

Case No. 2:19-cv-02415-SHL-dkv

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Hon. Sheryl H. Lipman
Chief Mag. Judge Diane K. Vescovo

Lead Plaintiffs Gary Fielder, Susan Ciesla, and Herbert Ciesla ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Fred's Inc. ("Fred's" or the "Company"), Walgreens Boots Alliance, Inc. ("Walgreens"), and/or Rite Aid Corporation ("Rite Aid"); analysts' reports and advisories about the Company, Walgreens, and/or Rite Aid; information obtained from interviews with knowledgeable individuals; a Freedom of Information Act request served upon the United States Federal Trade Commission ("FTC"); and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants[1] who purchased or otherwise acquired Fred's securities between December 20, 2016 and June 28, 2017, both dates inclusive (the "Class Period"), arising out of materially false and misleading statements that Fred's, Walgreens, and their respective Chief Executive Of-

---

[1] Fred's remains a Defendant in this action, but claims against it are stayed pursuant to the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a)(1), as a result of Fred's September 9, 2019 bankruptcy filing. *See* ECF No. 41 at 4 (noting that "claims against the other Defendants will proceed"). Plaintiffs will limit their prosecution of claims alleged herein to Defendants Bloom, Walgreens, and Pessina until Fred's bankruptcy stay is lifted.

ficers ("CEOs"), Michael Bloom ("Bloom") and Stefano Pessina ("Pessina") (collectively, "Defendants"), made to investors in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, regarding a lucrative divestiture sale of stores to Fred's as part of a proposed acquisition by Walgreens of Rite Aid (the "Merger").

2. For most of its corporate history, Fred's was a small regional dollar store chain operating in the Southeastern United States. In 2016, Fred's operated a fleet of 648 dollar stores, 370 of which also contained pharmacies. Fred's markets were small, too: 85% of its stores were in rural counties and small towns, where Fred's was the only (or one of the only) drugstores in the area. At the time, Fred's claimed that its mission was to serve "hyperlocal, underserved markets through tailored healthcare and consumer offerings."

3. While that strategy had served Fred's well in early years, by 2016 it was failing. Fred's had not earned a profit since the first quarter of 2014. Even worse, Fred's had allowed its enterprise management, supply chain, and warehouse management systems to become overtaxed and dilapidated—problems it had not disclosed to investors.

4. On December 20, 2016, Fred's announced what it called a "transformative event": Fred's had agreed to purchase for $950 million 865 Rite Aid stores to be divested as part of a deal by Walgreens to acquire the Rite Aid chain, set to close on January 27, 2017. Walgreens agreed to the divestiture sale to Fred's because the U.S. FTC had asked it to divest certain Rite Aid stores to maintain competition in markets that would otherwise be impaired by the merger of the two large drug store chains.

5. Fred's investors were thrilled, sending Fred's shares skyrocketing over 81% in a single day in reaction to the announcement. By taking advantage of Walgreens' and Rite Aid's

need to divest those stores, Fred's had been able to negotiate a very desirable price. Moreover, purchasing several hundred stores in the Northeast and West Coast would instantly vault Fred's from a small regional player to a top-five pharmacy chain with a national footprint.

6. There was one major hitch: Walgreens, Rite Aid and Fred's would need to convince the FTC to approve the transactions, including Walgreens' selection of Fred's as the divestiture buyer. Although the FTC allows the merging parties to select the divestiture buyer, it reserves the right to reject the transaction if the parties cannot show that the divestiture buyer can restore or maintain competition after the merger. To this end, the FTC evaluates a divestiture buyer to determine whether it (1) is ready, willing, and able to operate the divested stores in a manner that maintains or restores competition in the relevant markets, and (2) has the financial resources to consummate the proposed divestiture and to remain a vigorous competitor in the market. *See* FTC, *Negotiating Merger Remedies: Statement of the Bureau of Competition of the Federal Trade Commission* at 10, *available at:* https://www.ftc.gov/system/files/attachments/negotiating-merger-remedies/merger-remediesstmt.pdf (Jan. 2012). As commentators noted, this was a particularly acute concern for the FTC during the Class Period, because in three recent transactions, a divestiture buyer went out of business or could not afford to maintain the stores bought in the divestiture.

7. Because the lucrative divestiture to Fred's could not occur unless approved by the FTC, Fred's ability to satisfy the FTC's criteria and its regulatory communications with the FTC were crucial to Fred's investors. Unfortunately, neither Fred's, Walgreens, nor their respective CEOs were honest with investors about these issues. Each made highly misleading statements about the divestiture to investors, omitting that Fred's failed to satisfy FTC standards for divestiture buyers, that Fred's deficient infrastructure impeded its ability to compete, or that the FTC had raised concerns regarding Fred's financial and operational ability to compete with a post-Merger

Walgreens. As detailed herein, Defendants' misrepresentations and omissions served to artificially inflate, and to maintain artificial inflation in, the price of Fred's common stock during the Class Period.

8. On March 3, 2017, Rite Aid filed with the SEC its Schedule 14A Preliminary Merger Proxy Statement (the "March 2017 Merger Proxy"). The March 2017 Merger Proxy revealed certain aspects of the regulatory history between the FTC, Walgreens, Rite Aid, and Fred's, and was the first time that any of these parties provided any information about impediments threatening the divestiture. As a result, Fred's shares dropped $3.65 over the next five trading sessions from a close of $18.32 on March 2, 2017 to close at $14.67 on March 9, 2017, a loss of 19.9%. The drop was limited, however, because the March 2017 Merger Proxy did not disclose the most damning information about Fred's inability to satisfy the FTC's divestiture buyer criteria.

9. Defendants soon amped up their misrepresentations. Although the FTC Bureau of Competition expressly told Fred's and Walgreens on or about March 14, 2017 that it would not recommend approval of the Merger with Fred's as the divestiture buyer, Defendants concealed this terminal setback from investors. Instead, Walgreens and Pessina omitted this information entirely in a conference call at market close on April 5, 2017, and falsely implied that the FTC actually supported divestiture to Fred's by confirming that the FTC and Walgreen's were "seeing eye-to-eye" and insisting that "Fred's is the right buyer." Bloom and Fred's were no more candid. In a separate conference call the next day, they claimed that the already-dead divestiture would be "a transformative event that will add substantial scale to the company and transform Fred's Pharmacy, the largest regional pharmacy player, into an even stronger competitor and the third-largest drugstore chain in the nation." These false and misleading statements sent Fred's shares up 13.9% from a close of $12.55 on April 5, 2017 to close at $14.29 on April 6, 2019.

10. On June 6, 2017, Fred's reported ballooning debt from the potential divestiture. More importantly, Bloom stated in a conference call that he had shifted his focus to the "core" existing Fred's stores rather than the divestiture stores, a sign to the market that the divestiture transaction was in trouble. On this news, Fred's shares dropped $2.62 over the next five trading sessions from a close of $13.60 on June 5, 2017 to close at $10.98 on June 12, 2017, a drop of 19.3%.

11. Finally, after the market closed on June 28, 2017, investors learned what Defendants knew for months—that Fred's lucrative deal to acquire Rite Aid stores as part of a divestiture was dead, Fred's having failed to establish the FTC's criteria for approval as a divestiture buyer. Walgreens and Rite Aid announced that they had terminated their original Merger deal and the Asset Purchase Agreement with Fred's, and instead would structure a deal excluding Fred's, whereby Walgreens would purchase around half of Rite Aid's current stores, and Rite Aid would continue to operate the others. In a press release issued that day, Rite Aid disclosed that "the decision to terminate the merger agreement follows feedback received from the FTC that led the company to believe that the parties would not have obtained FTC clearance to consummate the merger."

12. This news had a devastating effect on Fred's shares, which plummeted $2.81, or 22.8%, the next day, to close at $9.51 on June 29, 2017. Shares continued to drop another $3.11 over the next four trading sessions.

13. As a result of Defendants' misrepresentations and omissions, and the precipitous decline in the market value of Fred's securities resulting from the disclosure thereof and/or the materialization of risks concealed thereby, Fred's lost hundreds of millions of dollars in market

capitalization during the Class Period, causing Plaintiffs and other Class members to suffer significant damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, and the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District and Walgreens operates stores within this District.

17. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18. Plaintiffs purchased Fred's securities during the Class Period, as described in the Certifications previously filed with this Court, *see* ECF No. 25-2, and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

*Fred's Defendants*

19. Defendant Fred's Inc. is a Tennessee corporation with its principal place of business at 4300 New Getwell Road, Memphis, Tennessee, 38118. At all times relevant hereto, Fred's operated a chain of dollar stores in the Southeastern United States, about half of which had pharmacies, and traded on the NASDAQ under the ticker "FRED."

20. On August 29, 2016, Fred's appointed Defendant Michael K. Bloom ("Bloom") to serve as the Company's CEO. On March 7, 2017, Bloom also joined Fred's Board of Directors. Bloom participated in Fred's conference calls, was identified as a source of information in its press releases to investors, and himself made materially false misrepresentations and omissions to investors as identified herein. Bloom also had the authority and ability to control the false and misleading statements made by Fred's and other Fred's executives. On April 24, 2018, Bloom resigned as Fred's CEO and from its Board of Directors.

*Walgreens Defendants*

21. Defendant Walgreens is a Delaware corporation with its corporate headquarters located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreens is a global pharmacy-led health and well-being enterprise that was created through the combination of Walgreens and Alliance Boots in December 2014. Walgreen's stock is publicly traded on the NASDAQ Exchange under the ticker symbol "WBA."

22. Defendant Stefano Pessina ("Pessina") is, and at all relevant times was, the CEO and Executive Vice Chairman of Walgreens. Pessina participated on Walgreens' conference calls, was identified as a source of information in its press releases, and himself made materially false misrepresentations and omissions to the market as identified herein. Pessina had the authority and ability to control the false or misleading statements made by Walgreens and other Walgreens executives.

23. Defendant Pessina is at times collectively referred to herein with Defendant Bloom, as the "Individual Defendants."

*Non-Party Rite Aid Corporation*

24. Rite Aid is a Delaware corporation with its corporate headquarters located at 30 Hunter Lane, Camp Hill, Pennsylvania 17011. Rite Aid is a retail drugstore chain that sells prescription drugs and various other merchandise referred to as "front-end products." Rite Aid's stock is publicly traded on the New York Stock Exchange under the ticker symbol "RAD." During the Class Period, Fred's investors were told that as part of Walgreens' merger with Rite Aid, several hundred Rite Aid stores would be divested to Fred's.

## SUBSTANTIVE ALLEGATIONS

### I. Background on the FTC's Hart-Scott-Rodino merger review process

25. The United States FTC is an independent agency empowered by Congress to enforce, among other things, the Clayton Act, 15 U.S.C. §§ 12 *et seq.*, a major component of U.S. antitrust law. One part of the FTC's stated mission is to promote competition. In particular, section 7 of the Clayton Act prohibits mergers and acquisitions between two companies when the effect "may be substantially to lessen competition, or to tend to create a monopoly."

26. The Hart-Scott-Rodino Antitrust Improvements Act of 1976 amended the Clayton Act, requiring companies seeking to merge to first file a premerger notification report with the FTC Bureau of Competition. Submission of a premerger notification report triggers a 30-day waiting period before the parties are allowed to effect the merger.

27. The FTC reviews premerger notification reports to determine whether the proposed merger would likely lead to anticompetitive effects in the merging parties' market(s). During the 30-day waiting period, the FTC must either allow the merger (sometimes by allowing the 30-day

period to lapse), file suit to block the merger, or request additional information (known as a "Second Request").

28. The FTC issues Second Requests in less than 3% of cases. Of the 1,832 premerger notifications filed between October 1, 2015 to September 30, 2016, the FTC issued Second Requests only 54 times.[2] If the FTC issues a Second Request, the 30-day waiting period is tolled until the merging parties certify "substantial compliance" with the Second Request.

29. According to the FTC Bureau of Competition,[3] if the FTC determines that a merger is likely to create anticompetitive effects, the FTC will attempt to negotiate remedies with the merging parties to reduce or eliminate such effects. For combinations of large retail operations, a common remedy would be for the acquiring party to divest some stores of the acquired company to a third party. If the parties agree to divest some of the stores to a third party, the divestiture is subject to review and approval by the FTC. Throughout the FTC's review of a potential transaction, the FTC Bureau of Competition remains in regular contact with the merging parties, as well as any potential divestiture buyer(s).

30. According to guidance published by the FTC Bureau of Competition,[4] a "preferred buyer" for such divestitures will be an entity that:

A. Is ready, willing, and able to operate the divested assets in a manner that maintains or restores competition in the relevant market; and

---

[2] *See* FTC, *Hart-Scott-Rodino Annual Report for FY2016*, *available at:* https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-bureau-competition-department-justice-antitrust-division-hart-scott-rodino/p110014_fy_2016_hsr_report_final_october_2017.pdf (Oct. 4, 2017).

[3] *See* FTC, *Negotiating Merger Remedies: Statement of the Bureau of Competition of the Federal Trade Commission*, *available at:* https://www.ftc.gov/system/files/attachments/negotiating-merger-remedies/merger-remediesstmt.pdf (Jan. 2012).

[4] *Id.* at 10.

B. Has the financial resources to consummate the proposed divestiture and to remain a vigorous competitor in the market.

31. The FTC Bureau of Competition's guidance[5] further explains that, in determining the proposed divestiture buyer's suitability, the FTC Bureau of Competition will:

A. Examine the proposed buyer's commitment to remain in the market by analyzing its past operations and business plans as well as its future business plans for the divested assets;

B. Evaluate the proposed buyer's experience and expertise to operate effectively in the market;

C. Examine both the proposed buyer's historical financial documents and its future business plans for the proposed divestiture;

D. Talk with industry members that are familiar with the proposed buyer, such as competitors, suppliers, and customers;

E. Talk with lenders and other creditors of the proposed buyer, particularly those involved in possible financing of the proposed deal; and/or

F. Examine the proposed buyer's current position in the relevant market to determine whether a divestiture to the proposed buyer will adequately address concerns about anticompetitive effects arising from the original transaction.

[5] *Id.* at 11-12; *see also* FTC, *Frequently Asked Questions About Merger Consent Order Provisions*, *available at*: https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/merger-faq (last visited Oct. 31, 2019).

32. During the Class Period, the FTC was particularly concerned about the ability of a divestiture buyer to successfully compete with the merged company. This concern followed several instances prior to the Class Period in which a divestiture to a smaller entity failed to create viable competition with the merged company:

A. In 2012, in conjunction with the Hertz Corporation's plan to acquire Dollar Thrifty Automotive Group, the FTC ordered Hertz to sell its Advantage Rent-a-Car business to a joint venture between an industry veteran and Macquarie Capital. Advantage petitioned for bankruptcy four months after the FTC approved the merger.

B. In 2014, in conjunction with Albertsons Companies, Inc.'s plan to purchase Safeway, Inc., the FTC ordered divestiture of 146 store locations to Haggen Food and Pharmacy, a regional grocery operator, which then only had 18 locations. Less than one year after the FTC's order, Haggen petitioned for Chapter 11 bankruptcy protection, and eventually closed down the majority of divested stores and sold 37 stores back to Albertsons.

C. In 2015, in conjunction with Dollar Tree Stores, Inc.'s plan to purchase Family Dollar, the FTC ordered the divestiture of 330 stores to Sycamore Partners. During the class period, in April 2017, Sycamore asked the FTC for approval to sell its locations to Dollar General, stating that it could no longer operate the stores as a viable business.

Both commentators and the FTC itself noted the FTC's focus on the ability of divestiture buyers to maintain competition. *See, e.g.*, David McLaughlin *et al.*, *Walgreens Said to Face U.S. Antitrust Concerns Over Rite Aid Fix*, Bloomberg (Jan. 20, 2017); *FTC Seeks Public Comment on Sycamore*

*Partners II, L.P. Application for Approval to Sell 323 Family Dollar Stores to Dollar General*, FTC, *available at:* https://www.ftc.gov/news-events/press-releases/2017/04/ftc-seeks-public-comment-sycamore-partners-ii-lp-application (Apr. 5, 2017).

## II. Fred's seeks to transform its business by acquiring hundreds of Rite Aid pharmacies in a divestiture sale

### A. Fred's prior failed business strategy

33. Fred's went public in 1992. For the next twenty-seven years, it built a chain of dollar stores branded as "Fred's Super Dollar" in the Southeastern United States. Fred's strategy was to locate most of its stores in rural markets with populations of fewer than 15,000, where there was less competition. Fred's described its focus on "patients and customers in these hyper-local, underserved markets" as a "mission." *See* SEC Form 10-Q filed December 8, 2016. Before the Class Period, Fred's operated 648 discount general merchandise stores, of which 370 contained pharmacies.

