**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS**

| | |
|---|---|
| THEODORE K. ZALLER, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:19-cv-02415-SHL-dkv |
| Plaintiff, | Hon. Sheryl H. Lipman<br>Chief Mag. Judge Diane K. Vescovo |
| v. | **JURY DEMAND** |
| FRED'S INC., MICHAEL K. BLOOM, WALGREENS BOOTS ALLIANCE, INC., and STEFANO PESSINA, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT BLOOM'S
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

---

Patrick V. Dahlstrom (admitted pro hac vice)
Joshua B. Silverman (admitted pro hac vice)
Jared M. Schneider (admitted pro hac vice)
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
T: (312) 377-1181
E: pdahlstrom@pomlaw.com
   jbsilverman@pomlaw.com
   jschneider@pomlaw.com

Al Holifield
Sarah R. Johnson
HOLIFIELD JANICH & FERRERA, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
T: (865) 566-0115
E: aholifield@hapc-law.com

*Attorneys for Lead Plaintiffs*

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

FACTS ALLEGED ....................................................................................................... 2

ARGUMENT ................................................................................................................ 9

I.     THE COMPLAINT ADEQUATELY ALLEGES THAT BLOOM VIOLATED
       §10(b) OF THE EXCHANGE ACT ........................................................... 9

       A.  Applicable Pleading Standards Do Not Favor Dismissal ................................. 9

       B.  Bloom Made Materially False and Misleading Statements About The
           Divestiture Sale ..................................................................................... 10

       C.  The Information Bloom Concealed Was Highly Material .............................. 12

       D.  Bloom's Misrepresentations and Omissions Are Actionable Even If
           Opinion ..................................................................................................... 14

       E.  Bloom's Additional Falsity and Materiality Arguments Fail ........................ 15

           1.  Truth-on-the-market is a factual dispute reserved for the jury ................ 15

           2.  Bloom's false statements are not protected by the limited safe harbor for
               forward-looking statements .................................................................... 16

           3.  Bloom was obligated to disclose material adverse facts .......................... 18

           4.  Factual questions about falsity are trial issues for the jury to resolve ...... 18

       F.  The Complaint Pleads a Strong Inference of Scienter ................................... 19

           1.  The Complaint alleges a cogent and compelling inference of scienter .... 19

           2.  Each of the Confidential Witnesses is credible and cannot be
               discounted ............................................................................................ 23

           3.  Bloom provides no plausible competing inference .................................. 24

II.    PLAINTIFFS STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER §20(a) ........................................................................................................... 25

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Ark. Pub. Emps. Ret. Sys. v. Harman Int'l Indus. Inc. (In re Harman Int'l Indus., Inc. Sec. Litig.)*,
791 F.3d 90 (D.C. Cir. 2015) ................................................................................ 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................... 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 9

*Bluestone v. Sadove*, No. 3:18-cv-63, 2019 U.S. Dist. LEXIS 62207
(E.D. Tenn. Mar. 14, 2019) .......................................................................... 24, 25

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) ............ 13

*Cross v. Metro. Gov't of Nashville/Davidson Cnty.*, No. 3-12-1109,
2013 U.S. Dist. LEXIS 64733 (M.D. Tenn. May 7, 2013) ....................................... 9

*Doshi v. Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016) ...................................... 23

*Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018) .................. 16, 19, 22

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .............................................. 10

*Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 U.S. Dist. LEXIS 207475
(M.D. Tenn. Dec. 18, 2017) ..................................................................................13

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) ................................................... *passim*

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ...................................... 19

*In re Accredo Health, Inc.*, No. 03-2216-BBD, 2005 U.S. Dist. LEXIS 46923
(W.D. Tenn. Apr. 11, 2005) ................................................................................ 20

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423
(S.D.N.Y. 2011) ................................................................................................ 17

*In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006) ...................... 10

*In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 U.S. Dist. LEXIS
200986 (M.D. Tenn. Nov. 19, 2019) ..................................................... 15, 22, 25

*In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837 (S.D. Ohio 2016) ...................23

*In re Nuvelo Inc. Sec. Litig.*, 668 F. Supp. 2d 1217 (N.D. Cal. 2009) ................................. 18

*In re PTC Therapeutics, Inc., Sec. Litig.*, No. 16-1124 (KM) (MAH),
2017 U.S. Dist. LEXIS 137930 (D.N.J. Aug. 28, 2017).......................................................... 21

*In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20 (D. Mass. 2004).................................... 14

*In re Sprint Corp. Secs. Litig.*, 232 F. Supp. 2d 1193 (D. Kan. 2002)................................... 25

*KBC Asset Mgmt. N.V. v. Omnicare, Inc. (In re Omnicare, Inc. Sec. Litig.)*, 769 F.3d 455
(6th Cir. 2014)....................................................................................................................... 12

*Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593 (E.D. Va. 2015) ............. 19

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ............................................ 24, 25

*Mediacom LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396 (6th Cir. 2012)........... 9

*Miller v. Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003) ..................................... 16, 17

*Muhammad v. Azar*, No. 18-cv-2857-MSN-tmp, 2019 U.S. Dist. LEXIS 152283
(W.D. Tenn. Aug. 19, 2019) .................................................................................................. 9

*Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472 (S.D.N.Y. 2018) ......................... 14

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
929 F. Supp. 2d 740 (M.D. Tenn. 2013)................................................................................ 12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................................................................. 14, 15, 18

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ...................................................................... 13

*Pen. Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015) ................... 17

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) ............................................. 19

*Sarafin v. BioMimetic Therapeutics, Inc.*, No. 3:11-0653, 2013 U.S. Dist. LEXIS 4909
(M.D. Tenn. Jan. 10, 2013)................................................................................................... 23

*Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010)........................................................... 17

*Stoneridge Inv. Partners, LLC v. Sci.–Atl., Inc.*, 552 U.S. 148 (2008)................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)........................ 9, 10, 19, 24

iv

*Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................... 18

*Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900 (M.D. Tenn. 2019) ........................... 18, 19

*Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475,
2018 U.S. Dist. LEXIS 97942 (M.D. Tenn. Apr. 19, 2018) .............................................16, 17

**Statutes**

15 U.S.C. §78u-4(b)(2) ..................................................................................................... 10

15 U.S.C. § 78u-5(c)(1)(A)................................................................................................ 16

**Rules**

17 C.F.R. §240.10b-5(b) ....................................................................................................10

Fed. R. Civ. P. 9(b) ........................................................................................................... 10

Fed. R. Civ. P. 12(b)(6)............................................................................................. *passim*

v

Lead Plaintiffs Gary Fielder, Susan Ciesla, and Herbert Ciesla ("Plaintiffs") hereby oppose the motion to dismiss of Defendant Michael Bloom ("Bloom"), former Chief Executive Officer of Fred's, Inc. ("Fred's" or "the Company") as follows:

## INTRODUCTION

Bloom's motion to dismiss hinges upon a simple proposition: is a senior executive entitled to conceal from investors the most important facts about the most important transaction in the company's history?  The law is clear.  If he chooses to speak about the transaction, he must "provide complete and non-misleading information with respect to the subject[.]"  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc).

