**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS**

|  |  |  |
|---|---|---|
| THEODORE K. ZALLER, Individually and on Behalf of All Others Similarly Situated, | | Case No. 2:19-cv-02415-SHL-dkv |
| | Plaintiff, | Hon. Sheryl H. Lipman<br>Chief Mag. Judge Diane K. Vescovo |
| v. | | **JURY DEMAND** |
| FRED'S INC., MICHAEL K. BLOOM, WALGREENS BOOTS ALLIANCE, INC., and STEFANO PESSINA, | | ORAL ARGUMENT REQUESTED |
| | Defendants. | |

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO THE WALGREENS DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

---

Patrick V. Dahlstrom (admitted pro hac vice)
Joshua B. Silverman (admitted pro hac vice)
Jared M. Schneider (admitted pro hac vice)
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
T: (312) 377-1181
E: pdahlstrom@pomlaw.com
   jbsilverman@pomlaw.com
   jschneider@pomlaw.com

Al Holifield
Sarah R. Johnson
HOLIFIELD JANICH & FERRERA, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
T: (865) 566-0115
E: aholifield@hapc-law.com

*Attorneys for Lead Plaintiffs*

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

FACTS ALLEGED................................................................................................... 3

ARGUMENT............................................................................................................ 9

I.   PLAINTIFFS HAVE STANDING TO SUE WALGREENS DEFENDANTS FOR
     THEIR MISREPRESENTATIONS ABOUT FRED'S ......................................... 9

II.  THE COMPLAINT ALLEGES §10(B) VIOLATIONS BY WALGREENS
     DEFENDANTS .............................................................................................. 12

     A.  Applicable Pleading Standards Do Not Favor Dismissal of Claims Against
         Walgreens Defendants ............................................................................ 12

     B.  The Complaint alleges that Walgreens Defendants made material
         misrepresentations and omissions about Fred's............................................ 13

         1.  The Complaint alleges Walgreens Defendants' misrepresentations and
             omissions with sufficient particularity........................................... 14

         2.  Walgreens Defendants' misleading statements are actionable even if
             opinions................................................................................... 18

         3.  Walgreens Defendants' statements touting Fred's involved concrete facts,
             not puffery................................................................................. 20

         4.  The Complaint is Not a "Puzzle Pleading"..................................... 22

     C.  The Complaint alleges a strong inference of scienter .................................... 22

         1.  Complaint allegations holistically demonstrate that Walgreens Defendants'
             decision to hide damaging facts from investors was intentional or at least
             reckless.................................................................................... 22

         2.  Complaint allegations also show scienter under
             *Helwig* factors 2, 3, and 6 ......................................................... 25

         3.  Walgreens Defendants offer no plausible competing inference for
             hiding damaging information from investors ......................................... 27

III. PLAINTIFFS STATE A CLAIM FOR CONTROL-PERSON LIABILITY UNDER
     §10(B) AGAINST WALGREENS ................................................................... 29

CONCLUSION...................................................................................................... 29

i

## TABLE OF AUTHORITIES

**Cases**

*Ark. Pub. Emples. Ret. Sys. v. Harman Int'l Indus. Inc. (In re Harman Int'l Indus., Inc. Sec. Litig.)*, 791 F.3d 90 (D.C. Cir. 2015) ................................................................................... 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................... 12

*Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461 (6th Cir. 2011) ..................................... 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 12

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ............................................ 10

*Bluestone v. Sadove*, 3:18-cv-63, 2019 U.S. Dist. LEXIS 62207
(E.D. Tenn. Mar. 14, 2019) ................................................................................................ 28

*Cal. Pub. Emps. Ret. Sys. v. N.Y. Stock Exchange, Inc. (In re NYSE Specialists Litig.)*,
503 F.3d 89 (2d Cir. 2007) ................................................................................................. 11

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994) ..................................... 9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .............................................................................................. 19

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651
(6th Cir. 2005) ............................................................................................................. *passim*

*Cosby v. KPMG, LLP,* 3:16-cv-121-TAV-DCP, 2018 U.S. Dist. LEXIS 130244
(E.D. Tenn. Aug. 2, 2018) .................................................................................................... 9

*Doshi v. Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016) .................................................. 22

*Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971 (6th Cir. 2018) ..................... *passim*

*Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011) ............................................................. 23

*Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..... 18

*Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015) ................ 11

*Helwig v. Vincor, Inc.*, 251 F.3d 540 (6th Cir. 2001) ................................................ 19, 25, 27

*Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412 (M.D. Penn. 2018) ................................ *passim*

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) .................................................... 23

ii

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009) .......... 21

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*, Case No. 14-81156 CIV-WPD,
2015 U.S. Dist. LEXIS 191815 (S.D. Fla. Sept. 4, 2015) ....................................................... 11

*In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006) ..................... 14

*In re Envision Healthcare Corp. Sec. Litig.*, Case No. 3:17-cv-01112,
2019 U.S. Dist. LEXIS 200986 (M.D. Tenn. Nov. 19, 2019) ......................................... 19, 29

*In re National Century Financial Enterprises,* 541 F. Supp. 2d 986 (S.D. Ohio 2007)......... 10

*In re Sprint Corp. Secs. Litig.*, 232 F. Supp. 2d 1193 (D. Kan. 2002)........................ 16, 17, 28

*Karinski v. Stamps*, No. CV 19-1828-MWF (SKx), 2020 U.S. Dist. LEXIS 10721
(C.D. Cal. Jan. 17, 2020) ...................................................................................................... 22

*KBC Asset Mgmt. N.V. v. Omnicare, Inc.*, 769 F.3d 455 (6th Cir. 2014)............................... 25

*Laborers' Local #231 Pen. Fund. v. PharMerica Corp.*,
Case No. 3:18-CV-109-RGJ, 2019 U.S. Dist. LEXIS 162763 (W.D. Ky. Sept. 23, 2019).... 19

*Lanier Tr. v. SandRidge Mississippian Tr.*, 361 F. Supp. 3d 1162 (W.D. Okla. 2019).......... 11

*LightSquared, Inc. v. Deere & Co.*, Case No. 13 Civ. 8157 (RMB), 2015 U.S. Dist. LEXIS
14412, (S.D.N.Y. Feb. 5, 2015) ............................................................................................ 11

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) .......................................... *passim*

*Muhammad v. Azar*, No. 18-cv-2857-MSN-tmp, 2019 U.S. Dist. LEXIS 152283
(W.D. Tenn. Aug. 19, 2019) ................................................................................................. 12

*Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472 (S.D.N.Y. 2018) ......................... 21

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ...................................................................... 23

*Omnicare, Inc. v. Laborers District Council Construction Pension Fund*,
575 U.S. 175 (2015)........................................................................................... 18, 19, 20, 21

*Ont. Pub. Serv. Empls. Union Pen. Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27
(2d Cir. 2004).......................................................................................................... 10, 11, 12

*Ont. Teachers Pen. Plan. Bd. v. Teva Pharm. Indus.*, No. 3:17-cv-558 (SRU),
2019 U.S. Dist. LEXIS 164126 (D. Conn. Sept. 25, 2019) ................................................... 22

*Pen. Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015) ................... 19

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) .............................................. 23

*Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998)........................................ 9

*Semerenko v. Cendant Corp*, 223 F.3d 165 (3d Cir. 2000) ...................................................... 9

*Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010)............................................................. 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................... 13, 22, 23, 25

*United States v. Ford Motor Co.*, 532 F.3d 496 (6th Cir. 2008)........................................ 13, 14

*Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457 (S.D.N.Y. 2013) .................................... 16

*Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900 (M.D. Tenn. 2019) ................................. 25

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) .................................................... 9

*Zwick Partners, LP v. Quorum Health Corp.*, Case No. 3:16-cv-2475,
2018 U.S. Dist. LEXIS 97942 (M.D. Tenn. Apr. 19, 2018)............................................ 19, 27

**Statutes**

15 U.S.C. §78j(b) ............................................................................................................... 9, 16

15 U.S.C. §78u-4(b)(1)(B)..................................................................................................... 13

**Rules**

17 C.F.R. §240.10b-5............................................................................................................. 9

Fed. R. Civ. P. 9(b) ........................................................................................................... 13, 14

Fed. R. Civ. P. 12(b)(6)................................................................................................. *passim*

Lead Plaintiffs Gary Fielder, Susan Ciesla, and Herbert Ciesla ("Plaintiffs"), by their undersigned attorneys, hereby oppose the Walgreens Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (the "Complaint") as follows: [1]

## INTRODUCTION

The Complaint alleges a straightforward case of securities fraud arising from misrepresentations and omissions that Walgreens Defendants *made about Fred's*. Shortly before the Class Period, Walgreens had selected Fred's to be the buyer, subject to FTC approval, of stores to be divested in connection with Walgreens' proposed merger with Rite Aid (the "Divestiture Sale"). ¶¶4, 6, 45-46, 61-63. Instead of telling the truth, Walgreens Defendants repeatedly made positive but materially misleading statements about Fred's and the Divestiture Sale, omitting highly material, known adverse facts about damaging regulatory developments, Fred's inability to meet FTC criteria for divestiture buyers, and crippling deficiencies in Fred's IT and supply chains. ¶¶66, 69, 77, 90, 103. Even worse, Walgreens Defendants continued to make misrepresentations and omissions about Fred's after the FTC Bureau of Competition expressly told them it would not recommend a deal so long as Fred's was designated as the divestiture buyer, and after Walgreens began negotiating a transaction that excluded Fred's. ¶¶90, 103.

