## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|  |  |
|---|---|
| THEODORE J. ZALLER, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil Action No.  2:19-cv-02415 |
| v. | Hon. Sheryl H. Lipman Chief Mag. Judge Diane K. Vescovo |
| FRED'S INC., MICHAEL K. BLOOM, WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA and GEORGE R. FAIRWEATHER, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF THE WBA DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Britt K. Latham (TN 23149)
Margaret V. Dodson (TN 35115)
BASS, BERRY & SIMS, PLC
150 Third Avenue, South, Suite 2800
Nashville, TN 37201
Tel: (615) 742-7762
blatham@bassberry.com
margaret.dodson@bassberry.com

Michael P. Kapellas (TN 33379)
BASS, BERRY & SIMS, PLC
The Tower at Peabody Place
100 Peabody Place, Suite 1300
Memphis, TN 38103
Tel: (901) 543-5900
mkapellas@bassberry.com

Jonathan D. Polkes (admitted *pro hac vice*)
Caroline Hickey Zalka (admitted *pro hac vice*)
Corinna Provey (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
jonathan.polkes@weil.com
caroline.zalka@weil.com
corinna.provey@weil.com

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT............................................................................................................................3

    I.    Plaintiffs Do Not Have Standing to Sue the WBA Defendants...............................3

    II.    Plaintiffs Fail to Plead A Strong Inference of Scienter............................................6

        **1.**    Plaintiffs' Allegations Do Not Support a Compelling Inference of
Scienter ................................................................................................................6

        **2.**    Plaintiffs Have Not Satisfied *Tellabs'* Comparative Analysis
Requirement .......................................................................................................11

        **3.**    *Hering* Does Not Shield Plaintiffs From the PSLRA's
Requirements .....................................................................................................12

    III.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission of
Material Fact .....................................................................................................................14

        **1.**    Plaintiffs' New Omission Theory Cannot Save Their Claims...................14

        **2.**    Plaintiffs' Remaining Arguments Regarding the Alleged Falsity of
the WBA Defendants' Statements Also Fail ............................................15

    IV.    The Section 20(a) Claim Should be Dismissed .......................................................20

CONCLUSION......................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert Fadem Tr. v. Am. Elec. Power Co.*,
334 F. Supp. 2d 985 (S.D. Ohio 2004) ...................................................................16

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) ......................................................4, 5

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 747 (1975)........................................................................................5, 6

*Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*,
2019 WL 6251435 (N.D. Ohio Nov. 22, 2019) ........................................................9

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)...........................................................................................3

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ..............................................................19

*Cosby v. KPMG, LLP*,
2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ........................................................3

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ..............................................................................8

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)...................................................................19

*Harbinger Capital Partners LLC v. Deere & Co.*,
632 F. App'x 653 (2d Cir. 2015) ..........................................................................5

*Hering v. Rite Aid Corp.*,
331 F. Supp. 3d 412 (M.D. Pa. 2018) .......................................3, 12, 13, 14, 15, 16

*In re Huntington Bancshares Inc. Sec. Litig.*,
674 F.Supp. 2d 951 (S.D. Ohio 2009) ...................................................................9

*Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v.
Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ..............................................................................20

*Kowal v. MCI Commc'ns. Corp.*,
16 F.3d 1271 (D.C. Cir. 1994)............................................................................16

*Kuyat v. BioMimetic Therapeutics, Inc.*,
 747 F.3d 435 (6th Cir. 2014) ....................................................................................20

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011) ...................................................................................11, 12, 19

*Miller v. Champion Enters., Inc.*,
 346 F.3d 660 (6th Cir. 2003) ......................................................................................6

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
 541 F. Supp. 2d 986 (S.D. Ohio 2007) ......................................................................3

*In re NYSE Specialists Sec. Litig.*,
 503 F.3d 89 (2d Cir. 2007)..........................................................................................4

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Fund*,
 575 U.S. 175 (2015)..................................................................................................18

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
 369 F.3d 27 (2d Cir. 2004).........................................................................................5

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
 614 F. App'x 237 (6th Cir. 2015) .............................................................................19

*Rubin v. Schottenstein, Zox & Dunn*,
 143 F.3d 263 (6th Cir. 1998) ......................................................................................3

*Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*,
 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ...........................................................8

*In re Sofamor Danek Grp., Inc.*,
 123 F.3d 394 (6th Cir. 1997) ....................................................................................17

*In re Sprint Corp Sec. Litig.*,
 232 F. Supp. 2d 1193 (D. Kan. 2002)..................................................................12, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)..............................................................................................2, 11

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4................................6, 7, 9, 12, 15, 18

Fed. R. Civ. P. 9(b) ................................................................................................ *passim*

## PRELIMINARY STATEMENT

As set forth in the WBA Defendants' opening brief, Plaintiffs' securities fraud claims are premised on an absurd, contradictory and obviously contrived theory of fraud. Supposedly, WBA had a secret plan to choose Fred's as the FTC-mandated divestiture buyer because Fred's would be a weak competitor to WBA post-merger. At the same time though, WBA secretly knew that Fred's was so weak that the FTC would never accept Fred's as the buyer. What is more, the WBA Defendants then repeatedly lied to Fred's shareholders about the likelihood of the deal closing, even though they secretly knew the deal would never be approved and that this would all inevitably be discovered. Finally, the WBA Defendants did this for no discernible financial benefit to WBA, its shareholders, or its executives. Plaintiffs' Opposition demonstrates that they cannot salvage this senseless, made-up theory. Not surprisingly, given their starting point, Plaintiffs' securities fraud claims fail as a matter of law on multiple independent grounds, any one of which requires the dismissal of the Complaint with prejudice against the WBA Defendants.

*First,* Plaintiffs' attempt to demonstrate standing misses the point. Plaintiffs show only that shareholders may bring securities fraud claims against secondary actors who served as an issuer's agent in selling the issuer's securities. That authority has no application here. WBA was not a secondary actor working on Fred's behalf in connection with the sale of Fred's securities. Plaintiffs' fallback suggestion that they have standing simply because the allegedly misleading statements were "***made about Fred's***" fares no better. Plaintiffs cite no support for this argument (there is none) and nowhere acknowledge that other courts have rejected it. *See* Section I.

