# EXHIBIT 1

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☒    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☐    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under §240.14a-12

**RITE AID CORPORATION**

(Name of Registrant as Specified In Its Charter)

**N/A**

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐    No fee required.

☒    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)    Title of each class of securities to which transaction applies:

Common stock, par value $1.00 per share, of Rite Aid Corporation ("Common Stock").

(2)    Aggregate number of securities to which transaction applies:

1,100,457,272 shares of Common Stock as of February 23, 2017, which consists of: (A) 1,053,689,721 shares of Common Stock outstanding; (B) 34,332,968 shares of Common Stock issuable upon the exercise of options granted pursuant to the 2004 omnibus equity plan, 2006 omnibus equity plan, 2010 omnibus equity plan, 2012 omnibus equity plan and 2014 omnibus equity plan, as well as any other plans or agreements to which Rite Aid has granted equity awards; (C) 5,816,329 shares of restricted Common Stock subject to vesting conditions granted pursuant to the above Rite Aid plans; (D) 6,520,230 shares of restricted Common Stock issuable upon vesting and settlements of performance-vesting restricted units granted pursuant to the above Rite Aid plans; and (E) 98,024 time-vesting restricted stock units granted pursuant to the above Rite Aid plans.

(3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(A) 1,053,689,721 shares of Common Stock outstanding, multiplied by $7.00 per share, (B) 34,332,968 shares of Common Stock issuable upon the exercise of options granted pursuant to the 2004 omnibus equity plan, 2006 omnibus equity plan, 2010 omnibus equity plan, 2012 omnibus equity plan and 2014 omnibus equity plan, as well as any other plans or agreements to which Rite Aid has granted equity awards, multiplied by $4.278, which is the excess of $7.00 over $2.722, which is the weighted average exercise price of such options, (C) 5,816,329 shares of restricted Common Stock subject to vesting conditions granted pursuant to the above Rite Aid plans, multiplied by $7.00 per share, (D) 6,520,230 shares of restricted Common Stock issuable upon vesting and settlements of performance-vesting restricted units granted pursuant to the above Rite Aid plans, multiplied by $7.00 per share and (E) 98,024 time-vesting restricted stock units granted pursuant to the above Rite Aid plans, multiplied by $7.00 per share. In accordance with Section 14(g) of the Securities Exchange Act of 1934, as amended, the filing fee was determined by multiplying the

sum (7,609,746,565.10) calculated in the preceding sentence by .0001159.

(4)    Proposed maximum aggregate value of transaction:

$7,609,746,565.10

(5)    Total fee paid:

$881,969.63

☐    Fee paid previously with preliminary materials.

☒    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount Previously Paid:

$982,609.03

(2)    Form, Schedule or Registration Statement No.:

Schedule 14A, File No. 001-05742

(3)    Filing Party:

Rite Aid Corporation

(4)    Date Filed:

November 24, 2015

Table of Contents

determined pursuant to an appraisal proceeding as contemplated by Delaware law, as described under "The Merger—Appraisal Rights" beginning on page 102).

### Changes to the Original Merger Agreement Pursuant to the Merger Agreement Amendment

The original merger agreement was amended pursuant to the merger agreement amendment to, among other things, (i) reduce the per share merger consideration from $9.00 per share to a range of $6.50 to $7.00 per share; (ii) increase the number of stores that WBA is required to divest, to the extent necessary to obtain the required regulatory approvals, from 1,000 stores to 1,200 stores; (iii) require that WBA sell, transfer, dispose of, divest, license or hold separate the Rite Aid Brand Rights; (iv) extend the end date from January 27, 2017 to July 31, 2017; (v) provide for a reduced $162.5 million termination fee payable by WBA to Rite Aid in the event that the merger agreement is terminated and the termination fee is payable but Rite Aid fails to satisfy the Adjusted EBITDA (as such term is defined in the merger agreement) threshold specified in the material adverse effect definition in the merger agreement; (vi) reduce the Adjusted EBITDA (as such term is defined in the merger agreement) threshold in the material adverse effect definition in the merger agreement from $1.075 billion to $1 billion; (vii) acknowledge that each party has complied with its obligations pursuant to the antitrust efforts covenant and that no material adverse effect has occurred from the date of the original merger agreement to the date of the merger agreement amendment; (viii) revise the no material adverse effect closing condition to be measured from the date of the merger agreement amendment rather than from the date of the original merger agreement; (ix) remove Rite Aid's obligation to reimburse WBA's expenses in certain circumstances specified in the original merger agreement; and (x) require that WBA sell, transfer, dispose of, divest or hold separate certain Rite Aid distribution centers, inventory related thereto and certain administrative assets.

