## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| THEODORE J. ZALLER, Individually and on Behalf of All Others Similarly Situated,[1] | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:19-cv-02415-SHL-atc |
| FRED'S, INC., MICHAEL K. BLOOM, WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA and GEORGE R. FAIRWEATHER, | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MICHAEL BLOOM'S MOTION TO DISMISS AND GRANTING THE WALGREENS DEFENDANTS' MOTION TO DISMISS

Before the Court are Defendant Michael Bloom's Motion to Dismiss, (ECF No. 57), filed

December 19, 2019, Plaintiffs' Response Brief in Opposition, (ECF No. 62), filed January 27,

2020 and Mr. Bloom's Reply, (ECF No. 70), filed February 18, 2020, as well as Defendants

Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company") and Stefano Pessina's

(collectively, the "Walgreens Defendants") Motion to Dismiss, (ECF No. 58), filed

December 19, 2019, Plaintiffs' Response Brief in Opposition, (ECF No. 63), filed January 27,

2020, and the Walgreens Defendants' Reply, (ECF No. 71), filed February 18, 2020.

This is a putative class action brought by investors in Fred's, Inc. ("Fred's"), who allege

that Fred's,[2] Walgreens and each company's Chief Executive Officer failed to disclose material

information in violation of federal securities laws.  Because the Court finds that some, but not

---

[1] This action has not yet been certified as a class action.

[2] Plaintiffs' claims against Fred's were stayed following the September 9, 2019 filing of Fred's Chapter 11 Bankruptcy Petition.  (See ECF Nos. 36, 41.)

all, of Mr. Bloom's statements are not actionable, his Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**. As for the Walgreens Defendants, the Court concludes that Plaintiffs do not have standing to pursue those causes of action. Thus, their Motion to Dismiss is **GRANTED**.

## BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint ("the Complaint") and accepted as true for the purpose of this Motion[3]:

In January 2015, Defendant Walgreens Boots Alliance, Inc. ("Walgreens") began negotiating with Rite Aid Corporation ("Rite Aid") to merge the two drug chains. In October 2015, Walgreens and Rite Aid executed a Merger Agreement that the companies publicly announced. The Merger Agreement provided that, to the extent necessary to obtain the Federal Trade Commission's ("FTC") approval, Walgreens would divest up to 1,000 Rite Aid locations to a third-party.

In November 2015, Walgreens and Rite Aid filed premerger notification forms with the FTC. A month later, on December 10, 2015, the FTC issued Second Requests—the manner in which the FTC requests additional information—from Walgreens and Rite Aid. For the next few months, until April 2016, the two drug chains responded to the FTC's Second Requests.

In late April 2016, the FTC pointed to geographic areas for which the merger posed antitrust concerns. In response, Walgreens and Rite Aid submitted twenty (20) advocacy papers addressing the FTC's concerns. Nevertheless, the FTC Bureau of Competition "delivered to [the two drug chains] a determination that anticompetitive effects were likely." (ECF No. 52 at ¶ 45.) Walgreens proposed divesting hundreds of Rite Aid stores to maintain competition in affected

---

[3] The Court includes few citations to the Complaint, given that the facts are not disputed.

areas.  Specifically, Walgreen solicited bids from companies interested in purchasing the Rite Aid locations potentially subject to divestiture, and, by late September 2016, Walgreens narrowed negotiations to Fred's and two other companies.

On December 20, 2016, Fred's announced that it had agreed to purchase 865 Rite Aid stores to be divested as part of a deal by Walgreens to acquire the Rite Aid chain.  Walgreens issued its own press release stating that Fred's was an "experienced pharmacy operator."  The deal was set to close just over a month later, on January 27, 2017.  Following the announcement, Fred's stock price shot up over 81% in a single day.

In a January 5, 2017 earnings call, the Walgreens Defendants stated that they did not have a "Plan B" if the divestiture to Fred's fell through and that "for the time being everything looks fine."  (ECF No. 52 at ¶ 68.)  Then, on January 30, 2017, Walgreens announced that it and Rite Aid had agreed to extend the merger deadline to July 31, 2017, and to revise the transaction terms, including that, if required by the FTC, Walgreens agreed to sell, and Fred's agreed to buy, up to 1,200 Rite Aid locations.

On March 3, 2017, Fred's stock experienced a jolt.  Rite Aid filed its Merger Proxy with the Securities and Exchange Commission ("SEC") that day, which disclosed that, according to Rite Aid's antitrust counsel, the FTC had subpoenaed Fred's management in January, requesting substantial documents, and that it was counsel's judgment that the FTC was unlikely to approve Fred's purchase in time for the deal's closure on January 27, 2017.  (ECF No. 52 at ¶ 81.)  Moreover, the Merger Proxy indicated that Rite Aid's Board determined that improvements to the divestiture proposal would likely be required to garner the FTC's approval.  Fred's stock price dropped 11%.

On March 14, 2017, representatives from Walgreens, Rite Aid and Fred's—including Mr. Bloom—met with the FTC Bureau of Competition.  According to one of Plaintiffs' confidential witnesses ("CW6"), the FTC officials informed Fred's representatives that they were unlikely to recommend approval to the FTC commissioners so long as Fred's was the divestiture buyer, due to Fred's limited financial resources.  Mr. Bloom, according to CW6, told the rest of senior management that the FTC was unlikely to approve the deal before Fred's April 6, 2017 earnings release.  However, during the April 6 earnings call, Mr. Bloom omitted this dampening news when discussing the divestiture purchase.  The price of Fred's shares rose by close of market on April 6, 2017.

In their own earnings call on April 5, 2017, the Walgreens Defendants likewise omitted the information that the FTC was unlikely to recommend approval of the deal.  Mr. Pessina stated that he was "still optimistic that we will bring this deal to a successful conclusion," but that 'there is no doubt that the process of getting clear for the transaction is taking longer than we expected."  (ECF No. 52 at ¶ 89.)  When asked whether Walgreens and the FTC were "seeing eye-to-eye," Mr. Pessina responded that he was "still positive on this deal" and that "we have a strong argument to defend this deal."  (Id. at ¶ 90.)  On May 23, 2017, the Walgreens Defendants told investors at a healthcare conference that they "strongly believe that Fred's is a viable buyer." (Id. at ¶ 103.)

Mr. Bloom eventually gave a clue that the divesture purchase was in trouble on June 6, 2017.  In a conference call with investors that day, Mr. Bloom stated that he was focused on Fred's "core" business rather than the potential pharmaceutical side.  (Id. at ¶ 104.)  And then, after close of market on June 28, 2017, investors finally learned that the Fred's deal to acquire the Rite Aid stores was dead.  Walgreens and Rite Aid announced that they had terminated their

merger deal, and instead would structure a deal excluding Fred's whereby Walgreens would purchase around half of Rite Aid's current stores, and Rite Aid would continue to operate the others.  (Id. at ¶ 106.)  The price of Fred's shares dropped nearly 23% the next day.