34. For many years, that strategy succeeded, allowing Fred's to grow profitably. But in the years immediately preceding the Class Period, it produced dismal results for Fred's and its investors. For the 39-week period ended October 29, 2016, Fred's reported revenue of $1.596 billion ($2.128 billion annualized) and a net loss of $44.07 million ($58.76 million annualized).

35. Moreover, Fred's had failed to report a profit since February 1, 2014:




36. Faced with a failing business model, Fred's decided to pivot in 2015 from a large format dollar store to a pharmacy chain. It hired Bloom, a former CVS executive, and began to make small, bolt-on purchases to grow its pharmacy operations.

37. Beginning in June 2015, Fred's employed Confidential Witness ("CW") 1 as its Senior Vice President for Information Technology until March 2019. CW1 was responsible for implementing a security program and ensuring Fred's information technology ("IT") complied with industry standards and state and federal statutes and regulations, including the Sarbanes-Oxley Act of 2002, the Health Insurance Portability and Accountability Act of 1996, and the Payment Card Industry Data Security Standards. As Senior Vice President for Information Technology, CW1 was also responsible for the day to day management of the IT department. According to CW1, from the time when he began employment at Fred's in June 2015, and continuing throughout the Class Period, Fred's senior executives, including Bloom, knew that Fred's IT systems were outdated and insufficient. In particular, according to CW1, Fred's lacked the modern enterprise resource planning ("ERP"),[6] warehouse management, and transportation management systems

[6] Some examples of ERP suites include those developed by SAP, Sage, and Microsoft.

necessary to effectively operate Fred's existing stores, let alone the much larger group of stores it planned to acquire from the Rite Aid divestiture.

38. Recognizing that Fred's internal systems were insufficient, Fred's executive leadership instructed CW1 to oversee requests for proposals to replace Fred's legacy internal systems. According to CW1, based on his experience, it would have cost about $100-$120 million to upgrade Fred's internal systems.

39. CW2 was employed by Fred's as a Senior Vice President and Chief Information Officer from May 2014 until February 2017. According to CW2, systems and IT are a significant big part of any merger. CW2 based his opinion on undertaking around thirty-five mergers/acquisitions while he worked for Stanley/Black & Decker.

### B. Fred's lucrative opportunity to acquire more than eight hundred Rite Aid store locations to be divested in the Walgreens-Rite Aid merger

40. In January 2015, Walgreens (America's second largest drug store chain) began negotiations with Rite Aid (America's third largest drug store chain). The merger, if consummated, would "help[] Walgreens vault past market leader CVS Health Corp." *See* Stephen West, Bloomberg, *Walgreens Posts Profit that Tops Estimates as Sales Increase* (Oct. 28, 2015).

41. Merger talks began on January 12, 2015. As Walgreens and Rite Aid negotiated the terms of a potential merger agreement, one of the key transaction terms was the number of store divestitures that Walgreens would be required to accept to obtain antitrust approval from the FTC.[7]

42. On October 27, 2015, Walgreens and Rite Aid executed a merger agreement (the "Merger Agreement"). This agreement, which both companies publicly announced and filed (with

---

[7] *See* March 2017 Merger Proxy.

redactions) as attachments to Forms 8-K each filed with the SEC on October 29, 2015, provided in relevant part that:

A. Walgreens would acquire all outstanding Rite Aid shares for $9.00 per share (for an approximate total transaction value of approximately $9.4 billion);

B. Walgreens and Rite Aid would use their best efforts to assist and cooperate with each other to do all things necessary, proper, or advisable to consummate and effect the Merger, and specifically would:

1. Cooperate with each other in connection with any filing or submission before a governmental entity (including but not limited to the SEC and the FTC);

2. Promptly inform the other party, and provide copies, of any communication sent to or received from a governmental entity;

3. Comply with any requests from a governmental agency for information, documents, or other material;

4. Not extend (directly or indirectly) the 30-day Hart-Scott-Rodino waiting period without the other party's mutual consent;

5. Allow the other party to review and discuss, and consider in good faith any communications to be given by the party to a governmental entity; and

6. Except as prohibited by the government, give the other party notice of any in-person meeting or conference call with the government, and provide the other party with an opportunity to attend and participate in the meeting or call;

C. Rite Aid would provide Walgreens with access to its business books and records;

D. Walgreens had the right to make all strategic decisions and lead all discussions, negotiations, and other proceeds, and coordinate all activities with respect to any requests that may be made by, or any actions, consents, undertakings, approvals, or waivers that may be sought by or from, the FTC or other governmental entities, including determining the strategy for contesting, litigating, or otherwise responding to objections to, or proceedings challenging, the merger with Rite Aid (subject to good-faith consultations with Rite Aid); and

E. To the extent necessary to obtain FTC approval, Walgreens would divest up to 1,000 Rite Aid locations to a third-party.

As a result of the mutual cooperation clause and Walgreens' right to review Rite Aid's corporate records and lead all discussions with the FTC regarding the merger, at all times relevant hereto, Walgreens had access to Rite Aid's internal information, including information related to the stores it intended to divest to Fred's.

43. On November 10, 2015, Walgreens and Rite Aid filed a Hart-Scott-Rodino notice with the FTC. On December 10, 2015, instead of approving the transaction, the FTC issued Second Requests to Walgreens and Rite Aid. From that time through the beginning of the Class Period, Walgreens and Rite Aid discussed merits of the merger, proposed synergies, and potential remedies (including divestitures) with the FTC Bureau of Competition.[8]

---

[8] *See* March 2017 Merger Proxy.

44. Walgreens and Rite Aid spent the first part of that period, between January 2016 and April 2016, responding to the FTC's Second Requests.

45. Beginning in late April 2016, the FTC began identifying geographic areas for which the merger posed antitrust concerns. From May 2016 to August 2016, Walgreens and Rite Aid submitted twenty (20) advocacy papers addressing the FTC's areas of concern. On or about August 17, 2016, the FTC Bureau of Competition delivered to Walgreens and Rite Aid a determination that anticompetitive effects were likely. Later, Walgreens proposed divesting hundreds of Rite Aid stores to maintain or restore competition in affected areas. In August and September 2016, Walgreens, through its advisors, solicited bids from companies interested in purchasing the Rite Aid locations it proposed to divest. On or about September 26, 2016, Walgreens narrowed divestiture negotiations to Fred's and two other companies.[9] Commentators reported that the two stores other than Fred's were Albertsons and Kroger.[10]

46. In October and early November 2016, Walgreens and Rite Aid had extensive due diligence meetings with Fred's and the two other bidders, focusing on how each prospective buyer would transition to full operation of the divested stores. Walgreens also engaged in extensive negotiations with each company.

47. Reports quickly surfaced that other bidders had little interest in purchasing the divestiture locations. On October 14, 2016, Bloomberg reported that "Interest in potential divestitures from Rite Aid/Walgreens Boots is 'tepid at best.'" *See* Joshua Fineman, Bloomberg, *Rite Aid/Walgreens Divestitures Not Enough to Entice Buyers: CTFN* (Oct. 14, 2016). According to

---

[9] *See* March 2017 Merger Proxy.

[10] *See, e.g.*, Arie Shapira, Bloomberg, *Kroger Emerges as Possible Buyer of RAD/WBA Stores: Cap Forum* (Aug. 24, 2016); Joshua Fineman, Bloomberg, *Albertsons, Kroger Said Interested in RAD/WBA Stores: CTFN* (Nov. 11, 2016).

the article, Walgreens would need to come up with a better package of store sales to get buyer interest because the current divestiture package was "second rate."

48. On October 19, 2016, in a report titled "Evaluating the Merits and Risks of a Potential Bid for WBA/RAD Assets," Barclays analyst Karen Short noted that, "based on the assumption that the FTC requires divestitures in markets where the combined share [of the market by Walgreens and Rite Aid] is above 40%," and "[a]fter examining market share by [metropolitan statistical area]," Rite Aid's divested stores were likely to be located in Northern California, New York and/or Pennsylvania. The Barclays report also noted that in Barclays' estimation, around one-third of Rite Aid's stores were then unprofitable and that "the FTC (given the Haggen blunder) is mandating that a successful bidder not close any stores (*i.e.* is taking a firmer stance given the sale/liquidation of Haggen)." *See also* ¶ 32, *supra* (discussing the Haggen and other failed divestitures).