Bloom did not do that.  Instead, in repeated statements to investors, he hid highly material adverse information about an Asset Purchase Agreement that Bloom had inked with Walgreens and Rite Aid for Fred's to purchase 865 Rite Aid stores to be divested in connection with a merger between the drug store giants (hereafter, the "Divestiture Sale").  Walgreens and Rite Aid agreed to divest those stores to another retailer who could operate them in competition with the merged chains after the United States Federal Trade Commission ("FTC") raised antitrust concerns.  ¶¶41-52.[1]  Bloom's statements about the Asset Purchase Agreement, the 865 Divestiture Sale stores, and what the Divestiture Sale meant to Fred's (¶¶64-65, 78-79, 92-100, 104-05) omitted:

- that Fred's failed to meet FTC criteria for divestiture buyers, which required proof that the buyer would be able to maintain or restore competition, ¶¶6-7, 29-31, 37-38, 53-60;

- that the FTC Bureau of Competition directly warned Bloom that it would not recommend approval of Fred's as a divestiture buyer, after Fred's had failed to show the FTC that it could meet FTC divestiture buyer criteria, ¶¶84-85;

- that after the FTC Bureau of Competition's warning, Walgreens and Rite Aid cut Fred's out of deal negotiations, ¶88; and

---

[1] References to "¶__" followed by a number refer to the numbered paragraphs of the Amended Complaint, ECF No. 52 (the "Complaint").

1

- that Bloom had been warned by his executive team about impediments in Fred's information technology ("IT") systems, supply chain, and warehouse management that rendered them incapable of accommodating 865 additional Rite Aid stores. ¶¶53-60.

Bloom's deceit is a straightforward case of misrepresentation by omission. Even Bloom does not dispute that the Complaint identifies each of his omissions with particularity, describes when and where the omissions were made, and why Plaintiffs contend that each rendered his biased positive statements about the Asset Purchase Agreement and Divestiture Sale materially misleading. Nor does Bloom provide any plausible inference that would excuse his concealment, let alone an inference *more* compelling than the unavoidable inference that Bloom was trying to hide damaging information, or was reckless to the danger of misleading investors.

Having failed to identify any pleading deficiency, Bloom's motion to dismiss should be denied in its entirety, and Bloom directed to proceed to discovery without further delay.

## FACTS ALLEGED

Fred's is a small dollar store retail chain operating primarily in the Southeastern United States. ¶2. Fred's focuses on small-town and rural markets, which it called "underserved." *Id.*; ¶33. By 2015, that strategy was generating large losses. ¶35. As a result, Fred's determined to reinvent itself as a pharmacy chain, and hired Defendant Bloom, a former CVS executive, as its new Chief Executive Officer to lead the transition. ¶36. In late 2015 and early 2016, Fred's began to make small bolt-on acquisitions to attempt to grow its pharmacy operations. *Id.* However, Fred's was not able to successfully transition on its own to a pharmacy chain. Fred's had pharmacies in only 370 of its 648 stores, a far smaller footprint than would be needed to compete with major chains, and continued to post large losses. ¶¶2, 35.

A merger between drug store giants appeared to offer Fred's a lifeline. In late 2015, Walgreens and Rite Aid announced that they would merge and filed a Hart-Scott-Rodino notice with the FTC Bureau of Competition. ¶¶40-43. Instead of approving the merger, the FTC made a "second request" for information on competition, a procedure the FTC invokes only in

2

approximately 3% of the cases where competition is of critical concern.  ¶¶28, 43.  Beginning in late April 2016, Walgreens and Rite Aid presented the FTC with advocacy papers addressing competition in important markets.  ¶45.  Nonetheless, in August 2016, the FTC indicated to Walgreens and Rite Aid that it believed competition in certain markets would be threatened without additional remedies.  *Id.*  Accordingly, Walgreens and Rite Aid began negotiating with Fred's and other potential buyers for divestiture of hundreds of Rite Aid stores, including Kroger and Albertsons.  ¶¶45-46, 61.

The announced divestiture purchase would be a home run for Fred's.  ¶¶4, 5, 53, 64.  Purchasing hundreds of Rite Aid stores in the planned coastal and urban locations would instantly vault Fred's into a major drug store chain, accomplishing in a single sweep the strategic transformation for which Bloom had been hired but had been unable to pull off.  ¶¶33-38, 64.  And, because the divestiture was a gesture to regulators rather than a market process, Fred's was able to secure the assets at a reasonable cost.  ¶¶40-52, 63.

However, there was a catch: the divestiture sale of Rite Aid stores to Fred's had to pass FTC approval.  ¶6.  The FTC Bureau of Competition requires that a divestiture buyer satisfy two criteria:

(1) a divestiture buyer must be ready, willing, and able to operate the divested stores in a manner that maintains or restores competition in the relevant markets, and

(2) a divestiture buyer must have the financial resources to consummate the proposed divestiture and to remain a vigorous competitor in the market.

¶6.  The FTC Bureau of Competition discusses these criteria privately with the companies involved.  ¶¶51-52, 55, 61, 84-85.  However, because the FTC does not disclose the content or even existence of its meetings with companies under review, investors must rely upon corporate executives to truthfully update them on regulatory developments with the FTC.

On November 10, 2016, Fred's met with the FTC Bureau of Competition to discuss its "suitability as a potential purchaser of the divestiture assets and [its] plans to transition full operation of the divestiture assets from Rite Aid."  ¶52.  On or around November 23, 2016,

3

Walgreens informed the FTC that it intended to pursue a divestiture sale to Fred's, rather than other bidders. ¶61. On December 2, 2016, Bloom, Fred's, Walgreens, and Rite Aid met with the FTC to discuss the divestiture sale and other topics. *Id*. Understanding that the FTC's concern focused on Fred's ability to maintain competition as a divestiture buyer, Bloom brought Fred's antitrust counsel and consultants to the meeting. *Id.*

On December 20, 2016, Bloom began to mislead investors about these mission-critical regulatory communications.[2] On that day, Bloom caused Fred's to issue a press release about the proposed divestiture, in which Bloom is quoted extensively touting claimed benefits of the divestiture transaction, promising that it "will accelerate our healthcare growth strategy through our acquisition of 865 new stores located in highly attractive markets." ¶64; *see also* ECF No. 57-3 (quoting Bloom in same press release trumpeting "the considerable benefits this transaction will bring to our customers, patients, payors, supplier partners, team members and shareholders"). However, Bloom omitted the most important information: that Fred's did not meet the FTC criteria for a divestiture buyer, and could not demonstrate to the FTC that approval criteria were satisfied. *See, e.g.*, ¶65. Bloom's effort to pump Fred's stock price was successful. Following the press release, Fred's shares spiked more than 81% on 45 times average daily volume. ¶67.