Notably, Walgreens Defendants neglect to inform the Court that another federal district court has already sustained claims involving similar misrepresentations that these same Defendants made with respect to the Divestiture Sale. *Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412, 427 (M.D. Penn. 2018). In *Hering*, the court found that Rite Aid's shareholders stated claims against Walgreens and Pessina for "making statements that would mislead a reasonable investor about the level of regulatory risk" regarding the FTC's review of the Merger (which review included the

---

[1] Walgreens Defendants are Walgreens Boots Alliance, Inc. ("Walgreens") and Walgreens CEO Stefano Pessina ("Pessina"). References to "¶__" followed by a number refer to the numbered paragraphs of the Amended Complaint, ECF No. 52. "Rite Aid" refers to Rite Aid Corporation, Walgreens' proposed merger partner. "FTC" refers to the United States Federal Trade Commission. As this brief is in opposition to Walgreens Defendants' Motion to Dismiss, ECF No. 58 (the "Motion"), it will focus on those facts relevant to Plaintiffs' claims against the Walgreens Defendants.

Divestiture Sale), on January 5, 2017 and April 5, 2017. *Id.* at 428. Those are the exact same dates and communications in which the Complaint alleges Walgreens Defendants also made mis-representations about Fred's. ¶¶68, 89-90. Likewise, the *Hering* court found "a strong inference of at least recklessness" by the Walgreens Defendants. 331 F. Supp. 2d at 428.

The same result should follow here. Plaintiffs' Complaint identifies with particularity each of the misrepresentations and omissions that Walgreens Defendants made about Fred's. Complaint allegations specify who made each misrepresentation, in what context each misrepresentation was made, what was said and what material information was omitted, and why Plaintiffs contend each was misleading. ¶¶66, 68-69, 76-77, 89-91, 103.

As in *Hering*, Plaintiffs also allege extensive facts demonstrating a strong inference of sci-enter. Walgreens Defendants' misrepresentations about Fred's, like those about Rite Aid, "were made in close proximity to both the revision of the merger agreement and the ultimate decision to terminate the merger. Moreover, the statements were made specifically to counteract reports that the merger may not be approved, making them more than mere statements of corporate optimism." *Hering*, 331 F. Supp. 2d at 428; *see also* ¶¶66, 68-69, 76-77, 89-91, 103. Here, scienter allegations are even stronger than in *Hering*, because Plaintiffs also allege that Walgreens Defendants touted Fred's as a divestiture buyer ***even after*** they had actual knowledge that the FTC Bureau of Com-petition would not recommend approving Fred's, and that their own course of conduct (negotiating a deal excluding Fred's) demonstrated that they did not actually believe their positive statements about Fred's. ¶¶89-91, 103. Collectively, Complaint allegations allow only two plausible infer-ences: either Walgreens Defendants intended to conceal adverse information, or were reckless to the danger of misleading investors by hiding these damaging facts.

Walgreens Defendants' novel "standing" argument does not excuse their securities law violations, either. Their claim to be immune from liability to Fred's shareholders for knowingly making misrepresentations and omissions ***about Fred's*** is inconsistent with binding precedent from the Supreme Court and the Sixth Circuit, both of which expressly allow a company's share-

holders to assert claims against parties other than the issuer for statements made about the company. Walgreens Defendants fail to address this controlling authority, and instead cite cases which either support the standing of Fred's shareholders as it relates to statements they made about Fred's, or are wholly inapposite. *See* Part I, *infra.*

Because Walgreens Defendants fail to identify any pleading deficiency in the Complaint's claims against them for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934, Walgreens Defendants' Motion should be denied in its entirety, and this case should proceed to discovery without further delay.

## FACTS ALLEGED

In 2015, Walgreens and Rite Aid, America's second and third largest retail pharmacies, decided to merge (referred to herein as the "Merger"). *See* ¶¶40-42. As with all mergers involving large companies, Walgreens and Rite Aid were required to file notice with the FTC. ¶43. The Merger Agreement provided for mutual cooperation and information exchanges between the parties, and acknowledged Walgreens as the party responsible for making all strategic decisions and leading all discussions with the FTC. ¶¶42, 70.

The FTC promotes competition in markets across the country. ¶25. One part of the FTC's duty is to review prospective mergers. *Id.* If companies to a proposed merger fail to demonstrate to the FTC that a full combination of the two companies will preserve competition, they can propose remedies to address competition in affected markets. ¶29. One common remedy, especially in retail mergers, is to divest some store locations to a third-party buyer (the "divestiture buyer"). ¶¶6, 29.

Although the merging parties select the potential divestiture buyer, a divestiture buyer must be approved by the FTC as part of the merger review process. *Id.* FTC criteria for divestiture buyers are clear, known to all parties involved, and published on the FTC's website. ¶¶6, 29-31. Published FTC criteria indicate that an appropriate divestiture buyer must be ready, willing, and

3

able to operate the divested assets in a manner that maintains and restores competition in the relevant markets, *and* have the financial resources to consummate the divestiture and remain a vigorous competitor in the market. ¶¶6, 30. Published criteria also indicate that evidence will be considered of the proposed divestiture buyer's: (1) past operations and business plans; (2) experience and expertise to operate effectively in the divestiture market; (3) historical financial documents and future business plans; (4) competitors, suppliers, and customers to gain additional insight into the buyers' operations; (5) lenders and creditors to determine the suitability of any financing, and (6) current position in the market. ¶31.

On December 10, 2015, after failing to establish that a full merger of Walgreens and Rite Aid would preserve competition, Walgreens received a Second Request for more information related to competition from the FTC. ¶43. Thereafter, and through the start of the Class Period (December 20, 2016), Walgreens, Rite Aid, and the FTC discussed the effects of the merger in markets where Walgreens and Rite Aid were competitors, including potential remedies to restore competition in those markets. *Id.*

Walgreens and Rite Aid submitted advocacy papers addressing geographical areas identified by the FTC as posing antitrust concerns. ¶45. On August 17, 2016, Walgreens proposed divesting several hundred Rite Aid stores after learning that the FTC Bureau of Competition opposed a full merger due to anticompetitive effects. ¶4, 45. After narrowing potential divestiture buyers to Fred's and two other stores, Kroger's and Albertson's, Walgreens conducted extensive due diligence meetings with Fred's, which focused on how Fred's would transition to full operation of the divested stores. ¶¶45, 46.

Walgreens learned from its due diligence of Fred's that Fred's logistical systems were dilapidated, outdated, and unsuited to support even its existing 648 retail locations (370 of which also contained pharmacies), let alone another 865-1,000 pharmacies in competitive markets where Fred's had no presence. ¶¶46, 53-60. In particular, Fred's information technology ("IT") systems were outdated and insufficient, and Fred's lacked the modern enterprise resource planning ("ERP"), warehouse management, and transportation management systems necessary to operate

4

its existing stores, let alone the stores it planned to purchase from Walgreens.  ¶¶37, 53-60.  In addition, Fred's supply chain was unreliable and could not manage additional Rite Aid locations due to warehouse-management software and related systems that experienced weekly software failures.  ¶¶53-60.  None of these problems had been disclosed to investors.  ¶¶3, 62, 65, 66, 69, 77, 79, 83, 91, 93, 96, 100.  Acknowledging these operational impediments, and as part of their divestiture negotiations, Walgreens entered into a secret support agreement to host Fred's most essential IT and ERP software on Walgreens' systems, reflecting Walgreen Defendants' under-standing that Fred's lacked the capacity to perform these basic operations on its own.  ¶60.