*Second*, Plaintiffs offer no response to the WBA Defendants' showing that the Complaint fails to plead the requisite "strong inference" of scienter. They parrot the Complaint and assert that they properly plead scienter as if merely saying it makes it so. Most significantly, Plaintiffs completely sidestep the WBA Defendants' showing that the alleged March 14 meeting with the

FTC Staff is anything but purported "smoking gun" evidence. In three pages (Mot. at 20-23), Defendants systematically dismantled every aspect of Plaintiffs' reliance on this unsupported allegation. Stunningly, *Plaintiffs offer not a single word of rebuttal.* Indeed, Plaintiffs do not challenge that this March meeting reflected, at most, interim regulatory feedback (Opp. at 18)— not (as they previously alleged) that the FTC had communicated a "terminal setback." Compl. ¶ 9.

Further, Plaintiffs (now on their second try) do not plead an inference of scienter that survives *Tellabs'* comparative analysis. Plaintiffs offer a different theory from the one in their Complaint: the WBA Defendants allegedly "abandoned their deal with Fred's," then "secretly negotiated a 'Plan B' with Rite Aid and the FTC." Opp. at 28. Plaintiffs' latest effort fails for the same reason as the first—it depends on the fundamentally illogical premise that WBA deliberately lied to Fred's shareholders for no apparent reason and for no benefit whatsoever. Moreover, this newly minted theory appears in only a few sentences of Plaintiffs' 50-page Complaint and is unsupported by a single factual allegation. This meager offering is not remotely as compelling as the far more simple, obvious and nonculpable explanation for WBA's conduct supported by Plaintiffs' own pleading: WBA wanted the merger to close and tried to make that happen, including by selecting a divestiture buyer it believed could pass FTC scrutiny. *See* Section II.

*Third*, the WBA Defendants have shown that all of the statements challenged by Plaintiffs are (i) accurate historical statements of fact; (ii) puffery; or (iii) statements of opinion, which do not give rise to liability simply because they might later prove incorrect. In response, Plaintiffs merely restate their conclusory allegations of falsity, cite irrelevant authority, and studiously avoid addressing well-settled Sixth Circuit precedent holding that there is no obligation to disclose "soft" information such as predictions concerning regulatory approval. *See* Section III.

*Finally*, in a last-ditch effort to sidestep these fundamental defects in their pleading,

2

Plaintiffs cite to *Hering v. Rite Aid Corp.* and assert "the same result should follow here." 331 F. Supp. 3d 412 (M.D. Pa. 2018). But this Complaint must rise and fall on its own under the law of this circuit applied to the facts it alleges. Plaintiffs ask the Court to ignore that these two actions are brought by shareholders of different issuers, under the law of two different jurisdictions, and allege two very different frauds. *Hering* cannot save Plaintiffs' claims.

### ARGUMENT

### I.   Plaintiffs Do Not Have Standing to Sue the WBA Defendants

The WBA Defendants have demonstrated that Plaintiffs do not fall within the class of investors who can pursue Section 10(b) claims against them. Mot. at 12-16. Despite promising "controlling authority" supporting their position (Opp. at 3), Plaintiffs offer none.

Indeed, Plaintiffs do not cite a single case holding that an investor in one company can sue an entirely different company (and/or its executives) whose stock they never purchased under the circumstances alleged in the Complaint.[1] Unable to surmount Defendants' unbroken line of authority that directly rejects their standing theory, Plaintiffs invoke the entirely unrelated principle that shareholders may bring securities fraud claims against secondary actors who were agents of the issuer (e.g., lawyers, accounts, and underwriters) directly involved in selling or promoting the securities on the issuer's behalf.[2] This authority has no bearing here. Plaintiffs do not (and cannot)

---

[1] Plaintiffs' citation to *Hering* is unavailing. Opp. at 10. The parties in *Hering* did not brief and the Court did not address whether Rite Aid shareholders (WBA's merger counterparty) had standing under the very different factual allegations in that case, nor can the decision shed light on whether an entirely different class of securities holders (here, the proposed third-party divestiture buyer) can sue the WBA Defendants. 331 F. Supp. 3d at 427.

[2] *See Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (issuer's attorney); *Cosby v. KPMG, LLP*, 2018 WL 3723712, at *2 (E.D. Tenn. Aug. 2, 2018) (issuer's auditor); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1019 (S.D. Ohio 2007) (underwriter of the securities); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 167, 191 (1994) (an indenture trustee, holding that a private plaintiff may not maintain an aiding and abetting claim under 10b-5).

3

allege that the WBA Defendants were agents of Fred's or otherwise acted on Fred's behalf in selling Fred's securities. Rather, Plaintiffs' claims fall squarely within *Nortel* and its progeny, which hold that the conditional commercial transaction alleged here—the potential sale of divested stores (directly analogous to the sale of a business unit in *Nortel*)—is too remote a relationship to confer standing.[3] Mot. at 14-15. Indeed, the *Altisource* court rejected Plaintiffs' very argument, holding that the existence of secondary liability does not in any way "limi[t] the application of *Nortel.*" *In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262, at *4 (S.D. Fla. Sept. 4, 2015). Despite Plaintiffs' conclusory assertions to the contrary, the cases cited by the WBA Defendants in their opening brief uniformly reject Plaintiffs' position.

In the face of this authority, Plaintiffs fall back on the theory that standing exists because the allegedly misleading statements were "***made about Fred's***." Opp. at 1. This argument fails for at least two reasons. To begin with, many of the statements in question did not concern Fred's at all. *See, e.g.*, Mot. at 7; pp. 16-18 below. Indeed, Plaintiffs repeatedly misquote and misleadingly excerpt the challenged statements to suggest that the statements concerned Fred's, when they plainly did not (including by inserting "Fred's" or "divestiture" in brackets in statements that did not mention either (*see, e.g.*, Opp. at 15, 17)).

Second, even accepting *arguendo* that "all" of the challenged statements were about Fred's (Opp. at 12), Plaintiffs' argument fails as a matter of law. Mot. at 14-16. Plaintiffs do not cite *any*

---

[3] Plaintiffs' attempt to undermine *Nortel* by citing to *In re NYSE Specialists* fails. Opp. at 10-11. As set forth in Defendants' opening brief at note 8, the court there left undisturbed *Nortel's* holding that the relationship between the defendant company and the issuer plaintiffs invested in was "too remote to sustain" a securities fraud claim, clarifying that *Nortel* should not be read to bar claims against secondary actors (i.e. "underwriters, brokers, bankers, and non-issuer sellers"). *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 102 (2d Cir. 2007). Indeed, rather than rejecting *Nortel's* core holding which bars Plaintiffs' claim, the Second Circuit recognized the distinction between the WBA Defendants' cases in which securities holders of one issuer have sued another issuer (as here) and Plaintiffs' cases addressing secondary liability. *Id.*

authority whatsoever for the proposition that standing to sue an unrelated company (that did not issue the securities) is conferred by the mere presence of statements made about another issuer. Contrary to Plaintiffs' argument, it is the relationship between the two companies that controls the analysis and the requisite relationship is plainly lacking here. Mot. at 15-16.