### Background of the Merger

Note that the portion of this "Background of the Merger" covering the period beginning in 2012 and ending on October 27, 2015 (the date of the original merger agreement with WBA) is the same as the disclosure provided in the definitive proxy statement filed on December 21, 2015 relating to the original merger agreement.

We refer to generally accepted accounting principles as applied in the United States as GAAP. This "Background of the Merger" section includes periodic information about Adjusted EBITDA, a non-GAAP financial measure. Rite Aid uses this non-GAAP financial measure in assessing its performance in addition to net income, the most directly comparable GAAP financial measure. Rite Aid believes Adjusted EBITDA serves as an appropriate measure in evaluating the performance of its business and helps its investors better compare Rite Aid's operating performance with its competitors. Adjusted EBITDA should not be considered in isolation from, and is not intended to represent alternative measures of, operating results as determined in accordance with GAAP. Rite Aid's definition of Adjusted EBITDA may not be comparable to similarly titled measurements reported by other companies and is not identical to similar terms in Rite Aid's debt facilities or the merger agreement. A reconciliation of Adjusted EBITDA to net income is included in Annex E hereto.

The Board of Directors regularly reviews and assesses Rite Aid's performance, risks, opportunities and strategy at board meetings. Additionally, the Board of Directors and Rite Aid management regularly review and evaluate the possibility of pursuing various strategic alternatives and relationships as part of Rite Aid's ongoing efforts to strengthen its businesses and maximize value for its stockholders, taking into account economic, regulatory, competitive and other conditions. From time to time, at Rite Aid's request, Citi, a financial advisor to Rite Aid, has assisted Rite Aid management and the Board of Directors in evaluating various potential strategic alternatives available to Rite Aid. Additionally, Rite Aid management sends monthly financial updates to the Board of Directors, including updates on Rite Aid's Adjusted EBITDA. These updates compare Rite Aid's actual performance to the prior year's performance and budget. Mr. John Standley, Chief Executive Officer of Rite Aid, also regularly speaks with the lead independent director of the Board of Directors to provide him with updates on Rite Aid's financial performance.

an effort to achieve approval of a divestiture plan by the end date, and Jones Day stated that based on the status of WBA's divestiture sale process, it agreed with this approach. The Board of Directors and members of management discussed WBA's plan for the divestiture sale process, including that WBA planned to meet with Fred's and the FTC during the week after the asset purchase agreement was executed. Management again discussed with the Board of Directors Rite Aid's Adjusted EBITDA and reported that Adjusted EBITDA was above the threshold in the definition of material adverse effect in the original merger agreement as of the third quarter, and was currently forecasted to stay above the threshold through the January 27, 2017 end date. In the period thereafter, Rite Aid management believed that there was risk that Adjusted EBITDA might fall below that threshold. The Board of Directors also discussed the future of Rite Aid as a stand-alone company in the event the merger was not completed. The Board of Directors discussed Rite Aid's strategic options, including the possibility of terminating the agreement after January 27, 2017 and receiving the termination fee from WBA and selling assets in the future. No decisions were made at this meeting regarding Rite Aid's strategic options in the event that the transaction was not completed by the January 27, 2017 end date, but the Board of Directors and management planned to continue to discuss and consider these issues at later board meetings once Rite Aid received additional clarity on the likelihood of completing the merger before the January 27, 2017 end date.

On December 19, 2016, Rite Aid, WBA, Fred's and Divestiture Buyer entered into the asset purchase agreement. Pursuant to the terms and subject to the conditions set forth in the asset purchase agreement, Divestiture Buyer, AFAE, LLC, a subsidiary of Fred's, would purchase from Rite Aid 865 stores and certain specified related assets for a purchase price of $950 million plus the Divestiture Buyer's assumption of certain liabilities of Rite Aid and its affiliates. If the FTC requires divestiture of more than the 865 Rite Aid stores contemplated by the original asset purchase agreement and WBA agrees to sell such stores, the asset purchase agreement requires the Divestiture Buyer to purchase such additional stores. The asset purchase agreement was conditioned on FTC approval, the approval and completion of Rite Aid's pending merger with WBA and other customary closing conditions.

On December 22, 2016, Rite Aid reported its financial position and results of operations as of and for the third quarter of its 2017 fiscal year. Rite Aid reported revenues of $8.1 billion (compared to revenues of $8.2 billion in the third quarter of Rite Aid's 2016 fiscal year), net income of $15.0 million (compared to net income of $59.5 million in the third quarter of Rite Aid's 2016 fiscal year) and Adjusted EBITDA of $274.1 million (compared to Adjusted EBITDA of $373.2 million in the third quarter of Rite Aid's 2016 fiscal year). Retail EBITDA was $221.7 million, which was a reduction of $117.6 million from the $339.3 million of Retail EBITDA generated in the third quarter of the prior year. Pharmacy reimbursement rate reductions were the primary driver of this decrease. Prescription counts were also trending lower than expected.