This is a putative class action, filed on behalf of individuals who purchased Fred's securities between December 20, 2016 and June 28. 2017.  As to Mr. Bloom, former chief operating officer of Fred's, Plaintiffs allege that he materially misled investors, violating Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act").  Plaintiffs allege that the following statements made by Mr. Bloom about the divestiture deal were misleading given that they omitted materially adverse information about the proposed deal:

| DATE | STATEMENT | ALLEGED OMISSIONS |
|---|---|---|
| December 20, 2016 Press Release | Mr. Bloom stated that the transaction with Walgreens was "a transformative event for Fred's Pharmacy that will accelerate our healthcare growth strategy through our acquisition of 865 new stores located in highly attractive markets." | (1) That Fred's lacked the financial, technological, and operational capabilities to effectively compete with a merged Walgreens and Rite Aid in the markets served by the divestiture locations; and (2) that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's satisfied the FTC criteria for a divestiture buyer. |
| January 30, 2017 Press Release | Mr. Bloom stated that Fred's "affirm[ed] that the asset purchase agreement it entered into on December 19, 2016 with Walgreens and Rite Aid remains in effect," that the merger agreement has "reinforce[d] the Company's confidence that the transaction is in the mutual best interest of Fred's Pharmacy and its shareholders," and "to the extent the Federal Trade Commission ("FTC") requests | (1) That Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could viably operate the number of locations referenced; (2) known operational, supply chain, and IT impediments to Fred's ability to operate the "additional stores"; (3) that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could satisfy the FTC's criteria for divestiture buyers; and |

5

| | | |
|---|---|---|
| | that additional stores be sold, and Walgreens agrees to sell such stores, Fred's Pharmacy has agreed to buy those stores." | (4) that it was Walgreens' understanding that it would have to provide significant support to Fred's due to Fred's lack of resources and business process deficiencies, including transferring Rite Aid distribution centers, allowing Fred's to use Rite Aid's brand rights, and allowing Fred's to use Walgreens' ERP software on an interim basis. |
| April 6, 2017 Earnings Release | Mr. Bloom described the divestiture transaction as follows: "The proposed acquisition of the stores, which are based in highly attractive markets, is a transformative event that will add substantial scale to the company and transform Fred's Pharmacy, the largest regional pharmacy player, into an even stronger competitor and the third-largest drugstore chain in the nation." | (1) feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer; (2) that neither Fred's nor Walgreens had demonstrated (and neither could demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; (3) known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; and (4) that Fred's lacked sufficient ability to acquire and operate the referenced divestiture stores on its own. |
| April 6, 2017 Earnings Conference Call | Mr. Bloom stated in prepared remarks, that "the transformation of Fred's Pharmacy that has been underway for the past 18 months has been working." Bloom also repeated that Fred's acquisition of Rite Aid stores would be "a transformational event for our Company," that "Fred's Pharmacy remains committed to purchasing 37 additional assets, including up to 1,200 Rite Aid stores to | (1) feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer; (2) that neither Fred's nor Walgreens had demonstrated (and neither could demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; (3) known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; and (4) that Fred's lacked sufficient |

6

|  | the extent necessary to obtain the FTC's approval of the transaction," and, in response to a question about what Fred's needed to do to transform itself into a national presence, that "[Fred's is] collaboratively working on the biggest piece of that transformation with Rite Aid and Walgreens Boots Alliance." | ability to acquire and operate the referenced divestiture stores on its own. |
|---|---|---|
| April 13, 2017 Form 10-K | Mr. Bloom signed Fred's Form 10-K, which stated that Fred's agreed to purchase 865 Rite Aid stores for $950 million; that "Fred's is working collaboratively with Walgreens, Rite Aid and the Federal Trade Commission to help obtain the FTC's approval of Walgreens' pending acquisition of Rite Aid and the divestiture of certain Rite Aid assets to Fred's"; that Fred's remains committed to purchasing additional assets, including up to 1,200 Rite Aid stores, to the extent necessary to obtain the FTC's approval of the Rite Aid Transaction; and that "[t]he proposed acquisition of the stores, which are based in highly attractive markets, is a transformative event that will add substantial scale to the Company and make Fred's an even stronger competitor and the third-largest drugstore chain in the nation." | (1) Feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer; (2) that Fred's and Bloom had not demonstrated (and could not demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; (3) known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; and (4) that Fred's lacked sufficient ability to acquire and operate the referenced divestiture stores on its own. |
|  |  |  |

| | | |
|---|---|---|
| June 6, 2017 Earnings Call[4] | Mr. Bloom stated that Fred's "remain[ed] optimistic in our ability to receive FTC Approval[.]" | That Fred's concealed the adverse determination of the FTC Bureau of Competition. |

Plaintiffs also allege that the Walgreens Defendants made the following

misrepresentations of material fact:

| DATE | STATEMENT | ALLEGED OMISSIONS |
|---|---|---|
| December 20, 2016 Press Release | The Walgreens Defendants stated that Fred's was an "experienced pharmacy operator." | (1) That Fred's limited "experience" in operating pharmacies had not been successful; (2) that Fred's did not have any experience operating pharmacies in the East and West Coast markets that were identified as concerns by the FTC and identified for divestiture by Walgreens; and (3) that Fred's did not have any experience operating pharmacies in larger markets and had sparse experience operating pharmacies in medium markets, and that many of the Rite Aid locations to be divested were in larger and medium sized markets. |
| January 5, 2017 Earnings Call | The Walgreens Defendants stated that Walgreens had a "very good relationship with the people of the FTC," that they were not thinking of a "Plan B" if the deal fell through, and that regarding potential litigation, that "for the time being everything looks fine." | (1) Walgreens and Mr. Pessina did not have a "very good relationship" with the FTC; (2) "everything" did not "look[] fine" in relation to Walgreens' and Fred's attempts to demonstrate to the FTC the viability of Fred's as a divestiture buyer; (3) the statements omitted that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's |

---

[4] Defendant does not challenge this statement in his Motion to Dismiss.  (See ECF No. 57-1 at PageID 686-87.)  He makes only one passing reference to this statement in his Reply, regarding whether the statement establishes the scienter factor that looks at temporal proximity.  Thus, any challenge to this statement being a basis for this cause of action at this stage is waived.

8

| | | met the FTC's criteria for a divestiture buyer; and<br>(4) the statements falsely implied that Walgreens and Mr. Pessina had access to non-public information from the FTC suggesting support of the FTC for Fred's as a divestiture buyer, when in fact Walgreens and Mr. Pessina had no such information. |
|---|---|---|
| January 30, 2017 Announcement | The Walgreens Defendants announced an extension to the merger deadline and a number of revisions to the terms of the transaction, including the share-acquisition price, the number of Rite Aid locations that Fred's might acquire in the deal, and the share-acquisition price should Walgreens be required to divest more than 1,000 locations. | (1) That Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could viably operate the number of locations referenced;<br>(2) known operational, supply chain, and IT impediments to Fred's ability to operate "up to 1,200 Rite Aid locations";<br>(3) that Walgreens and Fred's had not demonstrated (and could not demonstrate) to the FTC that Fred's could satisfy the FTC's criteria for divestiture buyers; and<br>(4) Walgreens' understanding that it would have to provide significant support to Fred's due to Fred's lack of resources and business process deficiencies, including transferring Rite Aid distribution centers, allowing Fred's to use Rite Aid's brand rights, and allowing Fred's to use Walgreens' ERP software on an interim basis. |
| April 5, 2017 Earnings Call | Mr. Pessina stated that he was "still optimistic that we will bring this deal to a successful conclusion," that the changes to the deal made in January 2017 reflected the Walgreens Defendants "absolute commitment" to the deal, and that Walgreens believed that Fred's was "the right buyer." | (1) That Walgreens had received feedback from the FTC Bureau of Competition indicating that it would not recommend approval of the Merger with Fred's as the divestiture buyer;<br>(2) that Walgreens and the FTC were not "seeing eye-to-eye";<br>(3) that Walgreens and Pessina had not demonstrated (and could not demonstrate) to the FTC that Fred's satisfied the FTC's criteria for a divestiture buyer; |

| | | (4) known deficiencies at Fred's, including IT, distribution, ERP, and supply chain and warehouse management; (5) that far from being a "legitimate player in the industry," Fred's was crippled by archaic systems and scarce resources, and lacked sufficient ability to acquire and operate up to 1,200 additional stores; and (6) that Walgreens and Rite Aid had already transitioned their focus to a transaction that did not involve Fred's. |
| May 23, 2017 UBS Global Healthcare Conference | The Walgreens Defendants told investors that "we strongly believe Fred's is a viable buyer." | Fred's was not a viable buyer, as the FTC Bureau of Competition had confirmed by informing Walgreens, Rite Aid and Fred's that the Bureau of Competition would not recommend approval of the Merger with Fred's as divestiture buyer. |

In sum, as to Mr. Bloom, Plaintiffs allege that he began fraudulently misleading investors about the divestiture sale on December 20, 2016, and continued to do so through the June 6, 2017 earnings call, in which he expressed that Fred's "remain[ed] optimistic in our ability to receive FTC approval." (ECF No. 52 at ¶ 105.)