49. On October 20, 2016, Walgreens and Rite Aid announced that they had extended the end date of the merger from October 27, 2016 (the original end date) to January 27, 2017.

50. On November 9, 2016, in a report titled *Private Education: We Get the PE Scoop on WBA/RAD Deal*, Deutsche Bank analyst George Hill noted that Walgreens "needs to negotiate with store buyers and put together a package of divestitures with buyers that satisfy FTC concerns for maintaining competition in these markets. We expect store divestitures to be sold to strategic competitors and potentially to private equity buyers in certain geographies." He also explained that:

- Private equity was not an attractive alternative to a strategic buyer: "PE [private equity] is a buyer of last resort [for the FTC], because both regulators and the stra-

tegic buyers would prefer to see the stores sold to established competitors. PE buyers would negotiate for very low prices given the challenges of running a small pharmacy business, the risk of losing prescription volume, and the investment needed in systems and management."

- "The FTC would also require an acquirer to operate the stores as is for a period of time (potentially one year), instead of shutting or selling the store";
- "The fastest path to completing the transaction would be to find one strategic buyer at a very attractive price"; and
- "While strategic buyers would be the best option from a divested store valuation standpoint, strategics are the last people [Walgreens] wants to sell to, as they'll have the most negotiating power and will be the most competitive. ***The FTC would likely prefer to see the stores sold to a strong competitor in each market to maintain the same level of competition as before*** the [Rite Aid] acquisition, which makes them the preferred buyer but also gives them negotiating power."[11]

51. All the concerns raised in the Deutsche Bank analyst report were also known to Walgreens. Because of its ongoing Merger review communications with the FTC, Walgreens knew how many stores, and in which geographical areas, that the FTC would want divested. As the Deutsche Bank report emphasized, Walgreens also knew that the FTC would prefer that the divested stores go to a competing chain instead of a private equity firm.

52. On or about November 10, 2016, Fred's and two other companies (believed to be Albertsons and Kroger, *see* ¶ 45, *supra*) met with, and made presentations to the FTC "regarding

[11] Unless otherwise noted, all emphasis is supplied.

such party's suitability as a potential purchaser of the divestiture assets and such party's plans to transition full operation of the divestiture assets from Rite Aid." [12] These meetings were disclosed in the March 2017 Merger Proxy. Because Fred's was the least capitalized and least sophisticated of these suitors, it was the perfect divestiture candidate for Walgreens. Upon completion of a divestiture, Fred's would pose less of a competitive threat to Walgreens than operation of the same stores by Albertson's or Kroger.

### C. Known impediments to a divestiture sale to Fred's

53. Although purchasing more than 800 stores in a divestiture sale would more than triple Fred's pharmacy base and instantly make it a top ten pharmacy chain, Fred's lacked the systems and processes to support expansion. After Fred's began discussions with Walgreens, CW1 brought to Bloom concerns about the adequacy of Fred's internal systems to support the additional Rite Aid stores. In response, Bloom declined to address CW1's concerns and directed CW1 to just keep moving forward.

54. CW3 was employed by Fred's from July 2014 until March 2018. In March 2015, Fred's promoted CW3 to its Executive Vice President of Supply Chain, Global and Domestic Logistics. On August 29, 2016, Fred's promoted CW3 to the newly created position of Chief Operating Officer – Front Store. As a part of his job, CW3 was responsible for managing and improving Fred's supply chain. According to CW3, before Fred's commenced divestiture discussions with Walgreens, Fred's had tasked CW3 with redesigning Fred's supply chain. CW3 explained that Fred's supply chain had problems due to aged warehouse management software and related systems.

---

[12] *See* March 2017 Proxy.

55. Understanding that its existing business processes and systems were deficient, when Fred's met with the FTC in November 2016, it provided the FTC with a list of improvements it promised to make. According to CW3, this list included supply-chain changes that Fred's would require to maintain and support the planned additional stores, and needed upgrades to Fred's warehouse management system. According to CW3, however, there was never any funding to make the upgrades, at least during his employment.

56. CW4 was employed by Fred's from June 2002 to July 2016. CW4 started at Fred's first as a district manager and then as a Regional Vice President of Store Operations. On March 26, 2015, Fred's promoted CW4 to Executive Vice President of Store Operations. CW4 corroborated that Fred's supply-chain and warehouse-management software were unreliable. CW4 also stated that during his tenure, Fred's supply-chain software was never correct. According to CW4, that meant Fred's could not take on another 1,000 stores.

57. According to CW4, from the time before Fred's commencement of divestiture discussions with Walgreens until the time he left Fred's, Fred's senior leadership often discussed with CW4 the inadequate condition and age of Fred's distribution system. During these discussions, CW4 advised Fred's senior leadership that Fred's needed to fix its distribution system in order to fix the company.

58. CW5 was employed by Fred's from December 2016 to September 2017. During that time, CW5 served as Fred's Senior Vice President of Supply Chain. Before working at Fred's, CW5 had experience working in and on the supply chains of much larger companies. According to CW5, Fred's supply-chain problems related to the software that ran Fred's distribution systems, not the physical supply chain. There were a lot of legitimate concerns around the viability of the

systems, CW5 said, adding that the software that ran the existing distribution systems was pretty temperamental, and that there were regular software failures in the supply chain every week.

59. According to CW1, around this time in late 2016, his superior at Fred's agreed that Fred's needed to replace its archaic enterprise resource planning ("ERP") software. ERP software is the core of most modern business operations, and usually includes a suite of computer programs that manage and automate integration of a business's front office systems (e.g., customer relationship management, supplier relationship management, sales) and its back office systems (e.g., accounting, human resources, inventory, procurement, production). CW1 was told that Fred's would not have room in its budget to purchase, implement, and maintain an ERP, until after it acquired the Rite Aid stores. CW3 also corroborated that recommendations that Fred's upgrade its supply chain and warehouse management systems were not funded.

60. According to CW1, Fred's brokered an arrangement with Walgreens for Walgreens to provide IT and ERP software to Fred's as a temporary and interim measure. According to CW2, even with this agreement, he did not think that Fred's had the capacity to take on the Rite Aid chain, from a systems and infrastructure perspective.

61. After Fred's met with the FTC in November 2016, Walgreens decided to focus on Fred's as a divestiture buyer. In the rest of November and early December 2016, Walgreens and Fred's conducted additional meetings and negotiations. Additionally, on or around November 23, 2016, Walgreens and its advisors updated Rite Aid on Walgreens' intention to proceed with Fred's as the potential divestiture buyer.[13] On December 2, 2016, Walgreens, Rite Aid, and Fred's (including Bloom) met with the FTC to discuss, at least in part, the divestiture sale. Reflecting its

[13] *See* March 2017 Merger Proxy.

understanding that the FTC's concern focused on Fred's ability to maintain competition as a divestiture buyer, Fred's brought antitrust counsel and consultants to the meeting.

62. By selecting Fred's as the divestiture buyer, Walgreens ensured that the divested stores would be operated by a weak competitor lacking the resources and sophistication to threaten Walgreens in the divestiture markets. However, proposing divestiture to a weaker competitor necessarily reduced the ability of the divestiture to address the competition concerns raised by the FTC. Neither Walgreens nor Fred's was honest with market participants about these risks, or their regulatory communications with the FTC.

63. On December 19, 2016, Walgreens, Rite Aid, and Fred's entered into an asset purchase agreement (the "Asset Purchase Agreement"), whereby Fred's agreed to purchase 865 divested Rite Aid stores for $950 million. The Asset Purchase Agreement also provided that if the FTC required the divestiture of more stores as a condition to approving the Merger, Fred's would purchase those stores. Recognizing that Fred's operational and IT deficiencies were impediments to the FTC's approval of the divestiture plan, Walgreens and Fred's also contracted in the Asset Purchase Agreement that:

A. Walgreens would provide commercial assistance to Fred's for up to two years;

B. Walgreens would develop a duplicate prescription-management system for Fred's benefit, which Walgreens would store and operate on Walgreens' mainframe; and

C. Walgreens would allow former Rite Aid employees to end their employment at Walgreens and begin working for Fred's.

## II. Defendants make material misrepresentations to investors

64. On December 20, 2016, before the market opened, Defendants Fred's and Bloom issued a press release announcing that Fred's had entered into the Asset Purchase Agreement with Walgreens. In the press release, Fred's and Bloom touted the transaction as "a transformative event for Fred's Pharmacy that will accelerate our healthcare growth strategy through our acquisition of 865 new stores located in highly attractive markets." To emphasize its business transformation, Fred's rebranded its stores from "Fred's Super Dollar" to "Fred's Pharmacy."