Bloom was well aware at the time of his statements that Fred's lacked the systems and resources to support any sizable expansion, let alone to more than double its store count and triple its pharmacy count (while maintaining competition against Walgreens in key markets, as the FTC divestiture approval criteria demanded). ¶¶53-60. Fred's Senior Vice President of Information Technology, identified in the Complaint as Confidential Witness ("CW") 1, directly warned Bloom that Fred's internal systems could not support the additional Rite Aid stores. ¶¶37, 53. Specifically, Fred's lacked modern enterprise resource planning ("ERP") technology, warehouse management systems, and transportation management systems necessary to effectively operate

---

[2] Walgreens and Pessina also concealed adverse information, as is addressed in the separate opposition brief filed herewith.

4

even existing stores, and was certainly incapable of supporting the minimum 865 store increase contemplated by the divestiture transaction. *Id.*

When CW 1 raised his concerns about the adequacy of these systems to Bloom, Bloom brushed him off and directed CW 1 to just keep moving forward. ¶53. CW 1 was told that Fred's would not have room in its budget to make needed improvements before the divestiture transaction. ¶59. Instead, Fred's brokered a temporary arrangement for *Walgreens*—with which it had to demonstrate it could compete in the divestiture markets—to provide Fred's with interim IT and ERP support. ¶60. CW 2, the successor to CW 1 as Fred's Vice President of Information Technology, confirmed that these interim measures would not be sufficient to support the additional Rite Aid stores. *Id.*

Other witnesses confirmed that Bloom had not funded the improvements necessary to take on additional stores. Fred's Executive Vice President of Supply Chain and Chief Operating Officer - Front Store indicated that he had been tasked with redesigning Fred's supply chain, which suffered from problems due to outdated warehouse management software and related systems. ¶54. Because Bloom and Fred's understood that the FTC was concerned about whether Fred's deficiencies in these areas would inhibit its ability to satisfy the FTC criteria of "maintaining competition" against Walgreens in the locations in which Fred's planned to acquire divested Rite Aid stores, Fred's supplied the FTC with an outline of the improvements it planned to make in its November 2016 meeting with the FTC. ¶55. However, according to CW 3, the promised improvements were not funded. *Id.*

CW 4, a Regional Vice President of Store Operations, corroborated that Fred's warehouse management system was unreliable and that its supply chain had never been correctly implemented. ¶56. CW 5, the Senior Vice President of Supply Chain, also corroborated that there were weekly failures in the supply chain. ¶58. CW 4 confirmed that he personally warned Fred's senior leadership that its distribution systems needed to be fixed, and that Fred's senior leadership often discussed deficiencies in those systems with him. ¶57.

5

At some point between December 20, 2016 and January 6, 2017, the FTC subpoenaed Fred's management requesting extensive documents. ¶70. In January 2017, CW 3 indicated that Fred's leadership was informed that Walgreens would likely need to divest more than 865 stores, but that the FTC was not comfortable with Fred's capability to build a distribution infrastructure to support the stores. ¶75.

On January 30, 2017, Walgreens announced that if required for regulatory approval it would divest, and Fred's had agreed to purchase, up to 1,200 Rite Aid stores. ¶76. That same day, Fred's issued a press release confirming its agreement to buy additional stores if requested by the FTC and Walgreens. ¶78.

On March 3, 2017, Rite Aid filed a Merger Proxy statement with the SEC on Schedule 14A (the "March 2017 Merger Proxy"), disclosing for the first time a fraction of the adverse information that Bloom and Fred's had been concealing from investors. ¶81. Specifically, the March 2017 Merger Proxy indicated that Fred's discussed with Walgreens and Rite Aid in January 2017 additional "support" that would have to be part of a divestiture proposal (in light of known deficiencies of Fred's), including infrastructure-related support. *Id.* As a result, Fred's shares dropped 11% on March 3, 2017 to close at $16.30. ¶82.

Fred's shares dropped further after Bloomberg confirmed that the FTC was concerned about whether Fred's had sufficient capital resources to maintain competition as a divestiture buyer. *Id.* As a result, Fred's shares dropped another $.78 over March 8-9, 2017, to close at $14.67.

On March 14, 2017, Bloom, along with Fred's Chief Operating Officer - Healthcare Timothy Liebmann and its lead antitrust counsel, as well as representatives of Walgreens and Rite Aid, met with the FTC Bureau of Competition and the Attorneys General of many states (who were invited because they were empowered to bring antitrust litigation on behalf of their respective states addressing if competition was threatened by divestiture or Rite Aid stores to Fred's). ¶¶84-85. At the meeting, the FTC Bureau of Competition indicated that it did not believe Fred's could meet the criteria of maintaining competition in the divestiture markets, and therefore it would not

6

recommend approval.  ¶85.  Specifically, according to CW 6, Fred's Senior Vice President of Human Resources, who attended executive meetings with Bloom in which the March 14, 2017 FTC meeting was discussed, the FTC Bureau of Competition told Bloom at the March 14, 2017 meeting that it believed Fred's financial resources prevented the Bureau of Competition from recommending approval so long as Fred's was the divestiture buyer.  ¶86.  Approximately three days later, Walgreens and Rite Aid began to meet with the FTC to discuss "transition" plans that did not include Fred's.  ¶88.

Right before Fred's April 6, 2017 earnings release, Bloom held a meeting in Fred's executive conference room, attended by CW 6, CW 3, and other senior management.  ¶87.  In that meeting, Bloom admitted that he believed the FTC was unlikely to approve the divestiture transaction.  *Id.*  However, Bloom indicated that he did not want to disclose the FTC's likely rejection in the earnings release or conference call.  *Id.*

On April 6, 2017, before the market opened, Bloom and Fred's issued an earnings press release, which claimed that the divestiture purchase "will add substantial scale to the company and transform Fred's Pharmacy, the largest regional pharmacy player, into an even stronger competitor and the third-largest drugstore chain in the nation."  ¶92.  Bloom made similar oral comments in a conference call that morning.  ¶94.  The press release and conference call both omitted any mention of the warning received from the FTC Bureau of Competition only three weeks earlier indicating that it would not recommend approval of a transaction designating Fred's as the divestiture buyer.  ¶¶93, 95.  Conference call and press release statements also omitted that Fred's did not qualify to serve as a divestiture buyer under FTC criteria, that Fred's had not demonstrated its qualification, that Fred's had extensive, known deficiencies in its IT, distribution, ERP, supply chain and warehouse management systems that rendered it incapable of effectively absorbing an additional 865-1,200 stores or more, and that Fred's lacked sufficient ability to acquire or operate the referenced divestiture stores on its own.  *Id.*   These misleading statements artificially inflated Fred's stock price, sending shares up 13.9% to close on April 6, 2017 at $14.29 per share.  ¶97.

7

On April 13, 2017, Fred's filed its Form 10-K with the SEC, signed by Bloom, which made the same omissions in discussing the divestiture transaction. ¶¶98-100. However, the risks concealed by Bloom partially materialized on April 19, 2017, when Bloomberg reported that the FTC was considering litigation to block the transaction that included Fred's as a divestiture buyer. ¶101. As a result, Fred's shares dropped 9.1% to close at $13.68. *Id.* On May 8, 2017, Bloomberg confirmed that the FTC remained "concerned . . . about the plan and Fred's ability to compete effectively if the merger is approved." ¶102.