Walgreens continued to focus on Fred's as the potential divestiture buyer.  On October 20, 2016, Walgreens and Rite Aid announced that the merger-closing date had been extended from October 27, 2016 to January 27, 2017.  ¶49.  On November 10, 2016, Fred's made a presentation to the FTC regarding its suitability as a potential buyer of the divestiture assets from Rite Aid. ¶52.  Part of Fred's presentation to the FTC included a list of improvements it promised to make, including supply-chain changes and upgrades to Fred's warehouse-management system.  ¶55.  The initiatives promised to the FTC were not funded.  *Id.*  Walgreens Defendants had full visibility into Fred's deficiencies and its failure to fund improvements.  ¶¶46, 53-60, 70.  In addition to conduct-ing ongoing financial and operational due diligence of Fred's, Walgreens had an agreement with Fred's requiring cooperation and exchange of information relevant to FTC approval. ¶¶46, 70.

On December 20, 2016, with knowledge of (1) the FTC's criteria for approving a divesti-ture buyer and (2) Fred's operational and financial insufficiencies, Walgreens announced that Fred's would purchase 865 Rite Aid stores as part of the Merger.  ¶¶3, 29-31, 53-60, 61, 63-64. In a press release that same day, Walgreens and Pessina described the Asset Purchase Agreement with Fred's, identified the divestiture stores that Fred's would buy as being on the East and West coasts, and touted Fred's as "an experienced pharmacy operator."  ¶66.  However, Walgreens De-fendants omitted that: (1) Fred's did not satisfy FTC criteria for a divestiture buyer; (2) in their meetings with and presentations to the FTC, Walgreens (and Fred's) had failed to establish that

5

Fred's satisfied FTC criteria for a divestiture buyer; and (3) serious, known operational impediments crippled Fred's ability to compete with a combined Walgreens/Rite Aid in the divestiture markets.  ¶¶3, 29-31, 46, 53-60, 66.

As Walgreens and Rite Aid later disclosed, in the end of December 2016 or the first few days of January 2017, the FTC subpoenaed extensive documents from Fred's management.  ¶70. Fred's was required to share the subpoena with Walgreens under the cooperation and information exchange provisions of the Asset Purchase Agreement.  *Id.*  Although the extensive subpoena indicated that the FTC was unlikely to approve the deal prior to the parties' planned Merger deadline of January 27, 2017, ¶70, on January 5, 2017, Walgreens and Pessina told investors that "everything looks fine" and Walgreens had a "very good" relationship with the FTC.  ¶68.  As a result, they indicated that there was no need for Walgreens to even consider a "Plan B" in case Fred's was not approved as a divestiture buyer.  *Id*.

On January 20, 2017, Bloomberg reported that the FTC had expressed concern that the proposed divestiture to Fred's "doesn't go far enough to preserve competition that would be lost in the tie-up." *See* ¶72.  As a result, while Walgreens and Fred's (as well as Rite Aid) began to discuss an even larger divestiture sale to Fred's, ¶73, the FTC was uncomfortable with Fred's capability to support additional stores.  ¶75.

In late January 2017, Walgreens agreed to divest up to 1,200 stores to Fred's, transfer Rite Aid's brand rights and some of its distribution centers to Fred's, and allow Fred's to use its ERP software on an interim basis. ¶¶73-77.  When Walgreens Defendants announced this revised divestiture agreement on January 30, 2017, *see* ¶76, they continued to conceal: (1) that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could viably operate the number of locations referenced; (2) known operational, supply chain, and IT impediments to Fred's ability to operate "up to 1,200 Rite Aid locations"; (3) that Walgreens and Fred's had not demonstrated to the FTC that Fred's could satisfy the FTC's criteria for divestiture buyers; and (4) Walgreens' understanding that it would have to provide significant IT and business process support to Fred's due to Fred's deficiencies.  ¶77.   Nor did Walgreens Defendants explain how

6

Fred's could possibly restore competition in divestiture markets if it was relying on its competitor, Walgreens, for vital software and was turning over its data to Walgreens.  ¶¶65, 69, 77, 91, 103.

A part of the information concealed by Walgreens Defendants was disclosed by Rite Aid on March 3, 2017, when Rite Aid filed its March 2017 Merger Proxy (after Walgreens reviewed and approved of the section of the Proxy that discussed the Merger).  ¶81.  The March 2017 Merger Proxy disclosed certain adverse indications from the FTC about Fred's suitability as the divestiture buyer and discussions among Walgreens and Rite Aid about additional "support" they acknowledged Fred's needed.  ¶¶70-81.  As a result of this partial disclosure, Fred's shares dropped 11% on March 3, 2017 to close at $16.30.  ¶82.  On March 8 and 9, 2017, Fred's shares dropped further after Bloomberg confirmed that the FTC was concerned that Fred's lacked the financial resources to maintain competition as a divestiture buyer.  *Id.*

On March 14, 2017, representatives of Walgreens, Rite Aid, and Fred's met with the FTC Bureau of Competition and the Attorneys General of many states (who were invited because they were empowered to bring antitrust litigation on behalf of their respective states).  ¶¶84-85.  At this meeting, the FTC Bureau of Competition indicated to Walgreens that it would not recommend Fred's to serve as the divestiture buyer because it did not believe that Fred's could meet the criteria of maintaining competition in the market.  ¶¶85-87.

After the devastating March 14 meeting with the FTC Bureau of Competition, Walgreens embarked on a course of conduct indicating it understood that Fred's would not be approved as a divestiture buyer.  In calls and meetings beginning no later than March 17, 2017 that excluded Fred's, Walgreens began to discuss with Rite Aid and the FTC a "transition" plan that did not involve divestiture to Fred's.  ¶88.  Instead, Walgreens and Rite Aid negotiated with the FTC a transaction whereby Walgreens would simply purchase half of Rite Aid's stores.  *Id.*  A "transition meeting" between Walgreens, Rite Aid and the FTC to discuss proceeding without divestiture to Fred's was held on March 22, 2017.  *Id.*

On April 5, 2017, three weeks after the FTC Bureau of Competition nixed recommending a deal involving Fred's, and two weeks after Walgreens' transition meeting with the FTC to discuss

7

a deal excluding Fred's, Walgreens and Pessina conducted a conference call, in which they falsely claimed to remain confident that the divestiture to Fred's was viable, while concealing knowledge that the FTC Bureau of Competition had already told them otherwise. ¶¶84-89. They falsely rejected concerns raised by an analyst that Walgreens and the FTC were not "seeing eye-to-eye," and told analysts that "Fred's is the right buyer . . . they are absolutely a legitimate player in this industry," the exact opposite of the warning that the FTC Bureau of Competition made to Pessina and Walgreens on March 14, 2017. ¶90. Two weeks after Pessina's conference call, on April 19, 2017, Bloomberg reported that the FTC was gathering evidence and preparing to sue to stop the Merger. *See* ¶101.

On May 23, 2017, Pessina and Walgreens continued to mischaracterize Fred's and the status of the divestiture sale at the UBS Global Healthcare conference in New York City. They stated that "Fred's is a viable buyer," but omitted that the FTC Bureau of Competition had already told them it was not, and that as a result Walgreens and Rite Aid had for more than two months been transitioning to a plan that did not involve Fred's. *Id.* ¶¶84-88, 103.

On June 29, 2017, the risks concealed by Walgreens Defendants' omissions fully materialized when Walgreens and Rite Aid announced that they had simultaneously terminated the Merger (and attendant agreement with Fred's) and entered into a separate agreement excluding Fred's, in which Walgreens would simply purchase half of Rite Aid's stores. ¶106. In a press release that same day, Rite Aid revealed that the decision to terminate the divestiture sale to Fred's was due to "feedback received from the [FTC] that led the company to believe that the parties would not have obtained FTC clearance." ¶108. As a result, Fred's shares dropped 22.8% to close at $9.51 on June 29, 2017, and dropped another $3.11 over the following week as the market continued to digest the news. ¶109.

8

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING TO SUE WALGREENS DEFENDANTS FOR THEIR MISREPRESENTATIONS ABOUT FRED'S

The plain language of the statute and regulation, and controlling precedent confirm Plaintiffs' standing to sue Walgreens Defendants for false statements they made about Fred's.  Section 10(b) of the Exchange Act and SEC Rule 10b-5 broadly prohibit "any person" from making false statements; there is no language limiting liability to the issuer (and its insiders) of the securities at issue.  *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5.