For example, in *Altisource*, plaintiffs (Altisource shareholders) claimed that they had standing to sue Ocwen because "unlike in *Nortel*, Ocwen Defendants made statements directly to Altisource shareholders about Altisource and the relationship between Altisource and Ocwen." 2015 WL 12001262, at *4. The Court disagreed, holding that "as in *Nortel*, the business relationship between the two companies, though substantial, is not enough to confer standing, despite the statements' content." *Id.*; *see also Harbinger Capital Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656 (2d Cir. 2015) (rejecting standing in a case brought by an investor in LightSquared against a different issuer even though "[d]efendants' omissions directly concerned LightSquared," finding "no relevant difference between Harbinger and the plaintiffs in *Nortel*").

Plaintiffs' reliance on cherry-picked dicta from *Blue Chip Stamps* is similarly unavailing. Opp. at 10. The language Plaintiffs cite—that the purchaser-seller requirement "limits the class of plaintiffs to those who have *at least* dealt in the security to which the prospectus, representation, or omission relates"—did not purport to define which investors are within the class of plaintiffs eligible to assert Section 10(b) claims. 421 U.S. 723, 747 (1975).[4] Indeed, the Court squarely *rejected* the theory, advanced by Plaintiffs here, that any investor who offers a "logical nexus

---

[4] Indeed, this language arose in the Court's discussion of the "virtue[s]" of the purchaser-seller rule: limiting vexatious litigation based on uncorroborated oral testimony from a plaintiff who did not purchase a defendant's securities. *Id.* at 746-47. As *Nortel* recognized, that risk is also present when a shareholder of one issuer sues a company they did not invest in. *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 33 (2d Cir. 2004).

5

between the alleged fraud and the sale or purchase" can assert a 10(b) claim. *Id.* at 736 n.8.[5]

Finally, Plaintiffs have no answer to Defendants' argument that allowing Plaintiffs' claims to proceed in these circumstances would have far-reaching ramifications that cannot be squared with the Supreme Court's restrictive view of the implied Rule 10b-5 cause of action. Mot. at 13-14. Indeed, the expanded and unsupported rule Plaintiffs urge this Court to adopt promises the very harms the Supreme Court has warned against, inviting "liability in an indeterminate amount for an indeterminate time to an indeterminate class" and creating the "danger of vexatious litigation which could result from a widely expanded class of plaintiffs." *Blue Chip*, 421 U.S. at 740, 748.

### II.  Plaintiffs Fail to Plead A Strong Inference of Scienter

The WBA Defendants have demonstrated that Plaintiffs' allegations, whether viewed individually or "holistically," fail to state "with particularity facts giving rise to a *strong* inference" that they acted with scienter. Mot. at 11-12, 16-25. Their Complaint does meet the PSLRA's heightened pleading requirements that exist to "screen out lawsuits," like this one, "that have no factual basis." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 691-92 (6th Cir. 2003). In opposition, Plaintiffs offer only unsupported speculation that conflicts with black letter law and that does not clear the significant pleading hurdle the PSLRA imposes. At bottom, Plaintiffs have no theory—much less a cogent and compelling one—as to why the WBA Defendants supposedly embarked on the futile scheme of securities fraud alleged in the Complaint.

#### 1.  Plaintiffs' Allegations Do Not Support a Compelling Inference of Scienter

First, Plaintiffs ignore that recklessness is not sufficient under Sixth Circuit law with respect to statements that allegedly misrepresent or omit "soft" information. Opp. at 22-24, 28.

---

[5] Plaintiffs' reliance on Section 10(b) and Rule 10b-5's prohibition of fraud *by* "any person" (Opp. at 9) is inconsistent with Supreme Court authority cited by the WBA Defendants, such as *Janus* which limits liability to the "maker" of a statement. Mot. at 13 n.7.

Rather, Plaintiffs must establish that such statements were made with *knowledge* of their falsity. Mot. at 16-17. Plaintiffs have made no such showing and claims based on the statements of opinion or the omission of "soft" information identified in Sections III.1. and III.2. below should be dismissed on this ground alone.

Second, Plaintiffs do not even attempt to rebut the WBA Defendants' showing that they fail to plead scienter as to Mr. Pessina. *See* Mot. at 23. They do not point to a single document Mr. Pessina received, a single meeting he attended (including the March 14 meeting with the FTC Staff), or a single conversation he participated in during which he allegedly learned of any information that contradicted his public statements. The sum of Plaintiffs' scienter allegations amounts to nothing more than an unparticularized assumption that Mr. Pessina must have been aware of adverse information due to his position at WBA, an argument courts have consistently rejected as insufficient under the PSLRA. *Id.* And while Plaintiffs assert that Mr. Pessina's "knowledge and intent is imputed to [WBA]" (Opp. at 22), they do not identify any knowledge he actually possessed that could be imputed to it. Plaintiffs' failure in this regard is not only fatal to their claims against Mr. Pessina, but to their corporate scienter claim as well, given that the Complaint does not identify a single other WBA employee. Mot. at 23. The Complaint should be independently dismissed on this ground.

Third, Plaintiffs do not rebut the WBA Defendants' showing that the FTC March 14 meeting—their self-styled "smoking gun"—does not support a strong inference of scienter. Mot. at 20-23. Although Plaintiffs continue to reflexively rely on this allegation, they do not dispute or challenge the WBA Defendants' showing that:

- The sole basis for Plaintiffs' allegation about the March 14 meeting is the report of a confidential witness (CW6, a former Fred's employee) regarding a discussion between two *Fred's executives* and the FTC Staff. *Id.* at 20-21.

7

- CW6's account of the meeting is unreliable and lacks the particularity as to the source of his knowledge required by the PSLRA. *Id.* at 21-22, n. 14.