During December 2016 and January 2017, the FTC Staff continued to analyze and review the proposed divestiture transaction and requested additional information from the parties relating to Fred's and the divestiture package.

On January 6, 2017, the Board of Directors held a telephonic board meeting during which Jones Day provided updates on the FTC approval process, including the FTC's subpoena to interview members of Fred's management, the FTC's request for substantial documents related to the divestiture, and the increasing likelihood that the merger would not be consummated by the January 27, 2017 end date. Jones Day informed the Board of Directors that at that point, the FTC continued to review the transaction, and, in the judgment of Jones Day, the FTC would not recommend approval of the divestiture transaction by the end date. Members of Rite Aid management updated the Board of Directors on Rite Aid's financial condition, including Rite Aid's most recent Adjusted EBITDA relative to the threshold set forth in the original merger agreement. Management discussed with the Board of Directors that, if the Board of Directors were to approve an extension of the original merger agreement beyond January 27, 2017, then Rite Aid may require a revised Adjusted EBITDA threshold

66

in order to maximize the likelihood of satisfying the related closing condition in the original merger agreement. Management discussed projections of pharmacy reimbursement rates for fiscal year 2018 and noted that pharmacy reimbursement rates and pharmacy margins were likely to continue to decline. Management also reiterated its intention to control costs to the extent advisable and allowed by the interim operating covenants of the original merger agreement to try to help mitigate these issues, and that many of those initiatives would likely be incorporated into its budget for the next fiscal year. Management and the Board of Directors discussed the fact that the original merger agreement contained certain restrictions on Rite Aid's ability to amend the terms of certain contracts or enter into certain new contracts with payors, vendors and other business partners. Members of management and representatives of Skadden, Jones Day and Citi attended the meeting.

During January 2017, on several occasions members of the Rite Aid and WBA management teams discussed the FTC review process and ways in which the parties might propose to revise certain aspects of Fred's business plan and propose potential changes to the asset purchase agreement to address the questions raised by the FTC Staff in their review of Fred's and to increase the likelihood of obtaining FTC approval of the transaction. Rite Aid and WBA management also held preliminary discussions about the possibility of extending the end date beyond January 27, 2017. No specific terms were discussed, and Rite Aid and WBA agreed to meet on January 22, 2017 to discuss the potential extension further.

On January 22, 2017 and January 23, 2017, representatives of Rite Aid's management met with representatives of WBA's management at Simpson Thacher's office and Skadden's office in New York. Representatives of Skadden, Jones Day, Simpson Thacher and Weil participated in such discussions as well. At the meetings, the parties discussed, among other things, the possibility of amending the original merger agreement to extend the end date, to alter the divestiture obligations in the original merger agreement, to propose potential changes to the divestiture transaction with Fred's and to provide certain additional exceptions to the interim operating covenant restrictions to account for the longer period for closing the transaction. In these initial discussions, the parties did not specifically discuss reducing the per share merger consideration, but WBA noted that it was unwilling to bear additional costs to revise the divestiture transaction with Fred's while operating under the terms of the original merger agreement, including that WBA was unwilling to bear the costs and business repercussions of transferring the Rite Aid Brand Rights to Fred's.

On January 23, 2017, Simpson Thacher sent Skadden a draft Amendment No. 1 to the Agreement and Plan of Merger, which we refer to as the Original WBA Amendment Proposal. The Original WBA Amendment Proposal provided for, among other things, (i) extension of the end date to March 31, 2017, (ii) removing the increased $650 million termination fee in the event that WBA had entered into a "parent permitted transaction" (as defined in the original merger agreement) and providing that the $325 million termination fee would still be payable if Rite Aid failed to satisfy the Adjusted EBITDA condition at the time of such termination, (iii) an acknowledgement that WBA was not required to enter into any divestiture agreement on terms that would be adverse to WBA relative to the terms of the asset purchase agreement (which had the effect of not requiring WBA to comply with the terms of the antitrust efforts covenant of the original merger agreement to the extent not required by the asset purchase agreement) and (iv) an acknowledgement, as of the date of the amendment, that neither WBA nor Rite Aid had breached its obligations pursuant to the antitrust efforts covenant. The Original WBA Amendment Proposal did not obligate WBA to take any additional actions beyond the obligations in the original merger agreement and the asset purchase agreement to obtain FTC approval of the transaction, and Jones Day advised Rite Aid that Jones Day believed that WBA likely needed to proffer additional divestiture obligations in order to maximize the chance of obtaining FTC approval of the transaction. Also on January 23, 2017, Skadden sent Simpson Thacher a draft of amendments to Rite Aid's disclosure letter providing, among other things, additional exceptions to the interim operating covenant restrictions on Rite Aid in light of the additional period contemplated for closing