As for the Walgreens Defendants, Plaintiffs allege that they began fraudulently misleading investors about the divestiture sale on December 20, 2016, and continued to do so through the May 23, 2017 remarks at the UBS Global Healthcare Conference, when they stated that they still believed that Fred's was "a viable buyer." (Id. at ¶ 103.) Instead, investors learned after the close of market on June 28, 2017, that the deal was dead, just over three weeks after Fred's June 6, 2017 earnings call and just over five weeks after the Walgreens Defendants' remarks at May 23, 2017 healthcare conference.

10

## ANALYSIS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must make factual allegations that "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 469 (6th Cir. 2014) (internal citation and marks omitted). A court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." DirecTV, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007).

To state claim for securities fraud under § 10(b) of the 1934 Act and SEC Rule 10b–51, a plaintiff must establish the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37–38 (2011) (internal citation omitted). As to each element, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") provide additional requirements for this type of pleading. Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Doshi v. Gen. Cable Corp., 386 F. Supp. 3d 815, 826 (E.D. Ky. 2019) (internal citation omitted). The PSLRA is an "elephant-sized boulder" (In re Omnicare, 769 F.3d at 461), that demands even more—the complaint must "specify each statement alleged

11

to have been misleading" as well as the "reason or reasons why the statement is misleading." Doshi, 386 F. Supp. 3d at 826.

Defendant Bloom and the Walgreen Defendants both seek dismissal of Plaintiffs' claims. The Court addresses each Motion in turn, explaining its position. Bloom argues that Plaintiffs fail to adequately plead two elements of their cause of action—material misrepresentation and scienter. Because the Court agrees with Bloom as to certain statements but does not agree as others, that Motion is **GRANTED IN PART** and **DENIED IN PART**. Walgreens seeks dismissal based on Plaintiffs' lack of standing and the Court agrees. Thus, that Motion is **GRANTED**.

## I.    Defendant Bloom's Motion to Dismiss

In his Motion to Dismiss, Mr. Bloom argues that Plaintiffs failed to establish the first and second elements of their cause of action for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5—material misrepresentation or omission and scienter. For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

### A. Legal Standards

#### 1. Element One: Material Misrepresentation or Omission

To establish a material misrepresentation or omission by a defendant, a plaintiff must allege facts that "demonstrat[e] two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." In re Omnicare, 769 F.3d at 470. A misrepresented or omitted fact is only material "if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available," or, put differently, "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding

12

how to vote." Id. at 472.  A statement is not material if it includes "vague, soft, puffing statements or obvious hyperbole upon which no reasonable investor would rely." Id. (internal citation omitted); City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 671 (6th Cir. 2005) (finding statements were "immaterial puffery" that were "loosely optimistic" and "insufficiently specific for a reasonable investor to 'find them important to the total mix of information available'"); Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 943 (6th Cir. 2009) ("mere corporate puffery" and "corporate optimism" do not create liability).  The Sixth Circuit has cautioned that, regarding materiality, courts must "tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context." In re Omnicare, 769 F.3d at 472; Doshi, 386 F. Supp. 3d at 828 ("Context matters when determining materiality.").

In a failure-to-disclose case, if a statement is found to be material, a court must find that the company had a duty to disclose.  This finding depends on whether the information is "hard" or "soft."

> A company has a duty to disclose hard information but not soft information unless other criteria are met. Hard information is typically historical information or other factual information that is objectively verifiable. Such information is to be contrasted with "soft" information, which includes predications and matters of opinion.  The failure to disclose soft information is actionable only if it is virtually as certain as hard facts.

Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008) (internal citations omitted).

The PSLRA also provides a safe-harbor provision that removes liability from statements that are future forecasts:

> [The safe harbor] provision excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance. A plaintiff may overcome this protection only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the

statement was not identified as "forward-looking" or lacked meaningful cautionary statements.

Id. (quoting Helwig, 251 F.3d at 547–48)).  Even if a company discloses that a statement is forward-looking, liability may still attach if the statement was made "in a misleading manner."  Id.  Disclosures about the future "must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts to the extent that the volunteered disclosure was misleading."  Id. (quoting Helwig, 251 F.3d at 564).

Whether a plaintiff is targeting misleading or false statements, or instead focuses on a defendant's omission(s)—a defendant's failure to disclose information when it had a duty to do so—"[m]isrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'"  In re Omnicare, 769 F.3d at 472. (quoting Sofamor Danek, 123 F.3d 394, 400 (6th Cir.1997)).  "In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant has a duty to disclose, and generally this duty does not apply to forecasts, or soft information."  In re Envision Healthcare Corp. Sec. Litig., No. 3:17-CV-01112, 2019 WL 6168254, at *8 (M.D. Tenn. Nov. 19, 2019) (citing Zaluski, 527 F.3d at 571.)

At bottom, materiality is a fact question, which the Sixth Circuit has cautioned "typically should not be decided" at the motion to dismiss stage.  Id. (quoting Stephen M. Bainbridge & G. Mitu Gulati, How Do Judges Maximize? (The Same Way Everybody Else Does—Boundedly): Rules of Thumb in Securities Fraud Opinions, 51 Emory L.J. 83, 115 (2002)).  Otherwise, courts risk "prematurely dismissing suits on the basis of our intuition."  In re Omnicare, 769 F.3d at 472.

14

### 2. Element Two: Scienter

To adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Courts follow a three-part test to assess the sufficiency of a plaintiff's scienter allegations. In re Omnicare, 769 F.3d at 473. First, the court must accept all allegations in the complaint as true. Id. Second, a court must consider the complaint in its entirety and decide whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (internal citation and marks omitted). Third, if the plaintiff's allegations create a "powerful or cogent" inference of scienter, the court then must compare the inference with competing inferences and allow the complaint to go forward "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (internal citation and marks omitted).

When the defendant is an individual, as here, the Sixth Circuit set out the following factors for consideration in the scienter analysis:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

Id. (quoting Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001)). "The more of these factors that are present, the stronger the inference that the defendant made his statement with the requisite state of mind." Id.

The Court now turns to the challenged statements. The scienter element is only considered as to those statements for which materiality is adequately pled.

### B.  Challenged Statements

Plaintiffs allege that Mr. Bloom made six material falsehoods and/or omissions in calls with investors or press releases with the requisite scienter, some of which are grouped together for analysis. Defendant argues as to five of those statements that Plaintiffs fail to establish both elements. The Court addresses each of those statements in chronological order, ending the analysis with materiality where that element is not met.

#### 1.  December 20, 2016 Press Release

Beginning with the first alleged misstatements in the December 20, 2016 press release, Plaintiffs allege that, in stating that the transaction would be "a transformative event for Fred's Pharmacy that will accelerate our healthcare growth strategy through our acquisition of 865 new stores located in highly attractive markets," Mr. Bloom omitted material information regarding Fred's deficient capabilities and Defendants' failure and inability to demonstrate Fred's viability to the FTC as a divestiture buyer. Mr. Bloom argues that his statement that the transaction would be "transformative" is not material because it is a quintessential example of corporate puffery and/or a statement of opinion, and Plaintiffs have put forward no evidence that the statement was false or misleading when made. Plaintiffs respond that the statement was materially false and/or omitted material information necessary to make the statements not misleading.