65. The statements identified in paragraph 64 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because: (a) they omitted that Fred's lacked the financial, technological, and operational capabilities to effectively compete with a merged Walgreens and Rite Aid in the markets served by the divestiture locations; and (b) they omitted that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's satisfied the FTC criteria for a divestiture buyer.

66. Also on December 20, 2016, before the market opened, Walgreens issued its own press release referring to the Asset Purchase Agreement, which it described as divesting stores on the East and West coasts to Fred's. In that press release, Walgreens and Pessina falsely claimed that Fred's was an "experienced pharmacy operator." This statement was materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because: (a) it omitted that Fred's limited "experience" in operating pharmacies had not been successful; (b) it omitted that Fred's did not have any experience operating pharmacies in the East and West Coast markets that were identified as concerns by the FTC and identified for divestiture by Walgreens; and (c) it omitted that Fred's did not have any

experience operating pharmacies in larger markets and had sparse experience operating pharmacies in medium markets, and that many of the Rite Aid locations to be divested were in larger and medium sized markets.

67. As a result of these announcements, Fred's shares jumped on extremely heavy trading volume of 29 million shares (more than 45 times its daily average for the previous twenty days) on December 20, 2016 to close at $20.19, a one-day gain of more than 81% over its prior close of $11.15 on December 19, 2016.

68. On January 5, 2017, before market open, Walgreens released its earnings for the first quarter of fiscal year 2017. In an earnings call that same day:

A. In response to an analyst's question regarding whether Walgreens had a "Plan B" if the divestiture to Fred's fell through, Walgreens and Pessina stated:

> We're working hard to have the deal approved and for the time being we don't want even to think of the fact that the deal could not be approved after so many months when we have given a lot of information and ***we have had a very good relationship with the people of the FTC*** and they have continued to ask information and we have continued to gain information and ***in reality we believe that if they have spent so much time asking self, and analyzing so many documents is because they want to understand the transaction, which is fine. So we are not thinking of a Plan B today***.

B. In response to an analyst's question regarding whether Walgreens could potentially litigate an adverse FTC determination, Walgreens and Pessina reassured market participants by stating "for the time being everything looks fine."

69. The statements identified in paragraph 68 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances

in which they were made because: (a) Walgreens and Pessina did not have a "very good relationship" with the FTC; (b) "everything" did not "look[] fine" in relation to Walgreens' and Fred's attempts to demonstrate to the FTC the viability of Fred's as a divestiture buyer; (c) the statements omitted that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's met the FTC's criteria for a divestiture buyer; (d) the statements falsely implied that Walgreens and Pessina had access to non-public information from the FTC suggesting support of the FTC for Fred's as a divestiture buyer, when in fact Walgreens and Pessina had no such information.

70. On January 6, 2017, Rite Aid's antitrust counsel informed its board of directors that the FTC had subpoenaed Fred's management, requested extensive documents, and advised that, in its counsel's judgment, the FTC was unlikely to approve Fred's as a divestiture buyer prior to the planned close of January 27, 2017.[14] This information was also known by Walgreens, as both its agreement with Rite Aid and its agreement with Fred's provided for cooperation and exchange of information.

71. Throughout January 2017, the FTC continued to meet with employees of Walgreens, Rite Aid, and Fred's as part of its continued review of the proposed divestiture of Rite Aid stores to Fred's.

72. On January 20, 2017, Bloomberg released an article suggesting that the FTC would want divestiture of more than the 865 stores initially discussed between Walgreens and Fred's. *See* David McLaughlin *et al.*, Bloomberg, *Walgreens Said to Face U.S. Antitrust Concerns Over Rite Aid Fix* (Jan. 20, 2017). "FTC officials are concerned the sale doesn't go far enough to preserve competition that would be lost in the tie-up," the article stated. It also highlighted recent

[14] *See* March 2017 Merger Proxy.

instances when the FTC's divestiture buyer in other transactions failed, including Albertsons and Hertz. *See* ¶ 32, *supra*. Over the next two trading sessions, Fred's shares dropped 7.1% to close at $15.00 on January 23, 2017.

73. Rite Aid and Walgreens management met several times in late January 2017 to discuss the FTC's merger review, potential additional divestiture support to Fred's "to address the questions raised by the FTC Staff in their review of Fred's and to increase the likelihood of obtaining FTC approval of the transaction," and the Merger schedule.

74. After meetings on January 22 and 23, 2017, Walgreens proposed an amendment of the merger agreement to Rite Aid, which provided that (1) the parties would extend the end date of the Merger to March 31, 2017, but that (2) Walgreens would not be required to enter into any divestiture agreement on terms that would be adverse to the terms in the Asset Purchase Agreement with Fred's, effectively releasing Walgreens from having to comply with the antitrust-efforts covenant of the Merger agreement (*see* ¶ 42(B), *supra*). After reviewing the draft, Rite Aid concluded that Walgreens would "likely need[]to proffer additional divestiture obligations in order to maximize the chance of obtaining FTC approval of the transaction."[15]

75. On January 24, 2017, continuing their amendment negotiations, Walgreens informed Rite Aid that it would not "increase[] [its] divestiture obligations" unless Rite Aid agreed to reduce the purchase price below $9.00 per share. In exchange for a reduced purchase price, Walgreens agreed to:

A. Increase the number of divestitures above the 1,000-store threshold in the original Merger agreement; and

[15] *See* March 2017 Merger Proxy.

B. Present to the FTC, as a part of the revised divestiture package, the sale of Rite Aid's brand rights to Fred's, as well as "additional infrastructure and other divestiture obligations."[16]

Fred's was also aware that the FTC would require increased store divestitures, and increased divestiture support. According to CW3, in January 2017, Fred's leadership informed him that Walgreens would likely need to divest more than the originally-negotiated 865 stores, but that the FTC was not comfortable with the capability of Fred's to build distribution centers to support the additional stores. CW3 advised Fred's leadership that to absorb additional Rite Aid locations, if Fred's was not itself able to immediately build new distribution centers, it would have to acquire three of Rite Aid's distribution centers: one in California and two in Pennsylvania.

76. On January 30, 2017, Walgreens announced that it and Rite Aid had agreed to extend the merger deadline to July 31, 2017, and to revise the transaction terms as follow:

A. Walgreens and Rite Aid agreed to reduce the share-acquisition price down to $7.00 from $9.00;

B. If required to obtain regulatory approval, Walgreens agreed to sell, and Fred's agreed to purchase, up to 1,200 Rite Aid locations; and

C. If Walgreens was required to divest more than 1,000 locations, the share-acquisition price would be adjusted down pro-rata to a range between $6.99 and $6.50 per share.

77. The statements identified in paragraph 76 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances

[16] *Id.*

in which they were made because: (a) they omitted that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could viably operate the number of locations referenced; (b) they omitted known operational, supply chain, and IT impediments to Fred's ability to operate "up to 1,200 Rite Aid locations"; (c) they omitted that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could satisfy the FTC's criteria for divestiture buyers; and (d) they omitted Walgreens' understanding that it would have to provide significant support to Fred's due to Fred's lack of resources and business process deficiencies, including transferring Rite Aid distribution centers, allowing Fred's to use Rite Aid's brand rights, and allowing Fred's to use Walgreens' ERP software on an interim basis.

78. Also on January 30, 2017, Fred's issued a press release, in which it represented that:

A. Fred's "affirm[ed] that the asset purchase agreement it entered into on December 19, 2016 with Walgreens and Rite Aid remains in effect;"

B. The amendment and extension of the Walgreens-Rite Aid merger agreement reinforces the Company's confidence that the transaction is in the mutual best interest of Fred's Pharmacy and all of its shareholders;" and

C. "[T]o the extent the Federal Trade Commission ("FTC") requests that additional stores be sold, and Walgreens agrees to sell such stores, Fred's Pharmacy has agreed to buy those stores."