On June 6, 2017, before the market opened, Bloom and Fred's conducted an earnings call in which Bloom announced a shift in strategy. ¶104. Instead of focusing on the transformative divestiture purchase, Bloom indicated that Fred's management was now "laser focused on core Fred's." *Id.* Analysts remarked that the shift in strategy underscored "management being less confident in being able to secure the Rite Aid Stores." *Id.* Bloom tried to soften the blow by claiming that he "remain[ed] optimistic" about FTC approval, but Fred's shares still dropped 19.3% over the next five trading sessions to close on June 12, 2017 at $10.98. ¶¶104-105.

On June 29, 2017, the risks concealed by Bloom's and Fred's omissions fully materialized when Walgreens and Rite Aid announced that they had terminated the merger and had entered into a separate agreement that did not involve Fred's, under which Walgreens would purchase about half of Rite Aid stores and leave Rite Aid to operate the remaining stores. ¶106. Rite Aid revealed that the decision to terminate the transaction involving Fred's followed "feedback received from the Federal Trade Commission ('FTC') that led the company to believe that the parties would not have obtained FTC clearance to consummate the merger." ¶108. As a result, Fred's shares dropped 22.8% to close at $9.51 on June 29, 2017, and dropped another $3.11 over the following week as the market continued to digest the news. ¶ 109.

8

## ARGUMENT

### I.   THE COMPLAINT ADEQUATELY ALLEGES THAT BLOOM VIOLATED §10(b) OF THE EXCHANGE ACT

#### A.   Applicable Pleading Standards Do Not Favor Dismissal

To establish a violation of §10(b) and Rule 10b–5, plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.–Atl., Inc.*, 552 U.S. 148, 157 (2008).  Bloom's motion challenges only the pleading of an actionable misrepresentation or omission and scienter.  Neither challenge is well taken.

A motion to dismiss is not the time to engage in fact finding or weigh evidence outside the pleadings. *See Mediacom LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 399 (6th Cir. 2012).  For purposes of "a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *accord Cross v. Metro. Gov't of Nashville/Davidson Cnty.*, No. 3-12-1109, 2013 U.S. Dist. LEXIS 64733, at *3-4 (M.D. Tenn. May 7, 2013) (Campbell, J.). In addition, "courts must consider the complaint in its entirety." *Id*.

A request for relief need only be "plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausibility is satisfied where, as here, a plaintiff pleads more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Muhammad v. Azar*, No. 18-cv-2857-MSN-tmp, 2019 U.S. Dist. LEXIS 152283, at *12 (W.D. Tenn. Aug. 19, 2019) (quoting *Iqbal*, 556 U.S. at 678).

While the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule of Civil Procedure 9(b) require more detailed pleading than Rule 8 for certain claim elements, they do not elevate pleading burdens to the extent suggested by Bloom.  Particularity simply requires that securities litigation plaintiffs plead the "who, what, when, where and how" details of Defendants' misrepresentations and omissions. *See In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 742 (S.D. Ohio 2006).

Similarly, though the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter, *see* 15 U.S.C. §78u-4(b)(2), the inference need not be "irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.

**B.     Bloom Made Materially False and Misleading Statements About the Divestiture Sale**

Bloom violated §10(b) of the Exchange Act and Rule 10b-5(b) by concealing crucial negative information in his statements regarding the divestiture transaction.  The Exchange Act prohibits the omission "of any material fact 'necessary in order to make the statements made . . . not misleading.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting Rule 10b-5(b), 17 C.F.R. §240.10b-5(b)).  Executives and corporations must "provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak." *Helwig*, 251 F.3d at 561.  A speaker "may choose silence or speech elaborated by the factual basis as then known – but [he] may not choose half-truths." *Id.*

Instead of remaining silent or being truthful with investors, Bloom made highly misleading statements about the divestiture transaction and its benefits that omitted crucial adverse information regarding known, then-existing impediments to the transaction:

| Date | Bloom's misleading statement | What Bloom concealed |
|---|---|---|
| 12/20/2016 | Fred's entered into an Asset Purchase Agreement covering the Divestiture Sale that "is a trans- | (1) that Fred's lacked the financial, IT, and operational capability to more than double its store count and more than triple its |

| | | |
|---|---|---|
| | formative event for Fred's Pharmacy that will accelerate our healthcare growth strategy through our acquisition of 865 new stores located in highly attractive markets." (¶64) | pharmacy count; (2) that Fred's did not meet FTC criteria for a divestiture buyer. (¶65) |
| 1/30/2017 | Fred's Asset Purchase Agreement with Walgreens remained in effect and that, if requested, it would purchase more than 865 stores (¶78) | (1) that Fred's could not demonstrate to the FTC that it could viably operate additional stores; (2) that there were known operational, supply chain, and IT impediments; (3) that Fred's did not meet FTC criteria for a divestiture buyer; (4) that Fred's had to ask Walgreens for extensive assistance to cover its deficiencies (¶79) |
| 4/6/2017 | Divestiture Sale "is a transformative event that will add substantial scale to the company and transform Fred's Pharmacy…into an even stronger competitor and the third-largest drugstore chain in the nation." (¶92) | (1) that Bloom had already received negative feedback from the FTC Bureau of Competition on March 14, 2017 indicating that it would not recommend approval; (2) that Fred's did not meet FTC criteria for a divestiture buyer; (3) that there were known operational, supply chain, and IT impediments; (4) that Fred's could not operate divestiture stores on its own (¶93) |
| 4/6/2017 | (1) Fred's transformation to a pharmacy chain "has been working" and the "biggest piece of that transformation" was the divestiture deal; (2) that Fred's remained committed to the transaction including buying up to 1,200 stores; and (3) that the biggest piece of Fred's turnaround was the Divestiture Sale (¶¶94-95) | (1) that Bloom had already received negative feedback from the FTC Bureau of Competition on March 14, 2017 indicating that it would not recommend approval; (2) that Fred's did not meet FTC criteria for a divestiture buyer; (3) that there were known operational, supply chain, and IT impediments; (4) that Fred's could not operate divestiture stores on its own (¶96) |
| 4/13/2017 | (1) that Fred's agreed to purchase 865-1,200 Rite Aid stores and was working to "obtain FTC approval"; (2) that the acquisition "is a transformative event that will add substantial scale to the Company and make Fred's an even stronger competitor and the third-largest drugstore chain in the nation" (¶99) | (1) that Bloom had already received negative feedback from the FTC Bureau of Competition on March 14, 2017 indicating that it would not recommend approval; (2) that Fred's did not meet FTC criteria for a divestiture buyer; (3) that there were known operational, supply chain, and IT impediments; (4) that Fred's could not operate divestiture stores on its own (¶100) |
| 6/6/2017 | That Fred's "remain[ed] optimistic in our ability to receive FTC approval" for the divestiture transaction (¶¶104-105) | That the FTC Bureau of Competition had already made and communicated to Bloom on March 14, 2017 an adverse determination (¶105) |