Consistent with this broad statutory language, the Supreme Court has affirmed that liability extends beyond the issuing company: "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met."  *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994).  "[I]t is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants" as long as the misrepresentation was material and disseminated publicly.  *Semerenko v. Cendant Corp*, 223 F.3d 165, 176 (3d Cir. 2000); *accord Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).

Similarly, the Sixth Circuit has expressly emphasized that §10(b) and Rule 10b-5 ordinarily impose "a duty . . . upon a third party" to speak truthfully, and that investors may bring suit against a third party that violates its duty.  *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 267-68 (6th Cir. 1998) (en banc) (allowing a company's investors to sue law firm for misrepresentations it made about the company).  District courts in this Circuit also consistently apply the unremarkable principle that investors in a given security *can* bring claims for securities fraud against non-corporate insiders who make statements about the at-issue securities.  For example, in *Cosby v. KPMG, LLP*, the Eastern District of Tennessee found that investors stated claims against a company's auditor for misrepresentations about the company in an audit report.  *See* Case No. 3:16-cv-121-TAV-DCP, 2018 U.S. Dist. LEXIS 130244, *24-26 (E.D. Tenn. Aug. 2, 2018).  *In re National*

9

*Century Financial Enterprises* likewise held actionable a §10(b) claim against an underwriter for misrepresentations about the subject company. *See* 541 F. Supp. 2d 986, 997-99 (S.D. Ohio 2007).

Moreover, a district court in Pennsylvania, applying many of the same facts alleged in the Complaint, found that a Rite Aid shareholder stated §10(b) claims against Walgreens and Pessina, notwithstanding that the plaintiff owned shares in Rite Aid, not Walgreens. *See Hering*, 331 F. Supp. 3d at 427. Accordingly, both as a general principle and as specifically applied to the facts and transactions in this case, Walgreens Defendants' standing argument is thoroughly rejected by applicable authority.

Walgreens Defendants' claim to be immune from liability for their securities fraud about Fred's is not even supported by the cases they cite. *See* Walgreens Br. at 13-15 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) and one appellate and three district court cases from outside this Circuit). None of the cited cases even remotely supports their argument. *Blue Chip* explains that §10(b) cases are "limit[ed] [to] the class of plaintiffs . . . who have at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip*, 421 U.S. at 747. However, that is precisely the position of Plaintiffs here. They are purchasers of Fred's, the security "to which the [Walgreens Defendants'] representation, or omission relates." *Id; also cited with approval in Ont. Pub. Serv. Empls. Union Pen. Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 29 (2d Cir. 2004) ["*Nortel Networks*"].

Defendants find no more support in the other cases cited. *Nortel Networks* involved claims by investors in JDS Uniphase against its largest customer, Nortel Networks, arising out of Nortel's misrepresentations about the demand for *Nortel's* products, not the products of JDS Uniphase. *See* 369 F.3d at 29. The Second Circuit rejected this theory of liability because the statements related to Nortel, not to the company plaintiffs had purchased, JDS. *See Nortel Networks*, 369 F.3d at 32 (quoting *Blue Chip*, 421 U.S. at 747). By contrast, Plaintiffs here are investors in the security (Fred's) to which the misrepresentations and omissions "relate[]." *See id.*

Moreover, a subsequent Second Circuit decision confirms that Walgreens Defendants mis-read *Nortel Networks*:

10

> We recognize that *Nortel Networks* contains language that could be read to suggest that a purchaser of a security may bring a fraud action under Rule 10b-5 only against the issuer of the security purchased. . . . Such a reading, however, would place beyond the reach of Rule 10b-5 false statements made by underwriters, brokers, bankers, and non-issuer sellers.

> That is not what *Nortel Networks* held. In *Nortel Networks*, the plaintiffs had purchased stock in JDS Uniphase. Plaintiffs claimed that a different company, Nortel Networks, knowingly made falsely optimistic public statements about ***its own financial prospects***. On the basis of a business relationship between JDS Uniphase and Nortel Networks, the plaintiffs claimed that their purchase price for JDS Uniphase stock had been inflated by ***Nortel Networks' false statements about itself***. In the particular circumstances of the case, the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b-5.

*Cal. Pub. Emps. Ret. Sys. v. N.Y. Stock Exchange, Inc. (In re NYSE Specialists Litig.)*, 503 F.3d 89, 102 (2d Cir. 2007) (Sotomayor, J.) (emphasis added) (vacating ruling that plaintiffs lacked standing). Thus, in the Second Circuit (like the Sixth Circuit and other Circuits), a plaintiff has standing to sue a third-party that makes a false statement relating to securities that the plaintiff bought or sold. *Id.* This rule is consistent with the holdings of the other district court cases cited by the Walgreens Defendants. *See In re Altisource Portfolio Sols., S.A. Sec. Litig.*, Case No. 14-81156 CIV-WPD, 2015 U.S. Dist. LEXIS 191815, *5-6 (S.D. Fla. Sept. 4, 2015) (involving claims by Altisource's investors about *Ocwen's* regulatory compliance);[2] *Lanier Tr. v. SandRidge Mississippian Tr.*, 361 F. Supp. 3d 1162, 1168-69 (W.D. Okla. 2019) (involving claims of purchasers of interests in Trust II that were allegedly due to statements made by Trust I about Trust I); *LightSquared, Inc. v. Deere & Co.*, Case No. 13 Civ. 8157 (RMB), 2015 U.S. Dist. LEXIS 14412, (S.D.N.Y. Feb. 5, 2015), *aff'd sub nom. Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656 (2d Cir. 2015) (involving claims by LightSquared investors against Deere, Garmin

---

[2] Sections of the *Altisource* decision that Walgreens Defendants chose not to cite make this clear. The claim related to *Ocwen*'s fraud, *not* Altisource's, and losses occurred after state regulators "issued a series of letters addressing Ocwen's regulatory compliance" and "Ocwen entered into a Consent Order" with those regulators." *See Altisource*, 2015 U.S. Dist. LEXIS 191815, *4-6.

11

and Trimble for representations those companies made about their own plans for a wireless spec-
trum).

In contrast to the cases cited by the Walgreens Defendants, Pessina's misrepresentations and omissions all concerned Fred's. *See, e.g.*, ¶¶66, 68, 89-90, 76-77. As Plaintiffs bought shares of Fred's—the "security to which the prospectus, representation, or omission relates"—they have standing to sue Walgreens Defendants. *See Nortel Networks*, 369 F.3d at 32.

## II. THE COMPLAINT ALLEGES §10(B) VIOLATIONS BY WALGREENS DE-FENDANTS

### A. Applicable Pleading Standards Do Not Favor Dismissal of Claims Against Walgreens Defendants

To state a claim under §10(b) of the Exchange Act, Plaintiffs must allege "'(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Walgreens Defendants challenge only the pleading of "material misrepresentation or omission" and "scienter." Both challenges lack merit.

To state a claim, a request for relief need only be "plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), i.e., "plead[] factual content that allows that court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678-79. Plausibility is satisfied where, as here, a plaintiff pleads more than "labels and conclusions," "a formulaic reci-tation of the elements of a cause of action," or "naked assertions devoid of further factual enhance-ment." *See Muhammad v. Azar*, No. 18-cv-2857-MSN-tmp, 2019 U.S. Dist. LEXIS 152283, *12 (W.D. Tenn. Aug. 19, 2019) (quoting *Iqbal*, 556 U.S. at 678). In assessing the sufficiency of the Complaint, the Court must "construe the complaint in the light most favorable to the plaintiff" and "accept all well-pleaded factual allegations as true." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011) (citation omitted).

Under Rule 9(b) and the Private Litigation Securities Reform Act ("PSLRA"), plaintiffs must plead falsity with particularity, "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B). Plaintiffs' burden of pleading with particularity is not overly onerous at this stage.  So long as Plaintiffs plead "sufficient detail – in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met."  *See United States v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008).

Similarly, though the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter, *see* 15 U.S.C. §78u-4(b)(2), the inference need not be "irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).  Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 323.

### B.    The Complaint alleges that Walgreens Defendants made material misrepresentations and omissions about Fred's

Plaintiffs allege with particularity each of Walgreens Defendants' false and misleading statements about the FTC's review of Fred's.  A federal district court has already held similar misrepresentations that Walgreens Defendants made about Rite Aid to be actionable:

> Starting October 20, 2016, the Walgreens Defendants began to express confidence that the deal would close and questioned newspaper reports of regulatory turbulence. . . .
>
> Because the statements directly questioned contradictory reports and purportedly were based on non-public information from the FTC, we find that a reasonable investor could have been misled into thinking that the review process was progressing better than it was.  At a time when approval of the transaction may have been legitimately in doubt, the Walgreens Defendants' statements alluded to secret knowledge that created a false sense of security.  Therefore, with respect to these particular statements ["expressing confidence based on 'inside knowledge' of the review, made on . . . January 5, 2017, and April 5, 2017"], we find that Plaintiff has satisfied the first element of a §10(b) claim.