- The Complaint nowhere alleges that the substance of this discussion was communicated to Mr. Pessina or any other WBA employee—let alone an employee whose scienter may be imputed to the Company. *Id.*

- The FTC Staff's statement, even if communicated to WBA, was not a final decision of the Staff, let alone of the ultimate decision-makers (the FTC Commissioners). *Id.* at 22-23.

- By Plaintiffs' own account, the Staff's alleged comment was non-definitive feedback, based on "information *provided to date,*" given in the course of ongoing negotiations that continued thereafter for months. Compl. ¶ 86 (emphasis added); Mot. at 22.[6]

Indeed, Plaintiffs ignore that by March 14, Walgreens and Rite Aid had yet to certify compliance with the FTC's Second Request and that the parties continued to work on the divestiture sale for at least three months thereafter. Compl. ¶¶ 101-102, 106, 107.

Fourth, Plaintiffs have not shown that the WBA Defendants were aware of any other information contrary to their public statements. Plaintiffs' Opposition focuses on a single allegation sourced exclusively to Fred's (not WBA) former employees: the WBA Defendants' purported awareness that "Fred's supply chain and IT systems were dysfunctional." Opp. at 24 (citing Compl. ¶¶ 37-38, 45-46, 53-61, 70).[7] Lacking any basis to argue that any confidential

---

[6] Plaintiffs' reliance on *Dougherty v. Esperion Therapeutics, Inc.* is misplaced. 905 F.3d 971, 975 (6th Cir. 2018). In *Esperion,* the Sixth Circuit found plaintiffs' scienter allegations sufficient where defendants made statements about regulatory approval of a drug following a meeting with the FDA and defendants corrected their public statements after receipt of the FDA's "official" minutes. *Id.* at 979-80. The allegations in *Esperion* are entirely distinct from those here, which do not entail the misrepresentation of a factual account of a meeting, but rather the failure to predict the outcome of a regulatory review process based on a preliminary, not definitive, view expressed by the FTC Staff (not the actual decision-makers). *Id.* at 979-82, 984.

[7] The FTC subpoena to Fred's (Compl. ¶ 70) is not probative of scienter as Plaintiffs have not pled particularized facts showing that it was anything but a typical part of the FTC process. Mot. at 20 n.11. And, the fact that the FTC subpoenaed Fred's was publicly disclosed in the 2017 Proxy (*see* Ex. 1, Rite Aid Mar. 3 2017 Proxy at p. 66) and thus hardly supports an inference of scienter. *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *7 (N.D. Ill. Sept.

8

witness described these problems to anyone at WBA (Mot. at 19-20), Plaintiffs speculate that the WBA Defendants must have learned of them through "due diligence," "negotiations" with Fred's, or through the parties' agreement for "cooperation and exchange of information." Opp. at 24.[8] But Plaintiffs do not cite a single allegation explaining the due diligence WBA conducted, what documents or communications it received addressing these issues, or that WBA (let alone who at WBA) learned of these purported deficiencies.[9]

Fifth, Plaintiffs' allegation that WBA and Rite Aid "transitioned" from a merger to an asset purchase immediately after the March 14 meeting is meritless. Opp. at 24; Mot. at 22 n.15. Plaintiffs aver only that WBA and Rite Aid "ha[d] discussions" with the FTC Staff "that did not include Fred's" on one occasion in March 2017 and twice in June (well after the last alleged misstatement). Compl. ¶ 88. The mere allegation that the merger parties met with the FTC Staff without Fred's does not plausibly suggest a nefarious purpose in the context of a merger transaction, after which WBA would own and operate thousands of Rite Aid stores, and of which the Fred's divestiture was just one part. Nor does the Complaint contain any particularized facts regarding the content of the meetings, let alone supporting the conclusory claim that it actually included discussion of an alternative transaction.

---

26, 2018) (public disclosure of a subpoena militated against an inference of scienter).

[8] Plaintiffs' generic allegations are patently insufficient under the PSLRA. *See Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, 2019 WL 6251435, at *4-5 (N.D. Ohio Nov. 22, 2019) (holding insufficient allegations that defendants "must have known" adverse information based on contractual access to due diligence documents where plaintiffs "fail[ed] to connect those documents with the documents" containing the contradictory information); *In re Huntington Bancshares Inc. Sec. Litig*., 674 F.Supp. 2d 951, 971-72 (S.D. Ohio 2009) (rejecting plaintiffs' allegation as "little more than an assumption" that conducting due diligence provided a defendant with knowledge of acquiree's subprime exposure).

[9] The merger parties' agreements to provide assistance to Fred's do not support Plaintiffs' theory. *See* Mot. at 6, 19 n.10.

9

Sixth, Plaintiffs concede that the Complaint does not plead facts satisfying *Helwig* factors 1, 4, 5, or 7-9. Opp. at 25-27. And, as shown above, Plaintiffs fail to plead with the requisite particularity that Mr. Pessina or anyone else at WBA disregarded current factual information when speaking or received any internal report contrary to their public statements (*Helwig* factors 2 and 6).[10] Further, Plaintiffs' attempt to manufacture support for the remaining *Helwig* factor, temporal proximity (factor 3), by citing to third party media reports based on anonymous sources fails. Opp. at 25-26. They do not cite a single case suggesting that such articles are sufficient under *Helwig*. And, these allegedly "inconsistent disclosures" do not touch on (and therefore cannot reveal) the information Plaintiffs allege WBA concealed—that Fred's would not be approved as a divestiture buyer.[11] Moreover, as discussed in the WBA Defendants' opening brief (and unanswered by Plaintiffs), WBA's June 29, 2017 announcement that it had voluntarily withdrawn the merger did not address Fred's viability as a divestiture buyer because, by the FTC's own account, the FTC never reached a final decision on the merger. Mot. at 8-10, 21 n.12; Compl. ¶ 107.[12] Even assuming support existed for this *Helwig* factor, as a matter of law, temporal proximity "alone cannot support

---

[10] The paragraphs Plaintiffs characterize as "alleging [WBA's] internal adverse reports about Fred's" (Opp. at 25) contain only an assortment of: public statements (¶¶ 81, 108 (by Rite Aid)); conclusory restatements of Plaintiffs' own allegations (¶¶ 7, 9, 77, 83, 91); CW accounts not communicated to WBA (¶¶ 37, 38, 53-60, 75, 87; Mot. at 19-20, 21 n.13); meetings WBA did not attend (¶¶ 52, 55); meetings "Walgreens" allegedly did attend (notably failing to specify whom), but at which nothing contrary to the WBA Defendants' public statements was communicated (¶¶ 46, 61, 71, 73-74, 88; Mot. at 20 n.13); the receipt of an ordinary course FTC subpoena (¶ 70; Mot. at 20 n.11); and the March 14 meeting for which Plaintiffs have not adequately alleged that WBA attended, the content of the meeting, nor its inconsistency with the WBA Defendants' public statements (¶¶ 84-86; Mot. at 20-23).