16

The Court notes, at the outset, that Plaintiffs' Complaint nominally states that the statement was actionable as a material misstatement or, alternatively, because it omitted material information, but that Plaintiffs' specific allegations regarding this statement primarily concern alleged omissions, as outlined supra. (See also ECF No. 62 at PageID 1219 (summarizing Defendant's wrongful behavior as follows: "in repeated statements to investors, he hid highly material adverse information about an Asset Purchase Agreement that Bloom had inked with Walgreens and Rite Aid for Fred's to purchase 865 Rite Aid stores to be divested in connection with a merger between the drug store giants").) Regardless, the Court assesses whether Plaintiffs have adequately plead material misrepresentations or omissions. See Stein v. U.S. Xpress Enterprises, Inc., No. 1:19-CV-98, 2020 WL 3584800, at *20 (E.D. Tenn. June 30, 2020) ("alleged misrepresentations and alleged omissions are often complementary sides of the same coin").

As stated supra, "[m]isrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." In re Omnicare, 769 F.3d at 472 (internal citation omitted). The Court finds that the alleged misrepresentation at issue in the December 20, 2016 Press Release—that the transaction would be "a transformative event for Fred's Pharmacy that will accelerate our healthcare growth strategy through our acquisition of 865 new stores located in highly attractive markets"—is partially a statement of opinion and puffery and partially a forward-looking protected statement. Id. First, that the transaction is a "transformative event" is opinion and puffery, for which liability does not attach. In re Envision, 2019 WL 6168254, at *9 ("liability does not attach to mere corporate puffery or statements of corporate optimism") (citing In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004)). The statement

17

constitutes the opinion of Defendant and holds "no obvious, objective meaning to a reasonable investor. In re Yum! Brands, Inc. Sec. Litig., 73 F. Supp. 3d 846, 864 (W.D. Ky. 2014), aff'd sub nom. Bondali v. YumA Brands, Inc., 620 F. App'x 483 (6th Cir. 2015). Moreover, the opinion is not justified with reference to purported hard evidence. See id.

The next part of the statement, that the transaction will accelerate the healthcare growth strategy through store acquisition, is forward-looking, which brings it within the PSLRA limited safe-harbor for forward-looking statements. The safe-harbor "excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance." In re Envision, 2019 WL 6168254, at *15. "[A] person shall not be liable for any forward-looking statement (1) if the statement is identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, or (2) if the forward-looking statement is immaterial, or (3) if the plaintiff fails to prove that the forward-looking statement was made by or with the approval of an executive officer of the business entity and was made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." Burges v. BancorpSouth, Inc., No. 3-14-1564, 2015 WL 4198795, at *3 (M.D. Tenn. July 10, 2015) (citing 15 U.S.C. § 78u–5(c)).

Here, the statement announces what Defendant expects to happen, accompanied by a full paragraph which states that statements that are not historical facts are forward-looking statements "that involve risks and uncertainties," including as to "the Company's announced strategic plan, the success of announced acquisition activities and future growth trends in businesses acquired; general economic trends; risks related to the possibility that the transactions may not close . . . ." (ECF No. 57-3 at PageID 723.) Moreover, in the body of the press release, just a few sentences

18

before the challenged statement, the Company stated that the "[c]losing of the transaction is expected to take several months after Walgreens Boots Alliance's proposed acquisition of Rite Aid is completed and is subject to approval by the Federal Trade Commission as well as customary regulatory approvals and closing conditions." (Id. at PageID 722.)

What is more, Plaintiffs fail to allege how the statement is false or misleading, another basis of protection from liability for a forward-looking statement. That Fred's was going to need to improve its internal infrastructure in order to acquire the Rite Aid stores does not render the statement that the transaction would be "transformative" untrue. Indeed, it suggests that the transaction would be "transformative." And, as Defendant notes, Plaintiffs specifically allege in the Complaint that the deficiencies were not only known, but addressed in the Asset Purchase Agreement, wherein Walgreens would be providing the Company "commercial assistance" for up to two years. (ECF No. 57-1 at PageID 701; ECF No. 52 at ¶ 63.) This is also reflected in the Form 8-K filing, to which the December 20, 2016 press release was attached. (ECF No. 57-3 at PageID 716 ("Subject to and upon the occurrence of the initial closing, [Fred's], [Fred's wholly-owned subsidiary], Rite Aid and Walgreens have agreed to enter into a transition services agreement, pursuant to which Rite Aid and its affiliates will provide transitional services to [Fred's wholly-owned subsidiary] for a period of twenty-four months following the initial closing, which term may be extended for an additional six months by [Fred's wholly-owned subsidiary.")].) In sum, the Court finds that this statement is not actionable and there was no omission, and the Motion to Dismiss as to this statement is **GRANTED.**

### 2. January 30, 2017 Press Release

Turning next to the January 30, 2017 press release, the Parties' positions are best described as ships passing in the night. Plaintiffs allege that Mr. Bloom made three misleading

19

statements when he (1) "affirm[ed] that the asset purchase agreement [Fred's] entered into on

December 19, 2016 with Walgreens and Rite Aid remains in effect," (2) stated that the merger

agreement has "reinforce[d] the Company's confidence that the transaction is in the mutual best

interest of Fred's Pharmacy and its shareholders," and (3) communicated that "to the extent the

Federal Trade Commission ("FTC") requests that additional stores be sold, and Walgreens

agrees to sell such stores, Fred's Pharmacy has agreed to buy those stores."  In his Motion to

Dismiss, Defendant appears to seek dismissal only as to the second statement, regarding the

Company's confidence "that the transaction is in the mutual best interest" of the Company and

its shareholders,  (ECF No. 57-1 at PageID 686 (quoting ECF No. 52 at PageID 626)), on the

basis that the statement is corporate puffery or opinion.  Defendant does not challenge statements

1 and 3.

Plaintiffs' Response, however, argues in support of the materiality of statements 1 and 3,

but not statement 2.  (ECF No. 62 at PageID 1229 (describing the misleading statements from the

January 30, 2017 Press Release as "Fred's Asset Purchase Agreement with Walgreens remained

in effect and that, if requested, it would purchase more than 865 stores (¶ 78).)  Thus, Plaintiffs

appear to have waived any argument regarding statement 2.

Thus, the Motion to Dismiss statement 2 is **GRANTED**, but statements 1 and 3 remain in

the case.  However, the Court does not opine about whether statements 1 and 3 are adequately

alleged.

### 3.  April 6, 2017 Earnings Release and Earnings Conference Call

Turning next to the April 6, 2017 earnings release and earnings conference call, which

concerned fourth quarter 2016 earnings, Plaintiffs allege that the following statement from the

earnings release was materially false and/or omitted material information:

> The proposed acquisition of the stores, which are based in highly attractive markets, is a transformative event that will add substantial scale to the company and transform Fred's Pharmacy, the largest regional pharmacy player, into an even stronger competitor and the third-largest drugstore chain in the nation.

(ECF No. 52 at ¶ 92.)  According to Plaintiffs, the statement was misleading because it omitted the following: (a) a warning from the FTC Bureau of Competition indicating that it would not recommend approval of the merger with Fred's as the divestiture buyer; (b) that Fred's did not meet the FTC's criteria for a divestiture buyer; (c) that Fred's had known deficiencies, including IT, distribution, ERP, and supply chain and warehouse management; and (d) that Fred's lacked sufficient ability to acquire and operate the referenced divestiture stores on its own.  (ECF No. 62 at PageID 1225; see also ECF No. 52 at ¶ 93.)

As to the conference call, Plaintiffs contend that the following statements made by Defendant were materially false and/or omitted material information:

- "[T]he transformation of Fred's Pharmacy that has been underway for the past 18 months has been working."
- "[Fred's acquisition of the Rite Aid stores will be] a transformational event for our Company," and "Fred's Pharmacy remains committed to purchasing additional assets, including up to 1,200 Rite Aid stores to the extent necessary to obtain the FTC's approval of the transaction."
- "[A]s a reminder, the purpose of today's call is to discuss our earnings results and we would appreciate it if you would please keep your questions focused on that topic."
- "[W]e're collaboratively working on the biggest piece of that transformation with Rite Aid and Walgreens Boots Alliance."