79. The statements identified in paragraph 78 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because: (a) they omitted that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could viably operate the number of

locations referenced; (b) they omitted known operational, supply chain, and IT impediments to Fred's ability to operate the "additional stores"; (c) they omitted that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could satisfy the FTC's criteria for divestiture buyers; and (d) they omitted Walgreens' understanding that it would have to provide significant support to Fred's due to Fred's lack of resources and business process deficiencies, including transferring Rite Aid distribution centers, allowing Fred's to use Rite Aid's brand rights, and allowing Fred's to use Walgreens' ERP software on an interim basis.

80. On February 13, 2017, Bloomberg reported that "Walgreens [was] expected to shortly submit a revised divestiture package to [the] FTC that should be acceptable to regulators," and that Walgreens "'sweetened' its divestiture package with some 'premier stores in desirable locations.'" *See* Joshua Fineman, Bloomberg, *RAD/WBA Improved Store Mix May Help Seal FTC Approval, CTFN Says* (Feb. 13, 2017).

**III. The truth is gradually revealed through a series of partial disclosures**

81. On March 3, 2017, Rite Aid filed the March 2017 Merger Proxy with the SEC, and disclosed, for the first time, that:

A. On January 6, 2017, the FTC had subpoenaed Fred's management, requested substantial documents, and advised that the FTC was unlikely to approve Fred's prior to January 27, 2017;

B. By January 24, 2017, Rite Aid's Board determined that improvements to the divestiture proposal would likely be required to garner FTC approval;

C. That Walgreens, Fred's and Rite Aid understood in January 2017 that additional support would have to be part of a divestiture proposal (to offset known deficiencies of Fred's), including allowing Fred's to exploit Rite

Aid's brand rights, as well as "additional infrastructure and other divestiture obligations;" and

D. Walgreens may have to divest *more* than 1,200 stores to satisfy the FTC. Walgreens had the right under the Merger Agreement to review and discuss the substance of any filing that Rite Aid planned to provide to a government agency, and therefore is believed to have actual knowledge of, and to have approved, the language in Rite Aid's March 2017 Proxy.

82. As a result of these partial disclosures, Fred's shares dropped 11% on March 3, 2017, to close at $16.30. Fred's shares continued to drop over the next four trading sessions. On March 8, 2017, Bloomberg confirmed that the FTC was concerned with Fred's financial and debt issues, reporting that the "FTC investigation into Walgreens/Rite Aid and review of Fred's divestiture is far from [the] finish line" and that "FRED's financial, debt issues are 'real,' may be hard to resolve" according to a "person familiar." *See* Joshua Fineman, Bloomberg, *RAD/WBA FTC Resolution Unlikely in Near-Term: Capitol Forum* (Mar. 8, 2017). In response, Fred's shares extended their drop from March 3-7, falling over the next two days to close March 9, 2017 at $14.67, a decline of $0.78 from its close of $15.45 on March 7, 2017. The extent of the decline was limited by a positive event that also occurred on March 8, 2017—the publication of a letter by an activist investor who had taken a stake in Fred's, which indicated that the activist would seek improvements in Fred's governance. *See* Alden Global Capital LLC, PRNewswire, *Alden Issues Statement in Response to Fred's Announced Board Changes*, *available at:* https://www.prnewswire.com/news-releases/alden-issues-statement-in-response-to-freds-announced-board-changes-300420293.html (Mar. 8, 2017). In total, from the close on March 2 to the close on March 9, Fred's shares fell over 19.9%.

83. Although the statements in the March 2017 Merger Proxy disclosed certain adverse information, they nonetheless concealed the most damaging information because they omitted: (a)

the full extent of the "additional infrastructure and other divestiture obligations" that Walgreens had agreed to provide to Fred's; (b) concerns raised by the FTC Bureau of Competition's review of the transaction; (c) that, even with divestiture support from Walgreens, Fred's would not satisfy the FTC's criteria for a divestiture buyer; and (d) known problems with Fred's rendering it unable to viably purchase and operate more than 1,200 additional stores.

84. On March 14, 2017, representatives of Walgreens, Rite Aid, and Fred's (including Bloom, Fred's Chief Operating Officer—Healthcare Timothy Liebmann, and Fred's antitrust counsel, Jonathan Klarfeld of Ropes & Gray) met with the FTC Bureau of Competition. Emails planning this meeting discussed whether State Attorneys General should be permitted to join the call, and indicated that Fred's was consulted on that decision.

85. During the March 14 meeting, Fred's and Walgreens presented the case for why the FTC should approve Fred's as a divestiture buyer, including with a PowerPoint presentation prepared by Fred's antitrust counsel. While Fred's and Walgreens have both kept secret the contents (and even the existence) of the meeting, Plaintiffs are informed and believe that the FTC indicated to meeting participants that Fred's and Walgreens had not established that the proposed divestiture to Fred's would satisfy the FTC's criteria for maintaining competition, and, as a result, that the FTC Bureau of Competition would not recommend approval. Plaintiffs base this belief on: (a) reports of Fred's former executives as detailed herein; (b) the fact that the FTC Bureau of Competition ultimately did not recommend approval, and that the FTC ultimately did not approve divestiture to Fred's; and (c) the presence of State Attorneys General at the meeting, who are empowered to bring antitrust litigation on behalf of their respective states.

86. CW6 was Fred's Senior Vice President of Human Resources, and worked for Fred's from 2013 until April 2018. According to CW6, when Bloom and Liebmann met with the

FTC Bureau of Competition, the Bureau of Competition informed Bloom and Liebmann that based upon the information provided to date, it believed that Fred's financial resources prevented the Bureau of Competition from recommending approval to the FTC commissioners so long as Fred's was the divestiture buyer.

87. According to CW6, before Fred's April 6, 2017 earnings release, Bloom held a meeting in Fred's executive conference room with CW6, CW3, and other senior management, in which Bloom informed the rest of senior management that the FTC was unlikely to approve the deal. CW6 observed that before the meeting, Bloom had already prepared his remarks for Fred's earnings release and related conference call, and did not want to disclose the FTC's likely rejection.

88. On or before March 17, 2017, Walgreens and Rite Aid began having discussions with the FTC Bureau of Competition that did not include Fred's or Fred's representatives. On March 22, 2017, Walgreens and Rite Aid met with the FTC Bureau of Competition for a "transition meeting." Walgreens and Rite Aid also met with the FTC Bureau of Competition, without Fred's, on June 15, 2017 and June 27, 2017. Understanding that the FTC Bureau of Competition would not recommend approval of the plan to divest stores to Fred's, Walgreens and Rite Aid negotiated a transaction whereby Walgreens would simply purchase about half of Rite Aid's stores, and Rite Aid would continue to operate its remaining stores in competition with Walgreens.

89. On April 5, 2017, Walgreens conducted an earnings call as part of the quarterly earnings statement it issued that same day. During the earnings call, in his prepared remarks, Pessina reiterated guidance incorporating the anticipated Rite-Aid accretion, and represented that:

> Turning to Rite Aid, ***I am still optimistic that we will bring this deal to a successful conclusion***, but there is no doubt that the process of getting clear for the transaction is taking longer than we expected. We are constantly and currently cooperating with [the] FTC, Rite Aid, and Fred's to get the necessary approval and close the transaction.

> At the same time we are working to be in a position to certify compliance [with the FTC's Second Request]. We believe that we can achieve this in the coming weeks and we are still working towards our revised timetable to obtain a clearance by the end of July. ***The changes to the deal that we agreed [to] in January demonstrate our absolute commitment to ensure [that] all transactions . . . meet our demanding financial and strategic requirement, while allowing us the ability to address any reasonable demand that may be made for us in obtaining regulatory approval***.

90. When an analyst questioned whether Walgreens and the FTC were "seeing eye-to-eye," Pessina responded, "[A]s I said, I am still positive on this deal. I believe that we have a strong argument to defend this deal." In response to another analyst's question of whether Walgreens would look for another buyer if the FTC decided that Fred's could not be the divestiture buyer, or if non-approval of Fred's as divestiture buyer would "bring an end" to the merger, Pessina represented that "for the time being we believe that Fred's is the right buyer. We believe they have—in particular the configuration we are proposing now—they are absolutely a legitimate player in this industry."