11

Bloom does not dispute that the Complaint alleges the "who, what, when, where" of each misstatement and omission, and "why" Plaintiffs contend each was materially false and/or misleading.[3]

### C.      The Information Bloom Concealed Was Highly Material

Bloom does not dispute that his false and misleading statements addressed the most important information about the most important business issue facing Fred's, but nonetheless asserts that they should be assumed "immaterial" as a matter of law.  Bloom Br., Section I. Bloom's argument is illogical on its face, and contrary to law.  Bloom cites no case supporting his view that adverse information threatening a mission-critical transaction is categorically "immaterial," and Plaintiffs are aware of no such cases.  Bloom's request that this Court assume away materiality instead of assessing the actual importance of the concealed information to investors violates controlling authority, which directs courts to "tread lightly" on materiality questions at the motion to dismiss stage, "engaging carefully with the facts of a given case and considering them in their full context." *KBC Asset Mgmt. N.V. v. Omnicare, Inc. (In re Omnicare, Inc. Sec. Litig.)*, 769 F.3d 455, 472 (6th Cir. 2014).  Courts "should decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 781 (M.D. Tenn. 2013).

Even Bloom does not contend that the information he concealed was "clearly and obviously unimportant."  Nor could he.  Bloom portrayed the divestiture to investors as qualitatively material, positioned as the centerpiece of the Company's shift to a pharmacy chain, and quantitatively material, as it was supposed to more than triple the pharmacy store count in desirable markets. ¶¶64, 78, 92, 94-95, 99.  Bloom and Fred's frequently spoke to the market regarding the Divestiture

---

[3] The Complaint also details two affirmative misrepresentations in the April 13, 2017 Form 10-K filing falsely claiming that Fred's was the "fourth-largest drug store chain" and had "deep experience" in "large" and "medium" as well as small markets, when neither was true. ¶98.

Sale, reflecting their understanding that the subject was important to investors.  *Id*.  Moreover, that Fred's stock price dropped when even partial information about the concealed risks were revealed also evinces materiality.  *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000).  Given his positive statements about the impact of the divestiture sale to Fred's, it is beyond dispute that reasonable jurors could find impediments to the transaction to be important to the total mix of information available to investors.

Having portrayed the Divestiture Sale as quantitatively and qualitatively important during the Class Period, Bloom's litigation strategy of characterizing the statements as "puffery" lacks merit.  "Puffery" protects only "loosely optimistic" statements that are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005).  What matters is not the particular phrase used, but the context.  *Id.; see also Ark. Pub. Emps. Ret. Sys. v. Harman Int'l Indus. Inc. (In re Harman Int'l Indus., Inc. Sec. Litig.)*, 791 F.3d 90, 109 (D.C. Cir. 2015) (Statement that business was "very strong" not puffery where "tied to a product and a time period"); *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 U.S. Dist. LEXIS 207475, at *58 (M.D. Tenn. Dec. 18, 2017) (rejecting defendants' puffery contentions and finding materiality to be a question for the jury).

Here, both Bloom's misleading statements and the crucial adverse information he omitted were not "squishy," "loose," or "untethered."  Instead, all were tethered to a specific, concrete transaction (the Divestiture Sale) that was supposed to implement a specific corporate transformation plan that Fred's trumpeted to investors (a shift from regional dollar store to national pharmacy chain) within a specific time period.  ¶¶64, 78, 92, 94-95, 99.  Additionally, Bloom promised specific, quantified benefits to Fred's: instantly adding 865 or more pharmacies in desirable markets, more than tripling Fred's pharmacy count, and making Fred's the "third-largest drugstore chain in the nation." *See, e.g.,* ¶¶4-5, 64, 92, 99.

The adverse information Bloom knew but concealed from investors was equally concrete.  Each of Bloom's omissions related to Fred's inability to satisfy objective FTC criteria for

13

divestiture buyers; specific adverse communications with the FTC Bureau of Competition; or known impediments in Fred's supply chain, ERP system, warehouse management system, or financial resources that prevented Fred's from satisfying FTC criteria. ¶¶65, 79, 93, 96, 100. Statements are not "mere puffery" when they omit "facts tending to seriously undermine the accuracy of any predictions about . . . potential success." *In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) (citing *Helwig*, 251 F.3d at 557); *see also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018) ("pollyannaish statements couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant").

### D.     Bloom's Misrepresentations and Omissions Are Actionable Even If Opinion

Bloom claims that the concrete statements to which the omissions were tethered could be construed as literally accurate because they were opinions Bloom claims he actually held.  Bloom Br. at 14-16.  However, federal securities laws do not permit an executive to conceal adverse information by couching his statement as opinion or belief.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015).

Bloom misreads *Omnicare*, erroneously claiming it stands for the proposition that "statements of opinion are . . . nonactionable under federal securities law." *See, e.g.,* Bloom Br. at 11.  In fact, *Omnicare* holds the exact opposite.  As the Supreme Court explained, opinion statements ***are*** actionable where: (1) the statements omit "'material facts about the [opinion holder's] inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself"; (2) the statement embeds facts which are untrue; <u>or</u> (3) the person holding the opinion did not actually believe in it. *Id.* at 188-89.  Although only one of these three tests need be satisfied, Plaintiffs' Complaint meets all three.

First, the Complaint details that at the same time Bloom spoke to investors regarding benefits of the divestiture transaction ¶¶64, 78, 92, 94-95, 99, he concealed known material facts conflicting with the ability to realize those benefits ¶¶65, 79, 93, 96, 100.  Investors had the right to expect that Bloom's statements "fairly align[ed] with the information in [his] possession at the time." *Omnicare,* 575 U.S. at 188-89.  One of the most striking omissions—Bloom's concealment

14

of the warning he received from the FTC Bureau of Competition on March 14, 2017, indicating that it would not recommend approval of Fred's as a divestiture buyer—even mirrors an example that Justice Kagan provided in *Omnicare* of an actionable omission. *See* 575 U.S. at 188 (if a company opined about a matter "with knowledge that the Federal Government was taking the opposite view, the investor . . . has cause to complain"); *see also In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 U.S. Dist. LEXIS 200986, at *38 (M.D. Tenn. Nov. 19, 2019) ("A statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion.").

Second, embedded in Bloom's discussion of the benefits of the divestiture sale was a factual assertion that Fred's qualified under the FTC's criteria for a divestiture buyer, since FTC approval was required. Plaintiffs have alleged specific facts indicating that it did not so qualify, ¶¶3, 7, 9, 10, 29-31, 33-39, 50, 52-60, 62, 65, 73-75, 79-88, 93, 96, 100, 105, and that Bloom was expressly warned of impediments preventing it from satisfying FTC criteria. ¶¶53, 57, 85.

Third, the Complaint alleges facts from which a reasonable jury could conclude that Bloom himself did not believe his professed opinions. For example, a reasonable jury could find that Bloom's internal admission that approval was unlikely reflected his actual opinion, ¶¶85-87, and his contradictory public statement on June 6, 2017 that he "remained optimistic" about FTC approval did not. ¶¶104-05.