*See Hering*, 331 F. Supp. 3d at 427-28, *id.* at 427 n.4. The same logic applies here.

### 1. The Complaint alleges Walgreens Defendants' misrepresentations and omissions with sufficient particularity

The Complaint alleges Walgreens Defendants' misrepresentations and omissions with sufficient particularity. Rule 9(b) and the PSLRA only require Plaintiffs to plead "sufficient detail – in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *See Ford Motor Co.*, 532 F.3d at 504.

Plaintiffs' claims against Walgreens Defendants arise from their failure to disclose adverse facts when they discussed the Divestiture Sale to Fred's. ¶¶66, 69, 77, 91, 103. As detailed below, the Complaint alleges the "who, what, where, when and how" details of Walgreens Defendants' misrepresentations and omissions, giving Walgreens Defendants fair notice of Plaintiffs' claims. That is all Rule 9(b) and the PSLRA require. *See In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 742 (S.D. Ohio 2006).

The December 20, 2016 Statement. On December 20, 2016, Walgreens and Pessina issued a press release announcing that Walgreens had agreed to divest stores on the East and West coasts to Fred's, describing the Asset Purchase Agreement, and holding Fred's out as an "experienced pharmacy operator." ¶66. These statements were materially misleading because it omitted that (a) Fred's "experience" operating pharmacies was unsuccessful; (b) Fred's (a small regional chain in the Southeastern United States) lacked any experience operating pharmacies in the East and West Coast markets where the divestiture stores were located; and (c) Fred's lacked any experience operating stores in larger markets, had only limited experience operating in medium markets, and that many of the to-be-divested Rite Aid stores were in larger and medium-sized markets. ¶¶2-3, 7, 33-38, 53-60, 66.

In their Brief, Walgreens Defendants misapprehend their disclosure duty, claiming that touting Fred's as "an 'experienced pharmacy operator' was not inaccurate, incomplete, or misleading because it was not accompanied by a history of Fred's track record as a pharmacy operator."

14

Walgreens Br. at 28-29.  A history of Fred's track record as a pharmacy operator, however, is *precisely* the type of full disclosure that would show that Fred's lacked "experience" relevant to the markets at issue, and thus would be unlikely to satisfy FTC divestiture buyer criteria.  ¶67. The omitted information was crucial to the total mix of information regarding Fred's experience and ability to serve as a divestiture buyer about which Walgreens Defendants spoke, and was necessary to make their statements not misleading.

The January 5, 2017 Statements. On January 5, 2017, Pessina and Walgreens represented in an earnings call to investors and analysts that "we don't want even to think of the fact that [Fred's] could not be approved [as the divestiture buyer] after so many months, when we have given a lot of information, and *we have had a very good relationship with the people of the FTC . . . . So we are not thinking of a Plan B today*."  ¶68(A). During that same call, Pessina reassured an analyst who asked whether Walgreens could potentially litigate an adverse FTC determination by stating that "for the time being everything looks fine."  ¶68(B).  Walgreens Defendants' statements were misleading because they omitted that (a) Fred's did not satisfy the FTC's criteria for a divestiture buyer, (b) neither Walgreens nor Fred's had demonstrated to the FTC that Fred's satisfied its criteria for a divestiture buyer, (c) Fred's had serious operational impediments that crippled its ability to compete with a merged Walgreens and Rite Aid, and (d) Walgreens and Pessina had no basis (such as access to non-public information) to claim that the FTC supported Fred's as a divestiture buyer.  ¶¶2-3, 7, 33-38, 53-60, 69.

Ignoring the well-pleaded facts in the Complaint, Walgreens Defendants assert that the January 5 statements are inactionable because the Complaint does not allege that Pessina knew of any facts adverse to his opinion.  *See* Walgreens Br. at 33.  However, Complaint allegations their Brief declines to address plead that Walgreens conducted a due-diligence review of Fred's for months before selecting it as the divestiture buyer, during a time when Fred's senior management knew that Fred's logistical systems were dilapidated, outdated, and unsuited to support its current stores, let alone any new acquisitions.  ¶¶37, 46, 53-58.  Moreover, by this time, Walgreens De-

15

fendants knew that the FTC had subpoenaed Fred's, indicating that the FTC was closely scrutinizing Fred's sufficiency as a divestiture buyer. ¶70. Thus, Walgreens Defendants' knowledge of adverse facts is properly alleged. Whether it is proved at trial is a question for the jury to decide on a full evidentiary record. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013).

The January 30 Statement. On January 30, 2017, Walgreens announced that as part of the deal extending the Merger-close deadline to July 31, 2017, Fred's agreed to buy up to 1,200 Rite Aid stores if required to obtain regulatory approval. ¶76. Walgreens' statement was misleading because it omitted that (a) Walgreens and Fred's had not demonstrated to the FTC that Fred's satisfied the FTC's criteria for divestiture buyers or that it could operate up to 1,200 locations in a manner that would restore competition to affected markets; (b) known operational, supply chain, and IT impediments to Fred's ability to operate up to 1,200 new locations; and (c) Walgreens understood that it would have to provide significant support to Fred's due to Fred's deficiencies. ¶¶2-3, 7, 33-38, 53-60, 77.

The Walgreens Defendants' contention that they were free to conceal highly material, known impediments from their January 30, 2017 statement so long as they stated "objective, verifiable deal terms," *see* Walgreens Br. at 29, turns securities law on its head. Under §10(b), speakers are liable for **both** affirmative misrepresentations and omissions. 15 U.S.C. §78j(b). Walgreens violated §10(b) by speaking about a deal with Fred's while concealing: Fred's known financial and operational failings impeding the deal it described, the failure to show to the FTC that Fred's satisfied FTC divestiture buyer criteria, and adverse regulatory communications. *See Matrixx*, 563 U.S. at 47 (holding that statements about product safety were misleading where the company omitted that some evidence potentially linked product to anosmia); *See In re Sprint Corp. Secs. Litig.*, 232 F. Supp. 2d 1193, 1219-20 (D. Kan. 2002) (finding "optimistic statements" about governmental approval of a merger were misleading because they omitted known facts that the government was unlikely to approve the merger). Walgreens' January 30 Statement omissions are actionable.

16

The April 5 Statements. On April 5, 2017, Pessina and Walgreens told investors during an earnings call that they were "still optimistic that we will bring [the divestiture sale and merger] to a successful conclusion." ¶89. Pessina also reassured investors that the Revised Merger Agreement would be more likely to satisfy regulators: "The changes to the deal that we agreed [to] in January demonstrate our absolute commitment to ensure [that] all transactions . . . meet our demanding financial and strategic requirement, while allowing us the ability to address any reasonable demand that may be made for us in obtaining regulatory approval." *Id.* Pessina refuted an analyst's [characterization] that Walgreens Defendants and the FTC were not seeing eye-to-eye: "[A]s I said, I am still positive on this deal. I believe that we have a strong argument to defend this deal." ¶90. These statements were misleading because Pessina omitted that (a) Walgreens Defendants had not demonstrated to the FTC that Fred's could satisfy the FTC's criteria for a divestiture buyer; (b) known serious operational impediments crippled Fred's ability to compete with a merged Walgreens/Rite Aid; (c) the FTC Bureau of Competition had already told Walgreens Defendants that it would not recommend Fred's as the divestiture buyer; (d) Walgreens Defendants understood that the Bureau of Competition's refusal to recommend Fred's meant that the divestiture transaction would not occur; and (e) Walgreens, Rite Aid, and the FTC had already transitioned their focus to an alternative transaction that did not involve Fred's. ¶¶2-3, 7, 9, 33-38, 53-60, 84-88, 91.