[11] *See* Opp. at 26 (citing Compl. ¶ 72 (discussing the number of stores to be divested); ¶ 80 (WBA would soon submit an improved package of stores, expected to be acceptable to the FTC)); Ex. 2 Apr. 19, 2017 Bloomberg Report (cited in Compl. ¶ 101) (discussions among WBA, RAD, Fred's, and FTC Staff about an amended divestiture plan remained ongoing).

[12] Contrary to Plaintiffs' suggestion that *Rite Aid* revealed that feedback from the FTC led to a decision to terminate the divestiture (Opp. at 8), Rite Aid never mentioned Fred's (Compl. ¶ 108).

a finding" of scienter. Mot. at 24.

### 2.    Plaintiffs Have Not Satisfied *Tellabs'* Comparative Analysis Requirement

Even had Plaintiffs pled the requisite particularized facts supporting a strong inference of scienter (they have not), their allegations nevertheless fail *Tellabs'* "comparative evaluation." 551 U.S. 308, 323-24 (2007). In opposition, Plaintiffs repeatedly claim that the WBA Defendants offer no plausible competing inference of scienter. Opp. at 27. That simply ignores the WBA Defendants' motion showing *at length* that the facts pled in the Complaint support a simple, benign inference under *Tellabs*, far more rational and compelling than Plaintiffs' theory. Mot. at 24-25.

Next, Plaintiffs claim that the WBA Defendants' competing nonculpable inference does not explain the WBA Defendants' alleged "concealment of known adverse information." Opp. at 28. But this turns *Tellabs* on its head. *Tellabs* asks, based on the *facts* alleged, would "a reasonable person [] deem the inference of scienter cogent and at least as compelling as any opposing inference"? 551 U.S. at 324. This Court is not required to accept from the start the inference that Defendants knew of and concealed "adverse information."

Finally, Plaintiffs switch gears and disregard the illogical theory espoused in their own Complaint: that WBA purposefully selected a weak divestiture buyer to enhance its competitive position, even while knowing that it was dramatically reducing (if not destroying) its prospect of obtaining regulatory approval. Unable to defend this theory, Plaintiffs offer a new one: the WBA Defendants "secretly abandoned their deal with Fred's," then "negotiated a 'Plan B' with Rite Aid and the FTC," while continuing to make "misleading statements about Fred's to investors." Opp. at 28.[13] As set forth above, this new theory finds no support in the Complaint (p. 9). It also makes

---

[13] Plaintiffs' reliance on *Matrixx Initiatives, Inc. v. Siracusano* is misplaced. The *Matrixx* plaintiffs pled particularized facts showing that Matrixx in fact possessed reports from medical professionals and researchers revealing a plausible causal relationship between their drug and loss of smell in users, as well as the existence of four lawsuits against Matrixx alleging the same, and that Matrixx

11

no sense. Plaintiffs offer no explanation for why the WBA Defendants would decide to "secretly abandon" the deal with Fred's and embark on securing FTC approval of an alternative transaction, but continue to publicly discuss that they were pursuing regulatory approval of the original merger with Fred's as the divestiture buyer (all the while, according to Plaintiffs, with the FTC knowing that they had abandoned the merger and Fred's). There would be no reason for the WBA Defendants to hide the "truth" from Fred's securities holders. Opp. at 28. And even taken at its strongest, this theory cannot explain why the WBA Defendants would mislead Fred's investors before March 2017. By Plaintiffs' own (entirely unsupported) account, WBA and Rite Aid only began negotiating an asset purchase in mid-March (Opp. at 24)—after all but two of the challenged statements.[14]

In sum, the WBA Defendants' explanation of the pleaded facts is far more plausible: at the time Mr. Pessina made his public statements (the last made some five weeks before WBA and Rite Aid withdrew their FTC merger application), the WBA Defendants still believed in their arguments and that they could convince the FTC to approve the merger. Mot. at 25.

### 3. *Hering* Does Not Shield Plaintiffs From the PSLRA's Requirements

The *Hering* decision cannot save Plaintiffs' Complaint.[15] In *Hering*, a class of Rite Aid

---

took actions intended to suppress and discredit those reports—including issuing a press release suggesting that internal studies had confirmed that the drug did not cause loss of smell even though Matrixx had not conducted any studies and a panel of scientists convened by the company had concluded that evidence on the issue was inconclusive. 563 U.S. 27, 46-49 (2011).

[14] The circumstances here are a far cry from those in *In re Sprint Corp. Sec. Litig.* (Opp. at 28) where the defendants issued positive public statements about the regulatory process because they needed shareholder approval of a merger and, in fact, altered their compensation plans to earn hundreds of millions of dollars once shareholder approval had occurred, "irrespective of the merger's actual viability." 232 F. Supp. 2d 1193, 1202, 1224-25 (D. Kan. 2002). And, the court dismissed allegations relating to statements after the shareholders had approved the proposed merger. *Id.* at 1225.