(ECF No. 52 at ¶¶ 94, 95.)  Plaintiffs allege that these statements omitted the same material information as the related Press Release.

As with the previously addressed statements, Plaintiffs' allegations are framed as misrepresentations based primarily on assorted omissions.  In essence, Plaintiffs "plead[] a theory of liability for selective, incomplete disclosure"—that Defendant made the

21

statements in question despite being in possession of adverse information regarding, inter alia, the likelihood that the FTC Bureau of Competition would not recommend approval of the merger.  See City of Monroe, 399 F.3d at 675.

Specifically, Plaintiffs allege that Defendant became aware on March 14, 2017, that the FTC Bureau of Competition would not be recommending Fred's as a divestiture buyer.  On that date, Plaintiffs allege that representatives of Walgreens, Rite Aid, and Fred's (including Defendant Bloom, Fred's Chief Operating Officer—Healthcare and Fred's antitrust counsel), met with the FTC Bureau of Competition, and that, at that meeting, Plaintiffs

> are informed and believe that the FTC indicated to meeting participants that Fred's and Walgreens had not established that the proposed divestiture to Fred's would satisfy the FTC's criteria for maintaining competition, and, as a result, that the FTC Bureau of Competition would not recommend approval.

(ECF No. 52 at ¶ 85.)  Plaintiffs base this belief on information from a confidential witness (referred to in the Complaint as Confidential Witness 6 ("CW6")),[5] Fred's Senior Vice President of Human Resources, who worked for Defendant and Fred's during the class period.  CW6 alleges that Defendant Bloom and the Chief Operating Officer—

---

[5] Defendant challenges the reliability of the confidential witness statements in the Complaint, arguing that the statements are insufficiently particularized to be considered.  Indeed, "plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged."  Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1037 n.2 (6th Cir. 2016). "While ... anonymous sources are not altogether irrelevant to the scienter analysis, conclusory or vague allegations do not deserve much weight."  Ricker v. Zoo Ent., Inc., 534 F. App'x 495, 497 n.2 (6th Cir. 2013) (internal citation omitted).  Here, the Court finds that CW6's allegations are neither conclusory or vague, and that Plaintiffs' allegations are made with sufficient particularity to support the probability that a person in CW6's position, a Senior Vice President of Human Resources, would possess the information alleged, especially given that CW6 alleges that he/she was personally present at a meeting in Fred's executive conference room where Defendant informed senior management "that the FTC was unlikely to approve the deal."  (ECF No. 52 at ¶ 87.)

Healthcare were informed by the Bureau of Competition that "it believed that Fred's financial resources prevented the Bureau [] from recommending approval to the FTC commissioners so long as Fred's was the divestiture buyer." (ECF No. 52 at ¶ 86.) CW6 further alleges that, before the April 6, 2017 earnings release, Defendant Bloom held a meeting with senior management, including another confidential witness (Confidential Witness 3), in which "Bloom informed the rest of senior management that the FTC was unlikely to approve the deal." (ECF No. 52 at ¶ 87.)

Defendant argues that Plaintiffs allege no facts "that Bloom did not believe" that the transaction would indeed be "a transformative event," that Defendant was not "committed to the Divestiture Sale," "or that Fred's was [not] collaboratively working with Rite Aid and Walgreens after the March 2017 Meeting." (ECF No. 57-1 at PageID 694.) Defendant further contends that Plaintiffs' allegations amount to "fraud by hindsight," which are not actionable under the PSRLA. (Id. at 695.) Defendant also points to the cautionary language that accompanied both statements. The cautionary language included with the earnings release, "[c]ompletion of the transaction is subject to approval by the FTC, as well as other customary regulatory approvals and closing conditions," directly precedes the statement Plaintiffs challenge. (ECF No. 57-1 at PageID 687; ECF No. 57-7 at PageID 869.) The cautionary language provided during the earnings call, prior to Defendant's statements, was as follows:

> It should be noted that the Company's future results may differ materially from those anticipated and discussed in the forward-looking statements.

> Some of the factors that could cause or contribute to such differences have been described in the news release issued earlier today and the Company's annual report on Form-10-K and in other filings with the Securities and Exchange Commission. We refer you to these sources for more information.

23

(ECF No. 57-1 at PageID 687; ECF No. 57-8 at PageID 879.)

Regarding scienter, Defendant argues that Plaintiffs' allegations regarding the FTC Bureau of Competition's position on the merger are unavailing because CW6's allegations are insufficient to establish Defendant's scienter. (ECF No. 57-1 at PageID 701–02.) Defendant urges that Plaintiffs have attempted to compensate for a "lack of particularized factual allegations by claiming that the purported negative feedback at the March 14, 2017 meeting with the FTC must have meant that Bloom knew the Divestiture Sale was inescapably doomed." (Id. at PageID 1399.)[6] According to Defendant, there is a countervailing inference, that the FTC had not yet decided whether to approve the Divestiture Sale, which is "substantially more compelling." (ECF No. 57-1 at PageID 702.)

The Court examines both elements at issue as to these statements.

### i.    Materiality

Beginning with the materiality of the earnings release statement, first, it strongly echoes Defendant's statement in the December 20, 2016 press release, regarding the transaction being a "transformative event," and otherwise appears to be, in part, another statement of puffery and corporate optimism. See City of Monroe, 399 F.3d at 671. The forward-looking aspect of the statement, about what the Company will do in the future, as with the December press release, brings it into the limited safe-harbor provision. (See Section I.B.1., supra.)

---

[6] Plaintiffs challenge this characterization, stating "Plaintiffs allege that Bloom omitted known, material risks, not that failure was certain." (ECF No. 62 at PageID 1236.) However, the Court notes that, in the Complaint, Plaintiffs' described the merger as "already-dead" in its description of the April 6 earnings release and conference call. (ECF No. 52 at ¶ 9.)

24

However, Plaintiffs also allege that Defendant failed to disclose material information regarding the likelihood that the deal would not be approved, new information learned in March of 2017, which warrants analysis. The Sixth Circuit considered withheld information in City of Monroe. In that case, the plaintiffs brought suit against tire-makers, contending that public statements regarding the quality and safety of a line of Firestone's tires were actionable "because they were made while in possession of specific, adverse information undermining the truth of those statement, thereby engendering a duty to disclose known adverse information about the safety of Firestone's tires." 399 F.3d at 670. The statements in question spanned annual report statements and other public statements across a number of years, regarding the companies' confidence in Firestone's tires. Id. at 670–71. The Sixth Circuit affirmed the district court's finding that all of the challenged statements, save for one, were either "self-praise and confidence in [the company's] future" or "general optimism and defense of its products," and thus immaterial as a matter of law. Id. at 671 (internal citations omitted).

However, the lone statement that the Sixth Circuit found to be a material misrepresentation was Firestone's August 1, 2000 statement that "objective data clearly reinforces our belief that these are high-quality, safe tires." Id. at 672–73. The court found the context of that statement to be "telling," pointing to the fact that it was made after a number of adverse events related to the tires that occurred just the month before, including the filing of multiple lawsuits regarding the tire safety, and urgings from multiple safety groups that cars with those tires should be recalled. Id. at 672. Given this context, the court concluded that "[a] reasonable juror could infer that the 'objective data'

25

representation was a direct response to the lawsuits, or to the public challenges to the safety of Firestone's tires, or to both." Id. The court also found that a reasonable juror could conclude that the statement was a misrepresentation, absent a disclosure that numerous pieces of evidence (including Firestone's own random testing on the tires which showed issues with the tires and internal reports indicating that the tires accounted for the majority of Firestone's claims) suggested that "objective data" indicated that the tires might not be safe or high-quality. Id.