91. The statements identified in paragraph 89 and 90 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because: (a) Walgreens had received feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer; (b) Walgreens and the FTC were not "seeing eye-to-eye"; (c) the statements omitted that Walgreens and Pessina had not demonstrated (and could not demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; (d) the statements omitted known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; (e) far from being a "legitimate player in the industry," Fred's was crippled by archaic systems and scarce resources, and lacked sufficient ability to acquire and operate up to 1,200

additional stores; and (f) the statements omitted that Walgreens and Rite Aid had already transitioned their focus to a transaction that did not involve Fred's.

92. On April 6, 2017 before market open, Fred's issued a press release that announced its fourth quarter 2016 earnings. The press release discussed the contemplated divestiture transaction as follows: "The proposed acquisition of the stores, which are based in highly attractive markets, is a transformative event that will add substantial scale to the company and transform Fred's Pharmacy, the largest regional pharmacy player, into an even stronger competitor and the third-largest drugstore chain in the nation."

93. The statements identified in paragraph 92 were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because: (a) they omitted feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer; (b) the statements omitted that neither Fred's nor Walgreens had demonstrated (and neither could demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; (c) the statements omitted known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; and (d) the statements omitted that Fred's lacked sufficient ability to acquire and operate the referenced divestiture stores on its own.

94. On April 6, 2017, before market open, Fred's and Bloom conducted an earnings conference call for investors and analysts. During that call, Bloom represented in prepared remarks that "the transformation of Fred's Pharmacy that has been underway for the past 18 months has been working." Bloom also repeated that Fred's acquisition of Rite Aid stores would be "a transformational event for our Company," and that "Fred's Pharmacy remains committed to purchasing

additional assets, including up to 1,200 Rite Aid stores to the extent necessary to obtain the FTC's approval of the transaction."

95. Bloom attempted to dodge questions about the divestiture purchase, stating "as a reminder, the purpose of today's call is to discuss our earnings results and we would appreciate it if you would please keep your questions focused on that topic." However, after an analyst asked Bloom what Fred's needed to do to make sure that it could transform from a regional pharmacy player into a national player, Bloom responded that "[W]e're collaboratively working on the biggest piece of that transformation with Rite Aid and Walgreens Boots Alliance."

96. The statements identified in paragraphs 94 and 95 above were materially false and/or omitted material information necessary to make the statements not misleading under the circumstances in which they were made because: (a) they omitted feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer; (b) the statements omitted that Fred's and Bloom had not demonstrated (and could not demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; (c) the statements omitted known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; and (d) the statements omitted that Fred's lacked sufficient ability to acquire and operate the referenced divestiture stores on its own.

97. The market responded favorably to Bloom's misleading statements falsely touting the prospects of the proposed acquisition. As a result, Fred's stock price closed on April 6, 2017 at $14.29 per share, a one-day gain of 13.9%.

98. On April 13, 2017, Fred's filed its 2016 Annual Report with the SEC on Form 10-K. Bloom signed Fred's 10-K as its CEO, and certified that he reviewed the Form 10-K and that it contained no untrue statement of a material fact or omitted a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading. In its section of the 10-K under the heading "A Healthcare Company Serving America," Fred's represented that, "We are the country's fourth-largest drug store chain and a leading regional pharmacy with deep experience across a spectrum of large, medium and small markets." This statement was materially false and/or misleading when made because: (a) as of April 13, 2017, Fred's was not, in fact, "the country's fourth-largest drug store chain"; and (b) Fred's did not have a "deep experience" operating pharmacies "across a spectrum of large, medium and small markets."

99. In the section of its 10-K relating to the Asset Purchase Agreement, Fred's repeated earlier representations about its acquisition of the Rite Aid stores, in particular that:

A. Fred's agreed to purchase 865 Rite Aid stores for $950 million;

B. "Fred's is working collaboratively with Walgreens, Rite Aid and the Federal Trade Commission to help obtain the FTC's approval of Walgreens' pending acquisition of Rite Aid and the divestiture of certain Rite Aid assets to Fred's";

C. Fred's remains committed to purchasing additional assets, including up to 1,200 Rite Aid stores, to the extent necessary to obtain the FTC's approval of the Rite Aid Transaction; and

D. "The proposed acquisition of the stores, which are based in highly attractive markets, is a transformative event that will add substantial scale to the Company and make Fred's an even stronger competitor and the third-largest drugstore chain in the nation."

100. The statements identified in paragraph 99 above were materially false and misleading and/or omitted material information necessary to make the statement not misleading under the circumstances in which they were made because: (a) they omitted feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer; (b) the statements omitted that Fred's and Bloom had not demonstrated (and could not demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; (c) the statements omitted known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; and (d) the statements omitted that Fred's lacked sufficient ability to acquire and operate the referenced divestiture stores on its own.

101. The market learned that concealed risks had partially materialized on April 19, 2017, when Bloomberg reported that the "FTC is deposing company executives, seeking declarations from third parties and making plans to sue to stop [the] Rite Aid/Walgreens deal." *See* Joshua Fineman, Bloomberg, *Rite Aid Down as Cap Forum Says FTC Prepares to Stop Deal*, (Apr. 19, 2017). As a result, Fred's shares fell 9.10% from the previous day, to close at $13.68 per share.

102. On May 8, 2017, Walgreens, Rite Aid, and Fred's certified substantial compliance with the FTC's Second Request, which triggered a 60-day waiting period for the FTC to either allow the merger or file a lawsuit to block the Merger. The next day, however, Bloomberg reported that "FTC officials have been concerned about the plan and Fred's ability to compete effectively if the merger is approved." *See* David McLaughlin, Bloomberg, *Walgreens Moves to Force U.S. Decision on Rite Aid Merger* (May 9, 2017).

103. On May 23, 2017, Pessina and Walgreens told investors at the UBS Global Healthcare conference in New York City that "we strongly believe that Fred's is a viable buyer." These representations were materially false and/or omitted material information necessary to make

the statements not misleading under the circumstances in which they were made because Fred's was not a viable buyer, as the FTC Bureau of Competition had confirmed by informing Walgreens, Rite Aid and Fred's that the Bureau of Competition would not recommend approval of the Merger with Fred's as divestiture buyer.

104. On June 6, 2017, before the market opened, Fred's conducted an earnings call attended by Fred's senior management, including Bloom. In prepared remarks, Bloom disclosed that management was now "laser focused on the core Fred's," which was understood by investors to mean focusing on Fred's existing operations rather than the acquisition of Rite Aid stores. For example, Nick Mitchell of Northcoast Securities stated, "Some people may be interpreting [plans to accelerate refurbishing some existing stores] as management being less confident in being able to secure the Rite Aid stores." *See* Cynthia Koons and Robert Langreth, Bloomberg, *Fred's Posts Loss, Stock Drops Amid Rite Aid Deal Doubts* (June 6, 2017).

105. Although Bloom stated that Fred's was continuing to collaborate with Walgreens, Rite Aid, and the FTC to obtain the FTC's approval of the divestiture of the Rite Aid stores with Walgreens, and continued to represent that "remain[ed] optimistic in our ability to receive FTC approval," market commentators expressed doubts, especially after Bloom revealed that Fred's "laser focus" shifted to existing operations. On June 6, 2017, Bloomberg reported that:

> The fate of the Walgreens deal hinges on whether the U.S. Federal Trade Commission can be convinced that Walgreens's plan to sell as many as 1,200 Rite Aid stores to Fred's is viable. The company's deteriorating financial health may raise concerns at the agency about Fred's ability to take on the new locations, which would essentially triple the chain's size.
>
> * * *
>
> The loss came as costs associated with the proposed buyout of Rite Aid stores mounted. [Fred's] took a $16.9 million charge for "professional and legal advisory fees" tied to the potential deal, as well as for the implementation of its growth plan. It took another $13.5 million charge related to the closing of underperforming stores.

> "There's a lot of ongoing uncertainty over the pending Rite Aid transaction," said Nick Mitchell, an analyst at Northcoast Research who covers Fred's and has a "neutral" rating on the stock. "With the soft numbers and the building debt, people are getting a little discouraged."