### E.    Bloom's Additional Falsity and Materiality Arguments Fail

#### 1.    Truth-on-the-market is a factual dispute reserved for the jury

Bloom notes that certain commentators questioned whether Fred's could meet the FTC criteria for approval. Bloom Br. at 12. However, this does not show that the truth was already on the market. None of the reports referenced by Bloom revealed the specific information that Bloom concealed (Fred's failure to meet FTC divestiture buyer criteria, the adverse March 14, 2017 warning of regulatory disapproval, and known impediments in Fred's supply chain, warehouse management, and IT). If anything, analyst interest highlights the importance that investors placed on the concealed information. To the extent Bloom wants to press his specious truth-on-the-market

15

argument, he must do so at trial.  Such arguments are "intensely fact-specific" and "not appropriate" for a motion to dismiss.  *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 U.S. Dist. LEXIS 97942, at *29-30 (M.D. Tenn. Apr. 19, 2018).

### 2.     Bloom's false statements are not protected by the limited safe harbor for forward-looking statements

Bloom also incorrectly claims his non-disclosure of known, then-existing impediments and FTC communications in his statements about an already existing contract are protected by the limited safe harbor for forward-looking statements contained in the PSLRA.  *See* Bloom Br. at 13-14; 15 U.S.C. § 78u-5(c)(1)(A).  Bloom is wrong.  As the Sixth Circuit has made clear, the PSLRA's safe harbor does not protect statements or omissions of existing fact even if other parts of a statement involve future events.  "[W]hen a defendant makes mixed statements, and a statement of present or historical fact is specifically challenged as fraudulent, it can be separated from surrounding forward-looking statements that remain within the safe harbor."  *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 984 (6th Cir. 2018).  Here, the statements involved an Asset Purchase Agreement that was already negotiated and signed, which covered the purchase of 865 stores that were already identified.  Bloom concealed from these statements: adverse regulatory communications that he and Fred's had already had with the FTC; Fred's failure to satisfy then-existing FTC criteria; and IT, warehouse, and supply chain deficiencies at Fred's that already existed at the time of Bloom's statements.  Neither his statements, nor the highly damaging facts he hid from investors, were forward-looking.

Moreover, even if the misrepresentations and omissions could fairly be characterized as forward-looking, they would not qualify for safe harbor protection.  The safe harbor applies only to statements accompanied by "meaningful" cautionary language or made without actual knowledge that they were false or misleading.  *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).  Neither prong is satisfied here.

First, "blanket [cautionary] statements" that are not "substantive and tailored to the [speaker's] specific future projections, estimates, or opinions" do not trigger the safe harbor.  *See*

16

*Helwig*, 251 F.3d at 559 (holding that cautionary language that the company "could not predict the form, effect, or likelihood of any proposed legislation" was not meaningful); *see also Miller*, 346 F.3d at 678 (holding cautionary language was only meaningful because the company "disclosed ***the exact risk*** that occurred . . . excess retailer inventory that could lead to negative economic effects") (emphasis added), *cited with approval in Pen. Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 244 (6th Cir. 2015). "'Cautionary language must be extensive and specific . . . [a] vague or blanket (boilerplate) disclaimer . . . will ordinarily be inadequate to prevent misinformation.'" *Quorum*, 2019 U.S. Dist. LEXIS 54810, at *12-13) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010).

The boilerplate "risk warnings" Bloom references, *see* Bloom Br. at 8-9, 14, do not address the specific, known risks Fred's was facing. The vague statements do not disclose anything about Fred's failure to demonstrate or satisfy FTC divestiture buyer criteria, do not mention known defects in Fred's IT and supply chains, make no mention of the express warnings from the FTC Bureau of Competition, and conceal that Walgreens and Fred's had "transition[ed]" beginning March 17, 2017 to a deal excluding Fred's. Instead, Fred's vanilla statements only cautioned that Fred's was subject to the same uncertainty facing any company with a transaction subject to regulatory review. Such boilerplate does not immunize Bloom's securities fraud.

Second, Bloom had actual knowledge of the risks he chose to conceal from investors. He knew his statements excluded crucial information about adverse regulatory communications, operational deficiencies, and impediments to the transaction he consistently touted. While a company "is not required to detail every facet or extent of [a] risk," *see Miller*, 346 F.3d at 678, the "'cautionary statement must discredit the alleged misrepresentations ***to such an extent that the risk of real deception drops to nil.***'" *Quorum*, 2019 U.S. Dist. LEXIS 54810, *27 (quoting *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011)) (emphasis added). Bloom's highly misleading statements are wholly outside the PSLRA's safe harbor.

17

### 3.     Bloom was obligated to disclose material adverse facts

Bloom's claim that no independent duty required him to disclose adverse, highly-material regulatory communications with the FTC or the Company's failure to meet FTC criteria, Bloom Br. at 17-18, is a red herring. Once Bloom chose to speak to investors about the Divestiture Sale, *even if it was an issue he otherwise "had no independent obligation to address,"* he "cannot omit material facts related to that issue so as to make [his] disclosure misleading." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019) (internal quotation and citation omitted). Bloom was required to provide "'the whole truth' . . . literal accuracy is not enough." *Omnicare*, 575 U.S. at 192.

### 4.     Factual questions about falsity are trial issues for the jury to resolve

In a final desperate attempt to challenge falsity, Bloom claims that there are some facts from which a reasonable jury might conclude that the divestiture sale was still viable after March 14, 2017, when the FTC Bureau of Competition told Bloom that it would not recommend approval of Fred's as a divestiture buyer, ¶85, and after March 17, 2017, when Walgreen's and Rite Aid shifted to plans that did not involve Fred's, ¶88. *See* Bloom Br. at 15-16.[4] But Plaintiffs allege that Bloom omitted known, material risks, not that failure was certain. "There is nothing wrong with taking a calculated risk. However, if . . . Defendants misled Plaintiffs about such risk by making assurances…Defendants may be held liable." *In re Nuvelo Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009) (citation and quotation omitted).

Moreover, disagreements about the "truthfulness" of Bloom's statements "amount to fact-based disputes that the Court will not credit on a motion to dismiss." *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). "It is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage. . . . A plaintiff is only required to allege facts and circumstances that, drawing reasonable inferences in their favor, would render their

---

[4] Bloom doesn't describe *how* approval could have any realistic shot of succeeding at that point, and the fact identified (Fred's May 2017 response to a January 2017 document request) says nothing about deal viability.

claims [of falsity] plausible." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015) (internal quotations and citations omitted).

### F.    The Complaint Pleads a Strong Inference of Scienter

The Complaint easily satisfies the modestly elevated standard for pleading scienter. To meet this standard, a plaintiff need only plead facts from which a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323. Scienter may be established either by showing conscious misbehavior or recklessness, *Esperion*, 905 F.3d at 979, and can be satisfied by circumstantial evidence, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983). No smoking gun is required, and well-pleaded factual allegations must be accepted as true. *Tellabs*, 551 U.S. at 322-24.