Controlling Supreme Court precedent rejects Walgreens Defendants' assertion that Pessina and Walgreens were free to hide adverse regulatory communications with the FTC Bureau of Competition because the FTC Bureau of Competition was only conveying "an interim recommendation," not a "final decision." *See* Walgreens Br. at 33-34. In *Matrixx*, the Supreme Court held that misrepresentations were properly alleged when a defendant omitted information that a key product *might* cause anosmia (loss of sense of smell), though scientific and regulatory impact remained unclear. 563 U.S. at 44-45. The duty to disclose adverse regulatory facts applies equally to merger-related statements. "[O]ptimistic statements" about governmental approval are actionable if they omit material facts suggesting that approval is not likely. *See Sprint*, 232 F. Supp. 2d

17

at 1219-20.  Parties to a transaction are 'certainly require[d]' to disclose 'information that would permit an investor to appreciate the risk[s]' associated with the Merger." *Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 562 (S.D.N.Y. 2017).  Whether final or not, Walgreens Defendants violated securities laws by hiding this adverse information.

The May 23 Statement. On May 23, 2017, at the UBS Global Healthcare conference in New York City, Pessina and Walgreens told the audience that "we strongly believe that Fred's is a viable buyer."  ¶103.  This statement was misleading because they omitted that the FTC Bureau of Competition had already informed Walgreens that it would not recommend approval of the Merger if Fred's was the divestiture buyer; that Fred's, in fact, was therefore not a "viable buyer;" and that Walgreens had already transitioned to a deal excluding Fred's, reflecting Walgreens Defendants' understanding of the FTC position.  ¶¶9, 84-88, 103.  Walgreens Defendants argue that, similar to their argument about the April 5 Statements, Pessina's May 23 Statement is not actionable because it does not reflect the FTC's final decision.  *See* Walgreens Br. at 22.  As explained above, this argument simply misstates the law and is inconsistent with controlling Supreme Court authority.  *See Matrixx*, 563 U.S. at 44-45.

### 2.   Walgreens Defendants' misleading statements are actionable even if opinions

Walgreens Defendants incorrectly aver that their statements made on January 5, April 5, and May 23 are statements of opinion and "nonactionable."[3]  Walgreens Br. at 32.  This is a red herring. Even if the statements are opinions, these statements concealed Walgreens Defendants' knowledge of then-existing impediments to FTC approval of Fred's as the divestiture buyer.  Under *Omnicare, Inc. v. Laborers District Council Construction Pension Fund*, 575 U.S. 175 (2015), statements of belief are actionable if (1) the speaker did not actually hold the stated belief (i.e., the opinion was "subjectively false" and "objectively false"); (2) the opinion contains "embedded statements of fact" that were untrue; *or* (3) the speaker omitted material facts about its "inquiry

---

[3] Walgreens Defendants do not argue that their December 20, 2016 and January 30, 2017 statements are opinions.  *See* Walgreens Br. at 32-34.

18

into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself." *Id.* at 184-89.[4]  Moreover, "merely appending 'we believe' or 'we think' does not automatically render statements non-actionable." *Envision*, 2019 U.S. Dist. LEXIS 200986, *38. "[S]uch a rule would 'nullify that statutory requirement for all sentences starting with the phrases 'we believe' or 'we think.''". *Id.* (citing *Omnicare*, 575 U.S. at 192-93).

A statement of opinion is actionable when it "'convey[s] facts about how the speaker has formed the opinion'" (i.e., the speaker's basis for holding the view), but conceals from the market the real facts underlying the opinion. *See Laborers' Local #231 Pen. Fund. v. PharMerica Corp.*, Case No. 3:18-CV-109-RGJ, 2019 U.S. Dist. LEXIS 162763, *29-30 (W.D. Ky. Sept. 23, 2019) (quoting *Omnicare*, 575 U.S. at 188).  Analyzing a statement of opinion requires focus on what a reasonable investor would understand. *Align Tech., Inc.*, 856 F.3d at 615; *Omnicare*, 575 U.S. at 186.  If the real facts underlying the opinion are different from those conveyed in the opinion, then the statement is misleading. *Omnicare*, 575 U.S. at 188.  For example, a speaker makes an actionable misrepresentation by stating an opinion "with knowledge that the Federal Government was taking the opposite view." *Id.* at 188-89.

Even if opinions, Plaintiffs properly allege that Walgreens Defendants' January 5, April 5, and May 23 statements were misleading because they omitted known, adverse material facts about Walgreens' inquiry into, and knowledge concerning, Fred's unsuitability under established FTC divestiture buyer criteria. ¶¶69, 91, 103. "[A] defendant who speaks voluntarily on a subject when he has no duty to do so '"assume[s] a duty to speak fully and truthfully on that subject.'" *Pen. Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015) (quoting *Helwig v.*

---

[4] *Omnicare*'s "reasoning is equally applicable to Section 10(b) and Rule 10b-5 claims." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).  *See also In re Envision Healthcare Corp. Sec. Litig.*, Case No. 3:17-cv-01112, 2019 U.S. Dist. LEXIS 200986, *29 (M.D. Tenn. Nov. 19, 2019); *Zwick Partners, LP v. Quorum Health Corp.*, Case No. 3:16-cv-2475, 2018 U.S. Dist. LEXIS 97942, *14 (M.D. Tenn. Apr. 19, 2018).

*Vincor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc)). Walgreens Defendants repeatedly chose to speak about Fred's, but concealed adverse material facts about regulatory communications, transaction status, and their own inability to demonstrate that Fred's satisfied the FTC criteria to be a divestiture buyer of Rite Aid stores. ¶¶2-3, 7, 9, 33-38, 45-46, 53-61, 84-88, 91. Walgreens Defendants also concealed material adverse information about Fred's serious operational impediments that it learned in its due diligence, negotiations, and from the FTC Bureau of Competition. *Id.*

Walgreens Defendants' statements made on April 5 and May 23, 2017 are further actionable under *Omnicare* because the facts alleged demonstrate that Pessina did not actually hold the beliefs he asserted publicly on those dates. *See Omnicare*, 575 U.S. at 184. While he claimed to still believe that Fred's was a viable divestiture buyer, he had already been told otherwise by the FTC Bureau of Competition and had already begun to negotiate a deal excluding Fred's. ¶¶84-88. From that information and course of conduct, a reasonable jury could conclude that Walgreens Defendants' optimistic characterization did not reflect their actual understanding.

### 3. Walgreens Defendants' statements touting Fred's involved concrete facts, not puffery

Nor are Walgreens Defendants' December 20 and April 5 statements examples of immaterial corporate puffery.[5] "[P]uffery" protects only "loosely optimistic" statements that are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005). What matters is not the particular phrase used, but the context. *Id.* For example, representing that business was "very strong" was not puffery when "tied to a product and a time period." *See Ark. Pub. Emples. Ret. Sys. v. Harman Int'l Indus. Inc. (In re Harman Int'l Indus., Inc. Sec. Litig.)*, 791 F.3d 90, 109 (D.C. Cir. 2015).

---

[5] Defendants challenge only these statements as "puffery." *See* Walgreens Br. at 31.

Even "pollyannaish statements couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018).

Walgreens Defendants' attempt to characterize the December 20  statements regarding Fred's "experience[]" as a "pharmacy operator" as immaterial puffery defies logic, and is inconsistent with the context of the statement. *See* Walgreens Br. at 31.  As particularized in the Complaint, this statement was tethered to specific information about the Divestiture Sale and specific criteria published by the FTC in which experience of a proposed divestiture buyer was crucial. ¶¶29-31, 66.  Indeed, the only plausible reason why Pessina and Walgreens trumpeted the experience of their so-called competitor was to imply that Fred's satisfied divestiture buyer criteria.[6]

Walgreens Defendants also improperly cherry-pick parts of one of the actionable comments from the April 5 earnings call, in an attempt to cast the entire statement as immaterial puffery.  *See* Walgreens Br. at 31.  However, puffery depends on context, not isolated fragments of sentences.  *See Matrixx*, 563 U.S. at 43-44; *Bridgestone*, 399 F.3d at 671.  The entirety of the April 5 statements and the context in which they were made leave no doubt that they were highly important to the total mix of information available to investors, and did not speak fully and truthfully about the Revised Merger Agreement and Fred's inability to satisfy the FTC's criteria.  ¶¶2-3, 7, 9, 33-38, 45-46, 53-61, 84-90.  Walgreens Defendants' sanguine comment to investors that the Revised Merger Agreement addresses the FTC's concerns (the passage they complain is puffery) was sandwiched between their optimistic statements about the viability of the divestiture to Fred's, and denials that they were not seeing "eye-to-eye" with the FTC.  Together, the statements gave a

---

[6] Defendants lone substantive case is distinguishable.  *See* Walgreens Br. at 31 (quoting *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009)).  The *Omnicare* Sixth Circuit decision considered a claim arising out of management's statements that "'Omnicare's revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy'" but failed to disclose a contract dispute.  *Id.* at 943. Here, by contrast, Walgreens Defendants referred to a current condition (i.e., Fred's experience in the market) ***because it was relevant to the FTC's competition criteria for a divestiture buyer***. Thus, unlike the cited case, the Complaint representation regarding Fred's experience was specific, concrete, and actionable.

highly misleading impression of the viability of the divestiture to Fred's, an issue crucial to inves-tors, *even after Walgreens Defendants learned that the FTC Bureau of Competition would not recommend Fred's as the divestiture buyer*, and after Walgreens, Rite Aid, and the FTC "transi-tioned" away from Fred's. ¶¶84-90.