[15] Contrary to Plaintiffs' suggestion that *Hering* involved the "exact same dates and

12

shareholders alleged that the WBA Defendants (including George R. Fairweather, WBA's then-CFO) misled Rite Aid shareholders about the level of regulatory risk that the WBA-Rite Aid merger faced, concealing FTC concerns about the market overlap between the two companies. Ex. 3 (*Hering* Compl. ¶¶ 68, 75, 85, 101). The WBA Defendants perpetrated this alleged fraud, the *Hering* plaintiff claimed, to convince Rite Aid shareholders to vote to approve the merger and to preserve Mr. Pessina's "deal-making reputation." *Id.* ¶ 112. The *Hering* plaintiff did not allege, nor did the court address, any fraudulent intent on the part of the WBA Defendants vis-à-vis Fred's securities holders. And, critically, the *Hering* plaintiff made no allegations—upon which this Complaint depends—that the WBA Defendants knew or recklessly disregarded information about Fred's internal deficiencies, the FTC Staff's concerns about Fred's viability as a divestiture buyer, or that WBA and Rite Aid secretly transitioned to an alternative transaction without Fred's. Ex. 3 (*Hering* Compl. ¶¶ 111-127). A case involving shareholders in a different company who claim they were misled about factors unique to the issuer in which they invested under a different theory of fraud provides no basis for allowing Plaintiffs to proceed here. The Complaint must be evaluated on its own merits separate and apart from consideration of the very distinct pleading at issue in

---

communications" (Opp. at 2), the only four statements challenged in both actions are: (1) January 5, "[W]e don't want even to think of the fact that the deal could not be approved after so many months, when we have given a lot of information, and we have had a very good relationship with the people of the FTC . . . So we are not thinking of a Plan B today" (Compl. ¶ 68; Ex. 3 *Hering* Compl. ¶ 98); (2) April 5, "I am still optimistic that we will bring this deal to a successful conclusion" (Compl. ¶ 89; Ex. 3 ¶ 100); (3) April 5, "The changes to the deal that we agreed to in January demonstrate our absolute commitment to ensure that all transactions meet our demanding financial and strategic requirements while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval" (Compl. ¶ 89; Ex. 3 ¶ 100); (4) April 5, "I am still positive on this deal. I believe that we have a strong argument to defend this deal" (Compl. ¶ 90; Ex. 3 ¶ 100).

*Hering*.[16]

Even if the cases were otherwise the same, the applicable law is different. The *Hering* court, applying Third Circuit law, found an inference of "at least [] recklessness," stating "[w]e do not know what the [WBA] Defendants knew or did not know." *Hering*, 331 F. Supp. 3d at 428. But under Sixth Circuit law, because Plaintiffs have alleged that the WBA Defendants omitted or misrepresented "soft" information in the January 5 and April 5 statements challenged in both actions (as well as in the January 5, January 30, and May 23 statements challenged here), they must plead with particularity that Defendants made these statements with *knowledge* of their falsity—a finding the *Hering* court did not address. *See* pp. 6-7 above. Nor did the court engage in a *Helwig* analysis.

### III. Plaintiffs Fail to Plead an Actionable Misstatement or Omission of Material Fact

#### 1.   Plaintiffs' New Omission Theory Cannot Save Their Claims

The WBA Defendants' opening brief demonstrated that Plaintiffs' central omission theory fails under well-settled Sixth Circuit precedent. Mot. at 29-31. The information that Plaintiffs allege the WBA Defendants omitted from the challenged statements—that the WBA Defendants should have publicly conceded defeat and predicted they would never convince the FTC to approve Fred's, while still engaged with the FTC—is subjective, speculative "soft information" that the

---

[16] Indeed, though the *Hering* court considered the January 5 and April 5 statements' proximity to the revision of the merger agreement (January 30) and the termination of the merger (June 29) (Opp. at 23), these dates do not have the same significance here. These statements do not address Fred's viability as a divestiture buyer nor the FTC's opinion thereof. In fact, the *Hering* plaintiff pled that the January 30 announcement of the revised merger agreement was a corrective disclosure, not a misstatement as alleged here. Ex. 3 (*Hering* Compl. ¶ 130). Likewise, Plaintiffs' citation to the *Hering* court's discussion of the WBA Defendants' October and November 2016 statements that the *Hering* court perceived as "contradict[ing]" and "disput[ing]" news reports is inapposite because Plaintiffs do not challenge these statements. Opp. at 2, 13, 23; *Hering,* 331 F.Supp.3d at 427 n.4 (noting October 20 and November 17, 2016 statements that challenged news reports). Nor do they name the speaker of the November 17 statement as a defendant.

securities laws do not require be disclosed. *See* Mot. at 29-30 (and cases cited therein).

Conspicuously, Plaintiffs offer no response, silence that is fatal to their omission theory as pled. Rather, faced with the evisceration of their claim, Plaintiffs pivot and seek to erase it from their allegations altogether, offering an entirely new theory. *Compare* Compl. ¶¶ 69(c), 77(a), 77(c), 91(c), 103 *with* Opp. at p. 15 "(a)-(b)", p. 16 "(a)", p. 17 "(a)." Plaintiffs now posit that the WBA Defendants should have disclosed that "Fred's did not satisfy the FTC's criteria for a divestiture buyer" or that WBA and Fred's "had not demonstrated to the FTC that Fred's satisfied the FTC's criteria for divestiture buyers." *Id.* This new theory is no less absurd. Why would a company state that a proposed divestiture buyer is "DOA" before the FTC had reached that conclusion? Indeed, why would it go forward with a massive publicly announced deal with such a buyer? Moreover, Plaintiffs proposed disclosure would still require WBA to make a "soft" opinion statement, predicting that in the FTC's (third party) judgement Fred's did not or would not satisfy its approval criteria. The securities laws impose no such requirement. Mot. at 30. Indeed, Plaintiffs' interpretation would lead to the absurd result that, to avoid a securities fraud claim, every time WBA made a disclosure about the merger, it would have to inform investors, all well aware that WBA and Fred's remained engaged with the FTC, that the FTC had yet to approve Fred's, when the market was not confused on this point.

### 2. Plaintiffs' Remaining Arguments Regarding the Alleged Falsity of the WBA Defendants' Statements Also Fail

With respect to each of the challenged statements, Plaintiffs fail to rebut the WBA Defendants' showing that the Complaint does not satisfy the PSLRA's requirements. Mot. at 26.[17]

---

[17] *Hering* does not save Plaintiffs' falsity allegations. The *Hering* plaintiff alleged that the January 5 and April 5, 2017 statements were false because defendants misled investors about the FTC's anticompetitive concerns about the *merger*, including market overlap between WBA's and Rite Aid's operations—not issues with Fred's. The *Hering* court, therefore, did not evaluate Plaintiffs' theory of falsity with respect to these statements. *Compare* Compl. ¶¶ 69, 91 *with* Ex. 3 (*Hering*

15

**The December 20, 2016 Statement.** Mr. Pessina's statement that WBA was "pleased to have found an experienced pharmacy operator" is, by Plaintiffs' own pleading, a plainly accurate statement[18] as well as nonactionable puffery. Mot at 28-29, 31. In opposition, Plaintiffs assert that Mr. Pessina's comment was "tethered to specific information about the Divestiture Sale and specific" FTC criteria. Opp. at 21. This is incorrect. Mr. Pessina said nothing about Fred's qualifications as a divestiture buyer (nor would investors understand his vague, generalized statement as a comment on them). And Plaintiffs' suggestion that a "full" disclosure required a lengthy negative characterization of Fred's public "track record as a pharmacy operator" (Opp. at 14-15) is plainly unsupported. *See Kowal v. MCI Commc'ns. Corp.*, 16 F.3d 1271, 1275-77 (D.C. Cir. 1994) (affirming dismissal where court viewed information allegedly omitted as simply "negative characterizations of disclosed corporate events, [and] general industry conditions").