Contrast the facts in City of Monroe with the facts here. Here, it is not clear that a reasonable juror would infer that the generic statement regarding the transaction being transformative was a direct response to the Bureau of Competition's indication roughly three weeks earlier that it would not recommend approval of the deal, unlike in City of Monroe, where the connection between the challenged statement and omitted information was close. Additionally, the statement here does not assert that approval of the deal was likely, which would have obfuscated the fact that Defendant had in fact been informed that approval would not be recommended, contrary to City of Monroe, where the challenged statement was in direct opposition to the omitted information. City of Monroe does not counsel in favor of Plaintiffs' position on this statement.

It is worth returning to the purpose of the safe-harbor. As the Sixth Circuit stated in Helwig, Congress created the safe-harbor by drawing on the "bespeaks caution" doctrine, "which states that 'beliefs about future statements which turn out to be incorrect are not actionable under Section 10(b) if the statements contain sufficient cautionary language.'" 251 F.3d 540, 559 (6th Cir. 2001) (quoting Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir. 1993)). Here, the earnings release statement is more akin to the statements

26

the City of Monroe court found nonactionable, which even included the statement that the company had "no reason to believe there is anything wrong with" defendant's tires despite adverse information undermining that statement. City of Monroe found this and other statements were "best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to 'find them important to the total mix of information available.'" 399 F.3d at 671 (quoting In re Ford, 381 F.3d at 570–71)). Thus, the Motion to Dismiss as to this earnings release statement is **GRANTED.**

However, the Court finds that Defendant's conference call statements, save for the statement regarding the transaction being a "transformational event," are material. The statements that "the transformation of Fred's Pharmacy that has been underway for the past 18 months has been working," that Fred's "remains committed to purchasing additional assets, including up to 1,200 Rite Aid Stores to the extent necessary to obtain to the FTC's approval of this transaction," and that Fred's "is collaboratively working on the biggest piece of that transformation with Rite Aid and Walgreens Boots Alliance," are more akin to the "objective data" statement in City of Monroe, such that a reasonable jury could find that these statements are a response to the FTC Bureau of Competition's indication that it would not recommend approval, and are without qualification or disclosure of evidence that suggested that FTC approval was unlikely. See 399 F.3d at 672. Moreover, the allegation regarding the FTC Bureau of Competition's indication that it would not recommend approval is arguably a piece of hard information (rather than soft) that was subject to disclosure. See Zaluski, 527 F.3d at 574 (6th Cir. 2008). Plaintiffs allege that Defendant was directly informed that the FTC Bureau of Competition would not recommend approval of the merger with Fred's as the divestiture

27

buyer on March 14, 2017, which he then shared with senior management before the earnings release and conference call.  (ECF No. 52 at ¶¶ 85, 86, 87.)  Despite this negative outlook, Defendant did not change his remarks to investors and analysts.  (Id. at ¶ 87.)

Indeed, Plaintiffs also allege that this information was not lost on the Rite Aid and the Walgreens Defendants, who, according to Plaintiffs, began having discussions on or before March 17, 2017 with the FTC Bureau of Competition without Fred's or Fred's representatives.  (Id. at ¶ 88.)  This information flies in the face of, or at least undermines, the statements that "the transformation . . . has been working," that Fred's "remains committed to purchasing additional assets . . . to the extent necessary to obtain the FTC's approval of the transaction," and suggesting that the "biggest piece of that transformation" was the merger.

While this may be a closer call, the Court must balance the Supreme Court's instruction that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information," Basic, 485 U.S. at 240, against the same Court's instruction that "the materiality requirement is not to 'attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of [opinion statements],' but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." In re Omnicare, 769 F.3d at 471–72 (quoting Basic, 485 U.S. at 234)).  As stated supra, materiality "typically should not be decided" at the motion to dismiss stage, In re Envision, 2019 WL 6168254, at *8, because otherwise courts risk "prematurely dismissing suits on the basis of our intuition." In re Omnicare,

28

769 F.3d at 472.  With this in mind, the Court finds that Plaintiffs adequately allege that Defendant's assurances in the conference call regarding the merger were misleading in their failure to disclose the FTC Bureau of Competition's indication that it would not recommend approval of the merger with Fred's as the divestiture buyer.

### ii.    Scienter

The next element, scienter, requires that Plaintiffs adequately plead a "mental state embracing intent to deceive, manipulate or defraud."  In re Omnicare, 769 F.3d at 472.  As outlined supra, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  City of Monroe, 399 F.3d at 682.  A court's task is "to determine whether the Complaint alleges facts that, if true, would, by forming the basis for a strong inference, 'convince a reasonable person that the defendant knew a statement was false or misleading.'"  Id. (quoting Adams v. Kinder–Morgan, Inc., 340 F.3d 1083, 1105 (10th Cir.2003)).

To begin, the Court rejects Defendant's argument that Plaintiffs' pleading amounts to "fraud by hindsight."  Plaintiffs do not allege that there was a problem barring FTC approval that Defendant was unaware of, nor that Defendant was unaware that the FTC Bureau of Competition had indicated that it would not be recommending approval of the merger with Fred's as the divestiture buyer.  See In re SmarTalk Teleservices Sec., Inc. Litig., 124 F. Supp. 2d 505, 516 (S.D. Ohio 2000) (finding that allegations that an auditor's failure to discover accounting errors was insufficient to state a claim for securities fraud under 10(b) against the auditor).  Rather, they plead the opposite—that Defendant did know of the FTC's position.  (ECF No. 52 at ¶¶ 86, 87.)  Defendant's argument is misplaced.

29

Turning back to the statements in question, the Court finds that multiple Helwig factors are apparent in Plaintiffs' allegations. First, there is a "divergence between internal reports and external statements on the same subject." Helwig, 251 F.3d at 552. Here, the FTC Bureau of Competition's indication that it would not recommend approval diverges from Defendant's representation that the transformation "has been working." The Court also notes that the FTC Bureau of Competition's indication that it would not recommend approval came three months after the FTC issued the Second Request, which it had done instead of approving the transaction. (ECF No. 52 at ¶ 43.) According to Plaintiffs, "[t]he FTC issues Second Requests in less than 3% of cases." (Id. at Para. 28.) Per Plaintiffs' allegations, Fred's was already on shaky ground in light of the FTC's decision to issue a Second Request, and, months after that, the Bureau of Competition indicated that it would not recommend approval. Thus, this factor supports scienter as to the first statement.

This factor also supports the presence of scienter as to the other statements, though to a lesser extent. The statements that (1) Fred's remained "committed to purchasing additional assets" and (2) that Fred's was "working collaboratively [on the merger] with Rite Aid and Walgreens Boots Alliance" do not diverge as strongly from the FTC Bureau of Competition's indication that it would not recommend approval, given that Plaintiffs otherwise allege that, as of May 8, 2017, Fred's, Walgreens, and Rite Aid were continuing with the process with the FTC. (ECF No. 52 at ¶ 102.) Indeed, Plaintiffs allege that the Parties certified substantial compliance with the FTC's Second Request on May 8th, which triggered a 60-day waiting period for the FTC to either allow the merger or file a lawsuit to block it. (Id.) Nevertheless, the statements about

30

continuing forward still diverge from the internal knowledge about the FTC's position against the merger, as well as the fact that Walgreens and Rite-Aid were pursuing a path that did not include Fred's.

As for the temporal proximity Helwig factor, there is a relative closeness in time between the statement regarding how the transformation "has been working" and the later disclosure of inconsistent information, in this case, that the merger would not go forward. As Plaintiffs allege, Rite Aid disclosed in a press release less than three months after the statement that "the decision to terminate the merger agreement follows feedback received from the FTC that led the company to believe that the parties would not have obtained FTC clearance to consummate the merger."  (ECF No. 52 at ¶ 11.)  If Rite Aid lost faith following this feedback, it is reasonable to conclude that Defendant did, too, which means the statement was made around the same time that Defendant had reason to know that the deal would not occur.  The other statements at issue also find support from this factor, as there was the same closeness in time between the other challenged statements made on the call, specifically that Fred's remained committed to the purchases and that the three companies were working collaboratively on the merger, and the FTC's negative position followed by the announcement that the merger was off.