*See* Cynthia Koons and Robert Langreth, Bloomberg, *Fred's Posts Loss, Stock Drops Amid Rite Aid Deal Doubts* (June 6, 2017). As a result of the June 6, 2017 partial disclosure, Fred's share price dropped by 19.3% over the next five trading sessions, from its June 5, 2017 close of $13.60, to close at $10.98 on June 12, 2017. The full extent of the drop was mitigated because Fred's and Bloom continued to claim the divestiture would be "transformative" and because they concealed the adverse determination of the FTC Bureau of Competition.

106. On June 29, 2017, before market open, Fred's and Walgreens and Rite Aid announced that on June 28, 2017, (1) the parties terminated the Merger, (2) by extension, the Asset Purchase Agreement with Fred's was terminated, and (3) Walgreens and Rite Aid had entered into a separate agreement, in which Walgreens would purchase 2,186 stores (around half of Rite Aid's fleet) for $5.175 billion, with no role for Fred's in the revised transaction.

107. The same day, Tad Lipsky, the FTC's Acting Director of the Bureau of Competition, issued a press release in which he stated:

> The Commission staff thoroughly investigated the potential impact that the proposed Walgreens/Rite Aid merger may have had on competition and evaluated a number of divestiture proposals put forward by the parties. Before the time the companies would have been free to close their transaction absent Commission action, they voluntarily withdrew their HSR filings, and the matter is no longer before the Commission. Walgreens and Rite Aid have publicly stated they have reached a new agreement related to certain Rite Aid assets. The FTC will review any new transaction proposed by the parties under the statutes enforced by the Commission, as may be applicable.

108. On a press release that same day, Rite Aid disclosed that "the decision to terminate the merger agreement follows feedback received from the Federal Trade Commission ("FTC")

that led the company to believe that the parties would not have obtained FTC clearance to consummate the merger."

109. For Fred's stockholders, the announcement was a disaster. On June 29, 2017, Fred's shares plummeted $2.81 per share to $9.51, or 22.8% by market close. Shares continued to drop over the next week as the market continued to digest the shock, to close at $6.40 per share on July 6, 2017.

110. On September 19, 2017, the FTC allowed the Hart-Scott-Rodino waiting period for Walgreens' and Rite Aid's revised deal to lapse, allowing Walgreens' and Rite Aid to complete their asset purchase transaction.

## CLASS ACTION ALLEGATIONS

111. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Fred's securities between December 20, 2016 and June 28, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, former and current officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

112. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Fred's disclosed in its Form 10-K filed with the SEC on April 13, 2017 that there were 5,000 shareholders of Fred's stock as of April 7, 2017. Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, Fred's had a large public float consisting of approximately 17.6 million shares

that traded actively on the NASDAQ. Class members may be identified from records maintained by Fred's or its transfer agent, institutional filings, and the records of brokers holding such securities in street name for their clients, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

A. Whether Fred's, Bloom, Walgreens, and Pessina made affirmative misrepresentations and/or omitted material information to investors regarding the proposed divestiture of Rite Aid stores to Fred's;

B. Whether Fred's, Bloom, Walgreens, and Pessina made affirmative misrepresentations and/or omitted material information to investors regarding known impediments to Fred's serving as a divestiture buyer;

C. Whether Fred's, Bloom, Walgreens, and Pessina made affirmative misrepresentations and/or omitted material information to investors regarding communications with the FTC;

D. Whether Defendants' misrepresentations and omissions violated federal securities laws;

E. Whether Defendants' misrepresentations and omissions were material;

F. Whether Defendants acted with scienter;

G. Whether the prices of Fred's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

H. Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

114. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

115. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have no interests antagonistic to the Class, and have retained highly experienced counsel specializing in securities litigation.

116. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

117. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- During the Class Period, Defendants made public misrepresentations of material facts and failed to disclose material facts necessary to make the statements they publicly made during the Class Period not misleading under the circumstances in which they were made;
- Fred's shares traded in an efficient market;
- Fred's shares were liquid and traded with moderate to heavy volume during the Class Period;

- Fred's shares traded on the NASDAQ and were covered by multiple analysts, journalists, and industry commentators; and
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Fred's shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

118. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

119. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (against all Defendants)

120. Plaintiffs restate and reallege each and every paragraph above as though fully set forth herein.

121. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

122. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fred's securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Fred's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

123. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Fred's and Bloom participated directly or indirectly in the preparation and/or issuance of the misleading Fred's press releases, SEC filings, statements to journalists and conference call statements identified above, and each of Walgreens and Pessina Bloom participated directly or indirectly in the preparation and/or issuance of the misleading Walgreens press releases, SEC filings, statements to journalists and conference call statements identified above. Specifically, as detailed above, each made materially false and/or misleading statements about Fred's ability to serve as a divestiture purchaser, known impediments in Fred's business operations, and regulatory communications with the FTC.

124. Because of his central role in the negotiations and regulatory communications described above and his role at Fred's, Bloom had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Bloom acted with reckless disregard for

the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to him.

125. Because of his central role in the negotiations and regulatory communications described above and his role at Walgreens, Pessina had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Pessina acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to him.

126. Information showing that Fred's, Bloom, Walgreens, and Pessina acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

127. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Fred's shares was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning regulatory communications, Fred's inability to meet FTC's criteria for a divestiture buyer, and Fred's business and financial condition, which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Fred's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

128. During the Class Period, Fred's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or

relying upon the integrity of the market, purchased or otherwise acquired shares of Fred's at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Fred's shares was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Fred's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

129. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Bloom and Pessina are liable both directly and indirectly for the wrongs complained of herein. Because of their dominant positions of control and authority at Fred's and Walgreens, respectively, Bloom and Pessina were able to and did control the content of the statements of those companies. Each had a duty as an officer and director of a publicly-traded company to disseminate timely, accurate, and truthful information with respect to the potential divestiture, regulatory communications, and impediments to the transaction.

130. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure of the truth, or materialization of the risks, concealed by Defendants' Class Period misrepresentations and omissions.

## COUNT II

### Violations of Section 20(a) of the Exchange Act (against Bloom and Pessina)

131. Plaintiffs incorporates by reference and re-alleges each and every allegation above, as though fully set forth herein.

132. Bloom acted as a control person of Fred's within the meaning of Section 20(a) of the 1934 Act, 15 U.S.C. § 78t, as alleged herein. By his direct involvement in negotiations with Walgreens and Rite Aid, regulatory communications with the FTC, and his authority as the most senior executive and as a Director of Fred's, Bloom had the power to influence and control, and did influence and control, directly or indirectly, Fred's false and misleading statements alleged herein.

133. Pessina acted as a control person of Walgreens within the meaning of Section 20(a) of the 1934 Act, 15 U.S.C. § 78t, as alleged herein. By his direct involvement in negotiations with Walgreens and Rite Aid, regulatory communications with the FTC, and his authority as the most senior executive of Walgreens, Pessina had the power to influence and control, and did influence and control, directly or indirectly, Walgreens' false and misleading statements alleged herein.

134. The Individual Defendants were provided with or had unlimited access to copies of the statements alleged to be misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of those statements or cause those statements to be corrected.

135. By virtue of these facts, Bloom has violated Section 20(a) of the Exchange Act and is liable to Plaintiffs and the other members of the Class for Fred's violations of the Section 10(b) of the Exchange Act.

136. By virtue of these facts, Pessina has violated Section 20(a) of the Exchange Act and is liable to Plaintiffs and the other members of the Class for Walgreens' violations of the Section 10(b) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in favor of Plaintiffs and the Class, and against Defendants as follows:

A. Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B. Awarding Plaintiffs and the Class compensatory damages;

C. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E. Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.

Dated: November 4, 2019

*/s/ Joshua B. Silverman*

POMERANTZ LLP
Patrick V. Dahlstrom
(admitted pro hac vice)
Joshua B. Silverman (IARDC # 6238108)
(admitted pro hac vice)
Jared M. Schneider
(admitted pro hac vice)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603

T: (312) 377-1181
E: pdahlstrom@pomlaw.com
jbsilverman@pomlaw.com
jschneider@pomlaw.com

HOLIFIELD JANICH & FERRERA, PLLC
Al Holifield
Sarah R. Johnson
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
T: (865) 566-0115
E: aholifield@hapc-law.com

***Attorneys for Lead Plaintiffs***

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that this Amended Class Action Complaint for Violation of the Federal Securities Laws was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on November 4, 2019.

/s/ Joshua B. Silverman
Joshua B. Silverman