Scienter requires holistic analysis. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "Accordingly, [a court is to] sift Plaintiff's allegations individually and then aggregate the nuggets of inference they generate," in order to conclude whether a strong inference arises. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004). Courts may, but are not required to, consider the non-exhaustive list of factors identified in *Helwig* when "determining whether the facts alleged, taken collectively, give rise to a strong inference of scienter that is at least as compelling as any opposing inference." *Tivity Health*, 365 F. Supp. 3d at 915.

#### 1.    The Complaint alleges a cogent and compelling inference of scienter

Plaintiffs have alleged extensive facts indicating that Bloom either intended to hide damaging information about the Divestiture Sale, or was at least reckless to the danger of misleading investors by omitting that information:

- **Bloom had actual knowledge of the information he omitted (*Helwig* factor 2):** While *Helwig* recognized that even a divergence between internal statements and public statements were indicia of scienter, Plaintiffs' Complaint pleads far more: it pleads that Bloom had actual

19

knowledge of the information he concealed from the market. ¶¶ 37-38, 53-60, 75, 85-87. CW 1 expressly told Bloom that Fred's IT systems could not handle the more than doubling of store count (and tripling of pharmacy count) contemplated by the Divestiture Sale. ¶53. Moreover, Bloom himself participated in the March 14, 2017 meeting in which he himself was told that the FTC Bureau of Competition would not recommend approval of Fred's as a divestiture buyer. ¶85. Thus, Plaintiffs need not infer that Bloom knew these facts when he omitted them from investors; his own senior executives confirmed Bloom's actual knowledge. ¶¶86-87.

- **Bloom admitted in an internal report the information he omitted from investors (*Helwig* factor 2):** Bloom admitted to his senior executives that after the March 14, 2017 meeting he understood the FTC was unlikely to approve Fred's as a divestiture buyer, but that he had decided to keep that crucial information out of the earnings announcement on April 6, 2017. ¶87.

- **Bloom disregarded the most current factual information before making public statements (*Helwig* factor 6):** After receiving adverse information about serious risks to the Divestiture Sale, Bloom did not moderate his statements to investors. ¶¶87, 92-96, 98-100 His repeated refusal to address new negative information is further evidence that Bloom was at least reckless to the danger of misleading investors. *Helwig*, 251 F.3d at 552.

- **Bloom had actual knowledge of the FTC criteria which Fred's did not meet.** FTC criteria for divestiture buyers is published. *See* ¶¶29-31. Bloom had actual knowledge of this criteria, which requires buyers to be able to effectively compete in divestiture markets and have adequate financial resources to do so. *Id.*; ¶¶55, 61, 63, 71 (discussing meetings about the Divestiture Sale between the FTC and Fred's). Bloom spoke with the FTC regarding concerns about Fred's ability to compete on December 2, 2016, and brought antitrust counsel, ¶61. Two weeks later, Fred's signed the Asset Purchase Agreement with Walgreens and Rite Aid, *see* ¶63, which was signed by Bloom, and acknowledged that the whole purpose of the Divestiture Sale was to address "concerns raised by FTC Staff" and that to do so, the parties would need

20

to show that Fred's could "replace lost competition by itself marketing and selling" pharmaceuticals in markets where Walgreens and Rite Aid previously competed.[5]

- **Bloom declined to fund improvements Fred's told the FTC it would make:**  Bloom knew that Fred's broken IT, supply chain and warehouse management systems were impediments to meeting FTC divestiture buyer criteria, so it told the FTC from its first meeting in November 2016 that it would make improvements to those systems.  ¶55.  However, Bloom did not fund these improvements, which numerous executives indicated were necessary to accommodate the Divestiture Sale stores.  ¶¶37-38, 55-60.

- **Bloom was aware that Fred's was excluded from FTC discussions following the March 14, 2017 FTC meeting.**  Within days after the disastrous March 14, 2017 meeting, Bloom and Fred's were excluded from discussions with Walgreens, Rite Aid and the FTC. ¶88.  This exclusion confirms what Fred's was expressly told on March 14, 2017: that the deal was not going to be recommended for approval if Fred's was the divestiture buyer. ¶¶85-87.

- **Bloom held himself out to investors as having knowledge about the Divestiture Sale.** In addition to participating in FTC meetings on behalf of Fred's, *see* ¶¶61, 84-85, Bloom held himself out to investors as a person with knowledge about discussions with the FTC, *see, e.g.*, ¶¶64, 94-95, 105.   Bloom's repeated statements to investors and analysts implies that he understood the subjects about which he spoke, undermining any inference that his misrepresentations were inadvertent. *See, e.g., In re PTC Therapeutics, Inc., Sec. Litig.*, No. 16-1124 (KM) (MAH), 2017 U.S. Dist. LEXIS 137930, at \*44 (D.N.J. Aug. 28, 2017) ("statements to investors during earnings calls and . . . conferences implied that [speakers] had first-hand knowledge" of the subjects they described).

- **Bloom's misrepresentations involved the "biggest piece" of Fred's transforming core operations.**  The Divestiture Sale, according to Bloom, was the cornerstone of Fred's efforts

---

[5] The full text of the Asset Purchase Agreement, which was incorporated by reference into the Complaint, ¶63, is available at
https://www.sec.gov/Archives/edgar/data/724571/000161577417001671/s105810_ex2-1.htm.

to pivot from a failed dollar store to a national pharmacy chain.  ¶4, 9, 64, 78, 92, 94-95, 99, 105.  Courts in this Circuit "'may presume that high-level executives are aware of matter related to their business's operations where the misrepresentations and omissions pertain to 'central, day-to-day operational matters,' particularly for facts 'critical to a business's core management.'"  *See Envision*, 2019 U.S. Dist. LEXIS 200986, *68 (collecting cases).

- **Bloom was aware that market participants were deeply concerned with whether Fred's could establish itself as a viable competitor following a divestiture sale.**  Market commentators repeatedly highlighted that the lucrative Divestiture Sale would depend on Fred's ability to prove its ability to establish itself as a viable competitor against Walgreens.  *See, e.g.,* ¶¶ 50, 72, 80, 82, 102, 105.

- **Bloom's fraudulent statements were closely followed by third-party reports of inconsistent information (*Helwig* factor 3):**  Disclosure of inconsistent information soon after a false or misleading statement supports the inference that the speaker understood his statement was false or misleading when made.  *Esperion*, 905 F.3d at 981 ("'[A] short turnaround makes it less likely that the corporation did not know that its statement was misleading.'") (internal citation omitted).  Here, while Bloom tried to conceal the truth as long as possible, third parties made partial disclosures closely after Bloom's statements. The first partial disclosure, by Rite Aid on March 3, 2017, followed Bloom's misleading January 30, 2017 statement by only 32 days.  ¶¶8, 78, 81.  Similarly, a report asserting that the FTC would likely challenge divestiture to Fred's was published on April 19, 2017, only 6 and 13 days, respectively, after Bloom made misleading statements in an earnings call and press release, and Form 10-K.  ¶¶94-96, 98-101.  And, on the same day Bloom told investors that he remained optimistic about FTC approval while concealing adverse information already received from the FTC, *Bloomberg* reported concerns about the viability of Fred's as a divestiture buyer.  ¶105.  Twenty-three days later, Walgreens and Fred's admitted the truth.  ¶106.  Bloom should have been truthful to investors all along.