### 4.    The Complaint is Not a "Puzzle Pleading"

Walgreens Defendants' "puzzle pleading" claim about the January 5 and April 5 misrep-resentations ignores the actual content of the Complaint.  Walgreens Br. at 26-27.  For ***each*** alle-gation, Plaintiffs identify the exact statements made and omitted.  ¶¶68-69, 89-91.  This practice is not puzzle pleading.  *See, e.g.*, *Karinski v. Stamps*, No. CV 19-1828-MWF (SKx), 2020 U.S. Dist. LEXIS 10721, *27-28 (C.D. Cal. Jan. 17, 2020).  That Walgreens Defendants acknowledge and address, albeit without force, each of the false and misleading statements alleged in the Com-plaint "prove[s] that the defendants were on notice of the claims against them."  *Ont. Teachers Pen. Plan. Bd. v. Teva Pharm. Indus.*, No. 3:17-cv-558 (SRU), 2019 U.S. Dist. LEXIS 164126, *38-39 (D. Conn. Sept. 25, 2019).  Accordingly, they cannot dispute that Plaintiffs' detailed alle-gations satisfy the "purpose of the heightened pleading requirements": "to provide a defendant with fair notice of a plaintiff's claim."  *Id.*

### C.    The Complaint alleges a strong inference of scienter

### 1.    Complaint allegations holistically demonstrate that Walgreens De-fendants' decision to hide damaging facts from investors was inten-tional or at least reckless

The Complaint pleads extensive allegations demonstrating the scienter of Pessina and Walgreens.  As discussed below, many are sufficient in isolation to demonstrate fraudulent intent. When considered holistically, as *Tellabs* requires, the inference that Walgreens Defendants acted at least recklessly is inescapable.  *See Tellabs*, 551 U.S. at 326; *see also Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 980 (6th Cir. 2018) ("[A]n inference of recklessness is sufficient to satisfy a plaintiff's pleading burden on the scienter element.") (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)).  Walgreens Defendants do not dispute that Pessina's knowledge and intent is imputed to Walgreens.  They cannot.  The "'knowledge of a corporate

officer or agent acting within the scope of [his] authority is attributable to the corporation.'"
*Bridgestone*, 399 F.3d at 688.

For scienter, the relevant "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "Accordingly, [a court is to] sift Plaintiff's allegations individually and then aggregate the nuggets of inference they generate," in order to conclude whether a strong inference arises. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004); *see also Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) (viewing the plaintiffs' scienter claims holistically). Circumstantial evidence can establish scienter. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983). Plaintiffs are not required to allege a "smoking gun," or even motive. *Tellabs*, 551 U.S. at 325. "[K]nowledge of facts or access to information contracting their public statements" is classic evidence of scienter. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

The *Hering* Court has already found a strong inference of scienter arising from Walgreens' and Pessina's decision to omit knowledge of adverse regulatory facts from their positive statements about the Merger and Divestiture Sale:

> Walgreens, by the time of the statements [on January 5 and April 5, 2017], had ample reason to understand that the merger was in trouble. Indeed, once the FTC raised the concerns and the original terms of the merger needed to be revised, one would expect the Walgreens Defendants to soften their aggressively confident stance. Instead, the Walgreens Defendants seemed to double-down and disputed reports that the transaction may falter.

> We do not know what the Walgreens Defendants knew or did not know based on their internal discussions with the FTC. However, based on the allegations as a whole, we find a strong inference at least of recklessness. These statements were made in close proximity to both the revision of the merger agreement and the ultimate decision to terminate the merger.

*Hering*, 331 F. Supp. 3d at 428.

The inference here is even stronger. Whereas *Hering* relied solely on circumstantial information, Plaintiffs here plead "smoking gun" evidence regarding Walgreens Defendants'

23

knowledge and conduct directly contradicting their public statements to investors. The Complaint details a March 14 meeting, attended by Walgreens, in which the FTC Bureau of Competition indicated it would not back Fred's as a divestiture buyer.  Days later, between March 17-22, Walgreens Defendants transitioned to negotiating a deal structure that did not involve divestiture to Fred's, under which Walgreens would only purchase about half of Rite Aid stores instead of merging the two companies.    ¶¶84-88, 106-08, 110.  Nevertheless, Walgreens Defendants continued to tout Fred's viability as a divestiture buyer and rejected an insinuation that Walgreens and the FTC were "not seeing eye-to-eye." ¶¶89-91, 103.  Complaint allegations are also stronger than those held sufficient in *Esperion*, another case involving the misrepresentation of regulatory communications.  *See Esperion*, 905 F.3d at 982.  Acknowledging that the defendants there, as here, made characterizations publicly that contradicted the adverse information they were told privately by government regulators, *Esperion* concluded that the only plausible inferences were that defendants intentionally misled investors or were reckless with the truth.  *Id.*  The same reasoning applies here, and is further bolstered by Walgreens Defendants' transition to a deal that excluded Fred's. ¶¶84-88, 89-91, 103, 106-08.

Remaining Complaint allegations, considered holistically, further bolster the conclusion that Walgreens Defendants acted at least recklessly in withholding known adverse facts about Fred's.  Walgreens knew of the FTC's criteria for divestiture buyers, which is published on the FTC's website and explicitly provides that divestiture buyers must possess the financial and operational capabilities to restore competition in affected markets .  ¶¶6-7, 29-31.  As the months of due diligence and negotiations Walgreens claimed to have conducted with Fred's revealed, Fred's supply chain and IT systems were dysfunctional.  ¶¶37-38, 45-46, 53-61, 70.  Walgreens' course of conduct acknowledged that dysfunction, secretly agreeing to put Fred's on Walgreens' internal systems.  ¶¶37-38, 46, 53-60.  Later, Walgreens acknowledged that additional support would be required for Fred's due to these deficiencies.  ¶¶70, 71, 73-75.  Walgreens knew that Fred's operational impediments affected its competitive ability, and were thus crucial to FTC divestiture buyer criteria, yet concealed these facts from investors in expressing their optimism about Fred's ability

24

to purchase and operate the divested stores.  ¶¶6-7, 29-31, 37-38, 46, 53-60, 66, 68-71, 73-77, 84-91, 103.  Considered holistically, these allegations create a strong inference that Walgreens Defendants were aware of adverse facts about the Divestiture Sale, and recklessly or intentionally concealed those facts from the market. Together with the "smoking gun" evidence described above, they allow no other plausible inference.

### 2.    Complaint allegations also show scienter under *Helwig* factors 2, 3, and 6

In addition to establishing scienter by the holistic consideration required by *Tellabs*, *see* 551 U.S. at 322-23, Complaint allegations also show scienter under the *Helwig* factors often considered in this Circuit.  Courts may, but are not required to, consider these factors post-*Tellabs. See Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 915 (M.D. Tenn. 2019).

*Helwig* factor 2 – divergence between external and internal reports.  As the Sixth Circuit explained in *Esperion*, "[w]e have described divergence [*Helwig* factor 2] as the 'key factor' to a finding of scienter."  905 F.3d at 981 (quoting *Bridgestone*, 399 F.3d at 688) (holding that *Helwig* factors 2, 3, and 6, the same factors alleged here, were sufficient to allege a strong inference of scienter).  *Esperion*, 905 F.3d at 981-82.  Non-public meetings with governmental agencies are considered to be "internal reports" as are any meetings attended by "senior corporate officers." *Esperion*, 905 F.3d at 981 (considering as internal report the company's meeting with the FDA). Here, the Complaint alleges a strong divergence between what Walgreens knew internally and what it expressed externally.  *Compare* ¶¶7, 9, 37-38, 46, 52-61, 70, 71, 73-75, 77, 81, 83-88, 108 (alleging Walgreens' internal adverse reports about Fred's) *with* ¶¶66, 68-69, 76-77, 89-91, 103 (alleging public statements touting Fred's competitive ability).