**The January 5, 2017 Statements.** In response to Defendants' opening brief (Mot. at 27-31), Plaintiffs abandon their contention that Mr. Pessina's January 5 statements were affirmatively false, and point to no particularized facts alleged in the Complaint even suggesting that WBA did not have a "good relationship" with the FTC or that WBA was considering a "Plan B" by January 5. Instead, they rewrite their theory to claim that Mr. Pessina should have disclosed that Fred's operational impediments rendered it unable to satisfy FTC criteria. *Compare* Compl. ¶ 69(a)-(d) *with* Opp. at p. 15(a)-(d). This is a non-starter. Mr. Pessina's January 5 statement was not about alternatives to the *Fred's divestiture*, it was about strategic alternatives to *the merger*. Mot. at 7. Nor would disclosure of Plaintiffs' pejorative characterization of Fred's supposed "operational

Compl. ¶¶ 98-101). Nor did that court apply the Sixth Circuit's "hard" versus "soft" information standard to evaluate defendants' duty to disclose.

[18] Plaintiffs affirmatively plead that Fred's operated nearly 400 pharmacies (Compl. ¶¶ 19, 33) and "operat[ed] in medium markets" (Opp. at 14).

impediments" render Mr. Pessina's statement any more (or less) accurate.[19] *Albert Fadem Tr.*, 334 F. Supp. 2d at 1022-24 (to be actionable, "omissions must be related to [a defendant's] statements").

The WBA Defendants have also shown that the majority of Mr. Pessina's statements on January 5 were nonactionable statements of opinion. Mot. at 32-34, n.17 (listing January 5 opinion statements). Plaintiffs do not challenge that Mr. Pessina genuinely held these opinions, but claim that these statements nonetheless omitted allegedly "adverse" facts. *Compare* Mot. at 32-33 *with* Opp. 15, 19-20. But, the Complaint contains *no* allegation of adverse regulatory feedback from the FTC before January 5. Moreover, Plaintiffs fail to plead particularized facts suggesting that anyone at WBA was aware of the alleged "operational impediments" that should have led them to speculate that the FTC would not approve Fred's. The FTC subpoena hardly qualifies, it was nothing other than typical FTC procedure. Mot. at 18-23, 33-34; pp. 6-10, n.7, and n.10 above. Plaintiffs are left with their hindsight view that WBA should have speculated that the FTC would not approve Fred's and thus disclose adverse information about Fred's two weeks after the agreement was announced. This does not state a Section 10(b) claim.

**The January 30, 2017 Statement.** Plaintiffs do not dispute the accuracy of the WBA Defendants' January 30 announcement of revised deal terms. Mot. at 29; Opp. at 16. Instead, they suggest that "by speaking about a deal with Fred's," the WBA Defendants had a duty to disclose Fred's "financial and operational failings," "the failure to show to the FTC that Fred's satisfied FTC divestiture buyer criteria," and "adverse regulatory communications." Opp. at 16. But the

_____

[19] Plaintiffs also mimic the language of the *Hering* decision, alleging that Mr. Pessina's January 5 statement "implied . . . access to non-public information from the FTC suggesting support . . . for Fred's as a divestiture buyer." Compl. ¶ 69(d); Opp. at 15(d). But Mr. Pessina's statement did not even mention Fred's, and thus *a fortiori*, his statement cannot have implied he had access to secret information concerning some positive assessment of Fred's by the FTC.

17

January 30 press release announced revised deal terms with *Rite Aid*—the release never even mentioned *Fred's*[20]—and thus could not be misleading due to the exclusion of allegedly adverse information about Fred's. Moreover, the Complaint contains zero facts to support that the FTC made any "adverse regulatory communications" before January 30. *In re Sofamor Danek Grp., Inc.,* 123 F.3d 394, 401 n.3 (6th Cir. 1997) (finding that "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical" information).

      **The April 5, 2017 and May 23, 2017 Statements.** In opposition to the WBA Defendants' showing (Mot. at 32-34), Plaintiffs do not meaningfully dispute that these statements reflect opinions,[21] but assert that Mr. Pessina did not hold these beliefs and that he omitted facts about WBA's "inquiry into, and knowledge concerning, Fred's unsuitability." Opp. at 19-20.[22] In this regard, Plaintiffs offer two new theories, neither of which pass muster under Rule 9(b) and the PSLRA. Opp. at 20 (citing ¶¶ 84-88, 91). First, Plaintiffs again raise the FTC Staff's March 14 remarks, but as the WBA Defendants have demonstrated, and Plaintiffs have made no effort to rebut, the WBA Defendants cannot be charged with knowledge of the Staff's interim view, which

---

[20] The January 30, 2017 press release did not "announce[] that . . . Fred's agreed to buy up to 1,200 Rite Aid stores." *See* Opp. at 16; Ex. 7 to Defs. Opening Brief, Jan. 30 Tr. at Ex. 99.1.

[21] *See* Mot. at 32 n.17 (listing April 5 opinion statements). The remaining April 5 statement— "[t]he changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions . . . meet our demanding financial and strategic requirements', while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval"—amounts to nonactionable puffery. Opp. at 17; Mot. at 31. Plaintiffs attempt to rewrite the statement, but Mr. Pessina never said that the "Revised Merger Agreement address[ed] the FTC's concerns" and the statement did not relate to the divestiture. Opp. at 21. This is a "rosy affirmation" that "no reasonable investor could find . . . important." Mot. at 31.