The factor concerning "disregard of the most current factual information before making statements" also weighs in favor of a finding of scienter, as the most current information suggested that the merger would not go through.  Finally, as to whether there was a "self-interested motivation of defendants in the form of saving their salaries or jobs," Helwig, 251 F.3d at 552, Plaintiffs' only relevant allegation is that, before the call, Defendant "had already prepared his remarks for Fred's earnings release and related

31

conference call, and did not want to disclose the FTC's likely objection." (ECF No. 52 at ¶ 87.) While it may be implied that Defendant did not disclose the FTC Bureau of Competition's indication regarding the merger because he wanted to save his salary or his job, this is not alleged. Thus, this factor does not support a finding of scienter.

The Helwig factors are essentially split: some weigh in favor, some do not, and some simply do not apply. At bottom, the Court is charged with scrutinizing the allegations "holistically," to determine whether an inference of scienter is "cogent and at least as compelling as any opposing inference of non-fraudulent conduct." Burges, 2015 WL 4198795, at *6. Plaintiffs allege that Defendant knew that FTC approval was unlikely, just weeks before Defendant stated that the transformation, undertaken to get FTC approval, "has been working." Flowing from this alleged omission are Plaintiffs' other alleged omissions, among them that Defendant knew and did not disclose that Fred's had considerable technical deficiencies that would impede FTC approval. While the Asset Purchase Agreement stated that Walgreens would provide Fred's with commercial assistance, this was apparently not enough for the FTC to believe that approval should be granted. Moreover, Plaintiffs allege that Walgreens and Rite Aid began meeting without Fred's shortly after the March 14, 2017 meeting in which they learned the FTC Bureau of Competition's position. Taken together, the Court finds that these allegations are sufficient to give rise to a strong inference that Defendant acted with scienter as to his representations and omissions during the conference call. Thus, the Motion to Dismiss as to the conference call statements is **DENIED**.

32

### 4. April 13, 2017 Form 10-K

The Court turns last to the April 13, 2017 Form 10-K.  Plaintiffs allege that Defendant made the following statements that were materially false and misleading and/or omitted material information necessary to make the statements not misleading:

- "[Fred's is] the country's fourth-largest drug store chain and a leading regional pharmacy with deep experience across a spectrum of large, medium and small markets." (ECF No. 52 at ¶ 98.)
- Fred's agreed to purchase 865-1,200 Rite Aid stores and was working to "obtain FTC approval"  (Id. ¶ 99.)
- "The proposed acquisition of the stores, which are based in highly attractive markets, is a transformative event that will add substantial scale to the Company and make Fred's an even stronger competitor and the third-largest drugstore chain in the nation."  (Id. ¶ 99.)

As to the first statement, Plaintiffs allege that it was materially false and/or misleading because as of April 13, 2017, Fred's was not, in fact, "the country's fourth-largest drug store chain" and Fred's did not have "deep experience" operating pharmacies "across a spectrum of large, medium and small markets."  (Id. ¶ 98.)  As to the second and third statements, the second a combination of two statements, Plaintiffs allege the same omissions as those connected to the April 6 earnings release and conference call, which includes, inter alia, the knowledge that the FTC Bureau of Competition had indicated to Defendant that it would not recommend approval of the merger with Fred's as the divestiture buyer.

Defendant argues that the first statement is not material because Plaintiffs "fail to explain how this 'altered the total mix of information made available' by Fred's when considered in context, or otherwise changed their investment decision."  (ECF No. 57-1 at PageID 692 (quoting Matrixx, 563 U.S. at 38).)  Defendant also contends that the statement regarding Fred's "deep experience" is a nonactionable statement of opinion.  Plaintiffs do not respond to this argument nor otherwise argue why this statement is material, nor how scienter is established.

(See ECF No. 62.)  The Court agrees with Defendant.  Even taking as true that Fred's was not the fourth largest pharmacy and did not have "deep experience" across a range of markets, these statements would be unlikely to "significantly alter[] the total mix of information available."  In re Omnicare, 769 F.3d at 472.  Moreover, the Court does not conclude that "there is a substantial likelihood that a reasonable shareholder would consider [these statements] important in deciding how to vote."  Id. (quoting Basic, 485 U.S. at 231).  Thus, Defendant's Motion as to the first statement is **GRANTED**.

As to the remaining statements, Defendant argues that these are nonactionable because the alleged omissions are statements of opinion from confidential witnesses and a mere "prediction" by the FTC Bureau of Competition that was offered at the March 2017 meeting. The Court's findings as to the April 6 statements and omissions are largely applicable here. Defendant represented that it was working to obtain FTC approval for the purchase of 865-1,200 stores and detailed what the transaction would do for the Company (e.g., making it the third-largest pharmacy), but withheld information regarding the news that FTC approval for the merger would not be recommended.   As with the April 6 conference call, the Company's mention of its effort to "obtain FTC approval" is reasonably interpreted to be in response to the indication that it would not get such approval, and thus is material.  The scienter analysis is also largely the same, as the timing, knowledge, and holistic picture are the same.  As such, the Court finds that an inference of scienter as to these statements remains "cogent and at least as compelling as any opposing inference of non-fraudulent conduct."  Burges, 2015 WL 4198795, at *6.  Thus, the Motion to Dismiss as to the second and third statements is **DENIED**.

34

### C.  Control-Person Liability Under § 20(A)

Defendant argues in one sentence that, because Plaintiffs have failed to state a claim for securities fraud, Plaintiffs' control person claim must likewise fail.  (ECF No. 57-1 at PageID 703.)  Because the Court finds that Plaintiffs have stated a claim as to some statements at this stage, this aspect of Defendant's Motion is **DENIED AS MOOT.** See Indiana State, 583 F.3d at 947 ("When a primary violation of securities law is shown, that provision imposes joint and several liability on 'controlling persons.'").

## II.   Walgreens Defendants' Motion to Dismiss

The Walgreens Defendants argue that Plaintiffs face a threshold issue in bringing a federal securities claim against them—standing.  According to the Walgreens Defendants, Plaintiffs cannot assert a federal securities claim against them based on Plaintiffs' purchase of stock in Fred's, a different company.  Plaintiffs counter that precedent permits liability to extend to third parties.  The Court agrees with the Walgreens Defendants.

The Walgreens Defendants begin by urging that, pursuant to Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), the class of investors who can assert securities fraud must be narrowly defined, a principle that courts have reinforced time and again.  In Blue Chip Stamps, the Supreme Court reviewed whether a claimant can sue under Section 10(b) and Rule 10b-5 without having bought or sold the securities described in the misleading statements at issue.  Id. at 728.  Put simply, the question before the Court was whether the Exchange Act "protects a person who did not actually buy securities, but who might have done so had the seller told the truth." Ross v. Abercrombie & Fitch Co., 257 F.R.D. 435, 448 (S.D. Ohio 2009) (quoting Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 594 (2001)).  The plaintiff class alleged that they were harmed under Rule 10b-5 when defendants made overly pessimistic

35

statements about their status and future prospects after a reorganization into a newly formed corporation so that plaintiffs would not purchase shares in the new entity.  Id. at 726–27.