> **2.    Each of the Confidential Witnesses is credible and cannot be discounted**

22

Unable to refute the Complaint's damning statements by multiple, corroborated former employees describing Bloom's actual knowledge of the adverse information he concealed from investors, Bloom incorrectly claims that their specific information should be "discounted" for purposes of scienter. Bloom Br at 22-23. Bloom does not accurately state the law in this Circuit, and his contention is refuted even by the cases he cites.

The Sixth Circuit has expressly provided that "plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016). Plaintiffs satisfy this standard. For each confidential witness, the Complaint identifies the senior position held at Fred's (Regional Vice President, Senior Vice President, Executive Vice President, or Chief Operating Officer), the responsibilities of such position, and the beginning and end dates of tenure at Fred's. ¶¶37, 39, 54, 56, 58, 86. Thus, the Complaint's detailed allegations establish "the probability that a person in the confidential witness's position would possess the information" that the witness provides. *Id.* Moreover, the Complaint details specific conversations and meetings with Bloom. *See, e.g.,* ¶¶53, 86-87.

Even the cases Bloom cites make clear that confidential witnesses "may assist securities fraud plaintiffs . . . so long as they are not vague and conclusory." *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 852 (S.D. Ohio 2016). Here, the confidential witnesses provide specific, detailed information within the scope of their respective positions. *Sarafin v. BioMimetic Therapeutics, Inc.*, also cited by Bloom, likewise acknowledged that confidential witnesses could support scienter. *Id.*, No. 3:11-0653, 2013 U.S. Dist. LEXIS 4909, at *55 (M.D. Tenn. Jan. 10, 2013). *Sarafin* applied a discount only because two confidential witnesses "left before the start of the class period, suggesting that they could not have known what was in BMTI's corporate mind at the time it issued the challenged statements," and the third "appears to have been a lower level employee." *Id.* Here, by contrast, all of the confidential witnesses were senior executives and all were at Fred's for some or all of the Class Period. To the extent that Bloom wishes to question

23

their credibility he may do so at trial. *See Bluestone v. Sadove*, No. 3:18-cv-63, 2019 U.S. Dist. LEXIS 62207, *31 (E.D. Tenn. Mar. 14, 2019) (even for scienter, the "[c]ourt does not weigh evidence or credibility at the pleading stage"). For this motion to dismiss, the specific information each provides must be taken as true. *Tellabs*, 551 U.S. at 322.

### 3.   Bloom provides no plausible competing inference

Bloom fails to provide any plausible competing inference for concealing damaging information from Fred's investors. Bloom's first claim, that "Fred's was working towards remediating systems issues and collaborating with Walgreens, Rite Aid, and the FTC to work out a deal that gave Fred's the necessary resources to succeed," Bloom Br. at 22, actually supports an inference of scienter. It concedes Bloom's knowledge that (1) Fred's systems required remediation; (2) Fred's did not have the ability to compete with Walgreens/Rite Aid on its own; and (3) Fred's lacked resources "necessary" to succeed. All of these were severe regulatory risks that should have been disclosed to, not concealed from, investors.

Bloom also claims that he did not definitively know the Divestiture Sale would fail, but this is not a competing inference. Bloom Br. at 22. The Complaint does not claim that Bloom had definitive knowledge of deal failure (though the March 14, 2017 warning from the FTC Bureau of Competition and Walgreens' subsequent pivot to a deal excluding Fred's approaches definitive). Instead, Plaintiffs allege that Bloom concealed known adverse facts about regulatory communications with the FTC, Fred's failure to demonstrate satisfaction of FTC criteria for divestiture buyers, and known impediments in Fred's operations and finances. ¶¶3, 7, 9, 65, 79, 85, 87, 93, 96, 100, 105. Bloom offers no innocent explanation, plausible or otherwise, for hiding that information from investors.

Nor does it matter that the FTC had not reached a final decision at the time Bloom decided to hide damaging facts from investors. *See* Bloom Br. at 23. As the Supreme Court made clear in *Matrixx Initiatives, Inc. v. Siracusano*, an uncertain outcome does not undermine a strong inference that defendants acted with scienter in withholding problems from investors. 563 U.S. 27, 48-49 (2011) (finding scienter was alleged where defendants concealed known information of ***possible***

24

side effect to product, even though there was no proved causal link).  "[T]he question is not whether . . . defendants knew that the [transaction] ultimately would be blocked; rather, the question is whether . . . defendants knew that the nondisclosure of" adverse facts coupled with optimistic statements "would mislead" shareholders. *In re Sprint Corp. Secs. Litig.*, 232 F. Supp. 2d 1193, 1226 (D. Kan. 2002).  Moreover, even for scienter, the "[c]ourt does not weigh evidence or credibility at the pleading stage." *See Bluestone*, 2019 U.S. Dist. LEXIS 62207, at *31.

## II. PLAINTIFFS STATE A CLAIM FOR CONTROL-PERSON LIABILITY UNDER §20(A)

Bloom does not dispute that he was a control person of Fred's.  Instead, Bloom challenges Plaintiffs' §20(a) claim only on the basis of his assertion that the underlying primary violation of §10(b) is not sufficiently alleged.  Bloom Br. at 24.  As discussed above, Plaintiffs adequately plead the underlying violation.  Accordingly, Plaintiffs also state a claim against Bloom under §20(a) for control person liability.  *See Envision*, 2019 U.S. Dist. LEXIS 200986, *92.

## CONCLUSION

For the foregoing reasons, Bloom's Motion to Dismiss should be denied in its entirety.  In the alternative, as this Complaint is the first complaint filed by Plaintiffs (the initial complaint was filed by another plaintiff who was not appointed lead), Plaintiffs respectfully request the opportunity to file an amended complaint (or a motion for leave to amend) within forty-five (45) days.

Dated: January 27, 2020

/s/ Joshua B. Silverman

POMERANTZ LLP
Patrick V. Dahlstrom
   (admitted pro hac vice)
Joshua B. Silverman (IARDC # 6238108)
   (admitted pro hac vice)
Jared M. Schneider
   (admitted pro hac vice)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603

25

T: (312) 377-1181
E: pdahlstrom@pomlaw.com
   jbsilverman@pomlaw.com
   jschneider@pomlaw.com

HOLIFIELD JANICH & FERRERA, PLLC
Al Holifield
Sarah R. Johnson
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
T: (865) 566-0115
E: aholifield@hapc-law.com

*Attorneys for Lead Plaintiffs*

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

26

## CERTIFICATE OF SERVICE

I hereby certify that this Plaintiffs' Brief in Opposition to Defendant Bloom's Motion to Dismiss Plaintiffs' Amended Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on January 27, 2020.

/s/ Joshua B. Silverman

Joshua B. Silverman