*Helwig* factor 3 – temporal proximity.  The Complaint also supports an inference of scienter under *Helwig* factor 3.  The closeness-in-time "factor is viewed as potentially probative of scienter because a 'short turnaround ma[kes] it less likely that the corporation did not know that its statement was misleading.'"  *Esperion*, 905 F.3d at 981 (quoting *KBC Asset Mgmt. N.V. v. Omnicare, Inc.*, 769 F.3d 455, 484 (6th Cir. 2014))*.  The *Esperion* Court noted that, for this factor, a one-

25

week span between a fraudulent statement and subsequent inconsistent disclosure was "probative of scienter," a four-month gap between statement and disclosure did not create an inference of scienter, and a six-week span satisfies the factor as "fall[ing] comfortably in between." *Esperion*, 905 F.3d at 981 (citing *Bridgestone*, 399 F.3d at 684, 687-88).

As set forth below, the Complaint alleges several instances in which a disclosure closely followed a misleading statement:

| Misleading Statement(s) | Closely-following Disclosure |
| --- | --- |
| **Dec. 20, 2016**: Touting Fred's as an experienced pharmacy operator (¶66) <br><br> **Jan. 5, 2017**: Reassuring market that everything was fine and there was no need for a Plan B (¶68) | **Jan. 20, 2017**: Report of FTC concern that divestiture as then constituted would not preserve competition (¶72) |
| **Jan. 30, 2017**: Misleading market that only obstacle to obtaining FTC approval was the number of stores to be divested (¶76) | **Feb. 13, 2017**: Report implying that quality of divested stores was insufficient, and stating that Walgreens expected to submit another divestiture proposal to the FTC, which included "premier stores in desirable locations." (¶80) |
| **Apr. 5, 2017**: affirming optimism about success of Divestiture Sale, claiming that Revised Merger Agreement will likely satisfy FTC, and refuting observation that Walgreens and the FTC were not seeing eye-to-eye about Fred's. (¶¶89-90) | **Apr. 19, 2017**: Report that FTC was gathering evidence in order to sue to stop the Merger (¶101) |
| **May 23, 2017**: touting Fred's as a viable buyer of the divested Rite Aid stores (¶103) | **June 29, 2017**: Walgreens Defendants' disclosure that the Merger and Divestiture Sale were dead and simultaneous announcement of alternative transaction with Rite Aid. (¶106) <br><br> Rite Aid reported further that the motivation for the alternative transaction (without Fred's) was feedback that the parties received from the FTC that created belief that the FTC would not have approved the Merger. (¶108) |

26

*Helwig* factor 6 – disregard of the most current factual information.  The sixth *Helwig* factor ("disregard of the most current factual information before making statements") is related to the second factor.  *Esperion*, 905 F.3d at 981.  The Complaint alleges that in each of Walgreens Defendants' statements to investors, they ignored the most current factual information.  *See* ¶¶66, 68-69, 76-77, 89-91, 103 (disregarding adverse information about impediments in Fred's operations and finances as well as failure to meet FTC criteria); ¶¶84-91, 103 (ignoring not only these impediments but adverse regulatory communication of March 14, 2017 and its pivot to a transaction excluding Fred's three days later).  Complaint allegations that satisfy *Helwig* factors 2, 3, and 6 are sufficient to support an inference of scienter.  *Esperion*, 905 F.3d at 982.

### 3.  Walgreens Defendants offer no plausible competing inference for hiding damaging information from investors

Walgreens Defendants offer no plausible competing inference for hiding damaging information from investors.  Although the scienter analysis "'must take into account plausible opposing inferences' and decide whether 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged,'" the Court need not credit implausible or speculative inferences, and cannot assume facts not alleged. *Esperion*, 905 F.3d at 979.

Here, Walgreens Defendants offer no plausible competing inference that can be drawn from the facts alleged.  Instead, they ask the Court to disregard well-pleaded factual allegations and infer, contrary to those allegations, a world in which they kept investors "updated on developments" and "repeatedly warn[ed]" that they could not assure regulatory approval.  But such "vague" and "boilerplate" disclaimers are "inadequate to prevent misinformation." *See Quorum*, 2019 U.S. Dist. LEXIS 54810, at *12-13.  Instead, to have legal import, "'[c]autionary language must be extensive and specific.'" *Id.* (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010)).  Moreover, as Complaint allegations make clear, they did not in fact keep investors "updated on developments."  To the contrary, both Walgreens and Pessina both concealed material "developments" about regulatory communications with the FTC, ¶66, 77, 91; their own course of

27

dealing excluding Fred's, ¶¶91, 103; and Fred's operational impediments that crippled its competitive ability, and thus its ability to satisfy the FTC's criteria, ¶¶66, 77, 91. This course of dishonesty was the exact opposite of keeping investors "updated on developments."[7]

Walgreens Defendants do not provide any competing inference that could possibly explain their concealment of known, adverse information from investors. Their so-called explanation (Walgreens Br. at 24-25) does not even address this concealment, and instead discusses whether Walgreens selected Fred's as the divestiture buyer *because* it knew Fred's would never get the FTC's approval. This is not what the Complaint alleges. Nor is it the proper legal consideration. "[T]he question is not whether the . . . defendants knew that the [transaction] ultimately would be blocked; rather, the question is whether the . . . defendants knew that the nondisclosure of certain information, coupled with" optimistic statements about transaction viability, "would mislead . . . shareholders." *Sprint*, 232 F. Supp. at 1226; *see also Matrixx*, 563 U.S. at 48-49 (lack of definitive regulatory and scientific outcome did not undermine strong inference that defendants acted with scienter in withholding problems from investors). Plaintiffs here allege not only known impediments to satisfying FTC regulatory criteria, but actual knowledge that the FTC opposed a deal involving Fred's and a course of conduct reflecting the Walgreens Defendants had secretly abandoned their deal with Fred's (or at least "transition[ed]" to a more viable plan, at the same time they were making their misleading statements about Fred's to investors). The only plausible inferences from these omissions are that Walgreens Defendants intended to hide this information from the market while they secretly negotiated a "Plan B" with Rite Aid and the FTC, or were reckless to the danger of misleading investors by omitting the information.

---

[7] Plaintiffs note that Walgreens Defendants do not contend they disclosed the actual information the Complaint alleges they concealed, nor could they. Regardless, that is a factual issue reserved for the jury at trial. *See Bluestone v. Sadove*, 3:18-cv-63, 2019 U.S. Dist. LEXIS 62207, *31 (E.D. Tenn. Mar. 14, 2019) (noting that even when determining whether the complaint infers scienter, the "[c]ourt does not weigh evidence or credibility at the pleading stage").

**III.   PLAINTIFFS STATE A CLAIM FOR CONTROL-PERSON LIABILITY UNDER §20(A) AS THEY HAVE ESTABLISHED A VIOLATION OF §10(B) AGAINST WALGREENS**

Pessina does not dispute that he is a control person of Walgreens and objects to the §20(a) control person claim alleged against him solely based on his contention that the underlying §10(b) claim against Defendant Walgreens is not well pled.  Walgreens Br. at 34.  For the reasons discussed above, Pessina is wrong.  Accordingly, Plaintiffs also state a claim against Pessina under §20(a) for control person liability.  *See Envision*, 2019 U.S. Dist. LEXIS 200986, *92.

## <u>CONCLUSION</u>

For the foregoing reasons, Walgreens Defendants' Motion to Dismiss should be denied in its entirety.  In the alternative, as the Amended Complaint is the first complaint filed by Plaintiffs (the initial complaint was filed by another plaintiff who was not appointed lead), Plaintiffs respectfully request the opportunity to file an amended complaint (or, if the Court prefers, a motion for leave to amend) within forty-five (45) days.

Dated: January 27, 2020

*/s/ Joshua B. Silverman*

POMERANTZ LLP
Patrick V. Dahlstrom
    (admitted pro hac vice)
Joshua B. Silverman (IARDC # 6238108)
    (admitted pro hac vice)
Jared M. Schneider
    (admitted pro hac vice)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
T: (312) 377-1181
E: pdahlstrom@pomlaw.com
    jbsilverman@pomlaw.com
    jschneider@pomlaw.com

HOLIFIELD JANICH & FERRERA, PLLC
Al Holifield
Sarah R. Johnson
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
T: (865) 566-0115
E: aholifield@hapc-law.com

29

*Attorneys for Lead Plaintiffs*

BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Plaintiffs' Brief in Opposition to the Walgreens Defendants' Motion to Dismiss Plaintiffs' Amended Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on January 27, 2020.

/s/ Joshua B. Silverman
Joshua B. Silverman