[22] Contrary to Plaintiffs' implication (Opp. at 19), *Omnicare* did not make a blanket statement that any opinion is actionable if made "with knowledge that the Federal Government was taking the opposite view." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Fund*, 575 U.S. 175, 188-89 (2015). Rather, the Court indicated that it might be misleading if an issuer expressed an opinion about legal compliance ("We believe our conduct is lawful") "if the real facts are otherwise." *Id.*

18

hardly represented a definitive FTC decision. Mot. at 20-23; pp. 7-8 above. And the Complaint is devoid of a single factual allegation supporting Plaintiffs' new conclusory theory that the WBA Defendants "understood [the FTC Staff's] refusal to recommend Fred's meant the divestiture transaction would not occur" (Opp. at 17) and that following the March 14 meeting the merger parties transitioned to an alternative transaction. Mot. at 22 n.15; p. 9 above.

Even if Plaintiffs had adequately pled Mr. Pessina's knowledge of the March 14 meeting, his opinion would not be actionable because the FTC Staff conveyed only an interim recommendation (as Plaintiffs do not challenge) that is not inconsistent with his statements of qualified optimism. Mot. at 30-31, 33-34; Opp. at 18. *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 825-26 (W.D. Mich. 2012) (no duty to disclose information that "did not constitute a final agency determination" and remained "soft information").[23] Indeed, WBA repeatedly warned that it could not guarantee regulatory approval. Mot. at 5-6.

Plaintiffs rely on *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, for the proposition that when a defendant speaks, he "assumes a duty to speak fully and truthfully on that subject." 614 F. App'x 237, 242 (6th Cir. 2015). Yet, Plaintiffs ignore that an opinion statement "is not necessarily misleading when an issuer knows but fails to disclose, some fact cutting the other way"—including a fact pertaining to interim regulatory feedback. Mot. at 34. Indeed, the Sixth Circuit held in

---

[23] Plaintiffs' other authorities do not support their arguments. Opp. at 17-18. *Matrixx* concerned the materiality of concrete, objective information such as lawsuits and reports from medical professionals and researchers linking the company's drug to loss of smell, not the duty to disclose soft information or interim third-party regulator feedback. 563 U.S. 27 at 31-36, 45-46. In *Sprint*, the court held that defendants' "favorable statement about regulatory approval" (designed to obtain shareholder approval) was reckless because, unlike here, they "*already knew*" that the government entities "were delaying and/or preventing the consummation of the merger," including that one had suspended its review of the merger. 232 F. Supp. 2d at 1208, 1226. *Fresno* is equally unavailing as the language Plaintiffs cite addressed the disclosure of information that a merger party's "revenue numbers were overstated," not whether interim regulatory feedback should be disclosed. 268 F. Supp. 3d 526, 560-62 (S.D.N.Y. 2017).

*Tempur-Pedic* that defendants' discussion of the company's "recent positive results" did not "obligate them to disclose *all* facts contributing to or undermining the company's recent successes, as '[s]uch a rule would require almost unlimited disclosure on any conceivable topic.'" 614 F. App'x. at 246, 249 (dismissing complaint). Nor does Plaintiffs' supposed duty to speak apply when the allegedly omitted information related to or "derive[d] solely from predictions regarding the actions of third parties," such as government agencies. *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.,* 583 F.3d 935, 945, 947 (6th Cir. 2009).[24]

## IV. The Section 20(a) Claim Should be Dismissed

Because the Complaint fails to allege adequately a primary violation, the claim for control person liability under § 20(a) against Mr. Pessina should also be dismissed. Mot. at 34.

## CONCLUSION

The WBA Defendants respectfully request that Plaintiffs' claims against them be dismissed with prejudice and that the Court deny Plaintiffs' request to file an amended complaint.[25]

Dated: February 18, 2020

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Britt K. Latham
Britt K. Latham (TN 23149)
Margaret V. Dodson (TN 35115)
BASS, BERRY & SIMS, PLC
150 Third Avenue, South, Suite 2800

</div>

---

[24] Even if analyzed as statements of fact, the April 5 and May 23 statements were not misleading due to the non-disclosure of interim regulatory feedback, the failure to predict and disclose that Fred's would "never" win FTC approval (pp. 14-15 above), the omission of a list of Fred's alleged internal failings that Plaintiffs have not shown WBA was aware of, nor the alleged switch to an alternative transaction that Plaintiffs do not support with particularized facts. Mot. at 29.

[25] *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444-45 (6th Cir. 2014) (district court "did not abuse its discretion in refusing to allow the plaintiffs to amend their complaint based on the final sentence of the plaintiffs' memorandum in opposition" to dismiss and where "plaintiffs did not present an adequate motion" and "did not attach a copy of their amended complaint").

Nashville, TN 37201
Tel: (615) 742-7762
blatham@bassberry.com
margaret.dodson@bassberry.com

Michael P. Kapellas (TN 33379)
BASS, BERRY & SIMS, PLC
The Tower at Peabody Place
100 Peabody Place, Suite 1300
Memphis, TN  38103
Tel: (901) 543-5900
mkapellas@bassberry.com

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes (admitted *pro hac vice*)
Caroline Hickey Zalka (admitted *pro hac vice*)
Corinna Provey (*pro hac vice* pending)
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
jonathan.polkes@weil.com
caroline.zalka@weil.com
corinna.provey@weil.com

*Attorneys for Defendants Walgreens Boots
Alliance, Inc., Stefano Pessina*

21

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of February, 2020, I filed the foregoing document using the Court's CM/ECF filing system, which will automatically send e-mail notification of such filing to the following individuals or counsel of record:

Jared M. Schneider (admitted *pro hac vice*)
Jeremy Alan Lieberman (admitted *pro hac vice*)
Joshua B. Silverman (admitted *pro hac vice*)
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
jbsilverman@pomlaw.com
jalieberman@pomlaw.com
jschneider@pomlaw.com

Al Holifield
Sarah R. Johnson
HOLIFIELD JANICH & FERRERA, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
aholifield@hapc-law.com

*Counsel for Lead Plaintiffs*

Bradley E. Trammell (TN 13980)
W. Preston Battle, IV (TN 35044)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
btrammell@bakerdonelson.com
pbattle@bakerdonelson.com

M. Scott Barnard (admitted *pro hac vice)*
Michelle Reed (admitted *pro hac vice*)
Erin Brewer (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Tel: (214) 969-2800
Fax: (214) 969-4343
sbarnard@akingump.com
mreed@akingump.com
erin.brewer@akingump.com

*Counsel for Fred's, Inc. and Michael K. Bloom*

s/ Britt K. Latham
    Britt K. Latham