Observing the "widespread recognition that litigation under Rule 10b-5 presents a danger of vexatiousness" beyond that found in general litigation, and Congress's failure to reject longstanding judicial acceptance of a narrow interpretation of Rule 10b, the Court declined to allow an exception to the general rule that a plaintiff who is neither a purchaser or seller of securities does not have standing to state a claim for securities fraud.  Id. at 733, 739, 754–55.  In essence, the Court concluded that "allowing a cause of action for non-purchasers would lead to an unacceptable level of abusive litigation."  Ontario Pub. Serv. Employees Union Pension Tr. Fund v. Nortel Networks Corp., 369 F.3d 27, 32 (2d Cir. 2004).

While this general rule and the Supreme Court's policy concerns cut against Plaintiffs, who make no allegation that they purchased or sold Walgreens securities, the Court nevertheless reviews additional authority for support.  To that end, Defendants point to multiple subsequent decisions outside of this circuit where shareholders of one company were found not to have stated a claim for securities fraud against another company.  See Nortel, 369 F.3d at 28; In re: Altisource Portfolio Sols., S.A. Sec. Litig., 2015 WL 12001262, at *3–4 (S.D. Fla. Sept. 4, 2015); Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr. I, 361 F. Supp. 3d 1162, 1166–71 (W.D. Okla. 2019); LightSquared, Inc. v. Deere & Co., 2015 WL 585655, at *1, *18 (S.D.N.Y. Feb. 5, 2015), aff'd sub nom., Harbinger Capital Partners LLC v. Deere & Co., 632 F. App'x 653 (2d Cir. 2015).

In Nortel, plaintiffs alleged that, because they had bought securities from a company that had a business relationship with a second company, Blue Chip Stamps did not bar them from bringing suit against the second company for alleged material misstatements.  369 F.3d at 32.

36

The Second Circuit rejected this interpretation, finding that it would be at odds with Blue Chip Stamps purchaser-seller requirement, which "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates."  Id. (quoting Blue Chip Stamps, 421 U.S. at 747).  The court also noted that allowing plaintiffs to bring suit "would encourage individuals to engage in potentially abusive litigation."  Id. at 33.

Plaintiffs argue that Nortel supports extending liability to a second company, pointing to a single sentence from the opinion, in which the court quotes Blue Chip Stamps' holding that the purchaser-seller requirement "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omissions relates."  Nortel, 369 F.3d at 32 (emphasis added) (quoting Blue Chip Stamps, 421 U.S. at 747).  Plaintiffs make hay of the word "relates," urging that because the Walgreens Defendants' alleged misrepresentations "relate" to Plaintiffs' shares in Fred's, they have standing to assert claims against the Walgreens Defendants.  But Nortel expressly rejected this position.  As here, the plaintiffs in Nortel "purchased securities of a company that had a business relationship with the misrepresenter."  Id. As a result, the plaintiffs claimed "that they [] met the Blue Chip Stamps standing requirements because they purchased the security at issue in the lawsuit."  Id.  The court rejected plaintiffs' desired interpretation—that Section 10(b) and Rule 10b-5 create universal standing for purchasers of securities—and held that it was "entirely at odds" with Blue Chip Stamps' purchaser-seller requirement.  Id.

Plaintiffs also point to a later decision in the Second Circuit, In re NYSE Specialists Litig., 503 F.3d 89 (2d Cir. 2007), which they urge supports their interpretation of Nortel. Though NYSE found that the lower court had misinterpreted its holding in Nortel, the court did not make any pronouncement that supports Plaintiffs' position here.  NYSE clarified that Nortel

37

did not stand for the proposition that liability under Rule 10b-5 for false statements can <u>only</u> lie against the issuer.  <u>Id.</u> at 102.   Rather, they concluded that such a reading would improperly immunize parties who the court held should not be beyond the reach of Rule 10b-5: underwriters, brokers, bankers, and non-issuer sellers.  <u>Id.</u>   As <u>NYSE</u> explained, though <u>Nortel</u> does not stand for the proposition that only the issuer can be liable, <u>Nortel</u> found no liability as to the defendant because the connection between the defendant's false statements about itself and the plaintiff's purchase of a different company's stock "was too remote to sustain an action under Rule 10b-5." <u>Id.</u>

Altisource further illustrates this point.  There, plaintiffs were stockholders in a company providing technology services for a mortgage servicer.  The plaintiffs brought claims under Section 10(b) and Rule 10b-5 against the mortgage servicer, from which they had not bought any stock, alleging that the mortgage servicer had "made statements directly" to them about the company in which they <u>had</u> bought stock, as well as the relationship between that company and the mortgage servicer.  2015 WL 12001262, at *4.  The plaintiffs further urged that the business relationship between the two companies was so close as to warrant a finding of standing.  <u>Id.</u> However, as the court observed, the plaintiffs failed to cite any case finding standing in similar circumstances.  The court reviewed the facts and holdings in <u>Blue Chip Stamps</u> and <u>Nortel</u> and found no standing, despite statements "covering the relationship between [the two companies,]" even a "substantial" relationship.  <u>Id.</u> [7]

---

[7] <u>Altisource</u> is also fatal to another of Plaintiffs' arguments, that, as long as alleged misrepresentations or omissions "relate" to their stock purchases, they have standing.   The <u>Altisource</u> plaintiffs attempted a similar argument that they had standing because the defendant mortgage servicer made statements about the company from which they had purchased stock, which was rejected.  <u>Id.</u> at *4.

Plaintiffs attempt to summon authority for the proposition that investors can bring suit against third parties who make statements about the securities at issue.  See Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 267–68 (6th Cir. 1998) (en banc); Cosby v. KPMG, LLP, No. 3:16-CV-121-TAV-DCP, 2018 WL 3723712, at *1 (E.D. Tenn. Aug. 2, 2018); In re Nat'l Century Fin. Enters., Inc., Inv. Litig., 541 F. Supp. 2d 986, 997–99 (S.D. Ohio 2007). However, as the Walgreens Defendants point out, this authority all relates to whether agents of an issuer, such as the issuer's attorney, auditor, or underwriter, can be liable for securities fraud. For example, in Rubin, the court held that a duty to disclose "naturally devolves on those who have direct contacts with the other side."  143 F.3d at 267 (internal citation and marks omitted). The court stated that "direct contacts" may take many forms, including an accountant or a lawyer, who, in preparing a dishonest statement, are "primary participant(s) in a violation even though someone else may conduct the personal negotiations with the security purchaser."  Id. Thus, the court addressed the question of whether a security seller's representative or agent has as much of a duty to disclose as the security seller itself.  Id. at 268.  Unlike Rubin, Walgreens is not a representative or agent of Fred's, thus Rubin provides no support for Plaintiffs' position.

Cosby and National are no different.  In Cosby, the defendant auditor prepared the security issuing company's audit reports included in the company's 10-K filings that contained inflated asset values.  2018 WL 3723712, at *2.  In National, the plaintiffs alleged that the defendant underwrote and managed notes issued by securitization programs and prepared offering materials in connection with plaintiffs' note purchase.  541 F.Supp.2d at 992, 996–97. These facts are plainly distinguishable from the facts at bar, which share much more in common with the out of circuit cases described supra.

Otherwise, courts in this circuit have cited Blue Chip Stamp's central holding approvingly.  In Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979), the Sixth Circuit confirmed that Blue Chip Stamps adopted the Birnbaum rule "limit[ing] standing in Section 10(b)/Rule 10b-5 cases to actual purchasers and sellers of securities." Id. at 1030.  And more recently, in Ross, 257 F.R.D. at 449, the court observed that Blue Chip Stamps "requires a plaintiff to be a purchaser or seller," subject to a caveat regarding plaintiff's participation in that purchase or sale that has no bearing to the facts here.  Id.

Given this authority, the Court finds that Plaintiffs do not have standing to bring their claims against the Walgreens Defendants.  Thus, the Walgreens Defendants' Motion to Dismiss is **GRANTED**.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Bloom's Motion to Dismiss and **GRANTS** the Walgreens Defendants' Motion to Dismiss.

**IT IS SO ORDERED**, this 31st day of March, 2021.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE